**GREENBAUM, ROWE, SMITH & DAVIS LLP**
David L. Bruck, Esq.
P.O. Box 5600
Woodbridge, New Jersey 07095 Telephone: (732)
549-5600 Facsimile: (732) 476-2441
dbruck@greenbaumlaw.com *Counsel to the Debtors and
Debtors in Possession, Atlantic Neurosurgical
Specialists, P.A. and ANS Newco LLC*

**FOX ROTHSCHILD LLP**
Joseph J. DiPasquale, Esq.
Michael R. Herz, Esq.
Agostino A. Zammiello, Esq.
49 Market Street
Morristown, New Jersey 07960 Telephone: (973) 992-4800
Facsimile: (973) 992-9125 jdipasquale@foxrothschild.com
mherz@foxrothschild.com azammiello@foxrothschild.com
*Counsel to the Debtor and Debtor in Possession, Hanover Hills Surgery Center*

Order Filed on December 26, 2024
by Clerk
U.S. Bankruptcy Court
District of New Jersey

### IN THE UNITED STATES BANKRUPTCY COURT FOR
### THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re:<br><br>**ATLANTIC NEUROSURGICAL**<br>**SPECIALISTS, P.A.** *et al,*[1]<br><span style="padding-left:8em">Debtors.</span> | Chapter 11<br><br>**Case No. 24-15726(VFP)**<br><br>**Jointly Administered** |

## ORDER GRANTING THE DEBTORS' MOTION FOR AN ORDER APPROVING THE SETTLEMENT BY AND BETWEEN THE SETTLING PARTIES[2]

The relief set forth on the following page two (2) is hereby **ORDERED**.

**DATED: December 26, 2024**

_____
**Honorable Vincent F. Papalia**
**United States Bankruptcy Judge**

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are: Atlantic Neurosurgical Specialists, P.A., d/b/a Atlantic Neurosurgical (0733); ANS Newco, LLC, d/b/a Altair Health (7893); and Hanover Hills Surgery Center LLC, (8645).
[2] The term "Settling Parties" as used herein includes Key Bank, the Debtors, the Committee, the ANS Group, the Borrower Group and the Settling Shareholders

9555554.1

Upon consideration of the Motion (the "Motion") of Atlantic Neurosurgical Specialists, P.A. (the "Debtor") for an order approving the settlement by and between the Settling Parties* and a hearing having been held on December 23, 2024 (the "Hearing") at which counsel were present either in the Court or by Court Solutions, and the Court having heard the presentation of the settlement and counsel to the Parties having commented on the record, and due notice having been given, and for the reasons set forth on the record at the Hearing; it is hereby

**ORDERED** as follows:

1.    The Motion is **GRANTED** as set forth herein.

2.    The Settlement Agreement attached as Exhibit A is hereby **APPROVED**;

3.    The Settling Parties are authorized to immediately implement the terms of the Settlement Agreement.

4.    The stay set forth in Rule 6004 is waived.

5.    This Court shall retain jurisdiction to interpret and enforce the terms of the Settlement Agreement and this Order.

*Capitalized terms not otherwise defined in this Order shall have the meanings ascribed to them in the Motion.

9555554.1

Execution Copy

# SETTLEMENT AGREEMENT

## December 23 2024

### 1. Settlement Participants.

The following parties (each a **"Party"** and collectively **"Parties"** are participants in this agreement ("the **Settlement Agreement "**), which constitutes a supplement to the Plan. In the event of inconsistencies between the Settlement Agreement and the Plan (defined below and attached hereto as **Exhibit A**), the Plan controls.

    A.    **KeyBank National Association** (the "**Bank**").

    B.    **Continuum Institute Atlantic, LLC,** a Delaware limited liability company ("**Continuum Institute Atlantic**"), **Florham Park Investors, LLC**, a Delaware limited liability company ("**Florham Park**"), **Continuum Institute, LLC**, a Delaware limited liability company ("**Continuum Institute**"), **ANS Continuum Holdco, LLC.** a Delaware limited liability company ("**ANS Continuum**"), **Hanover Hills Surgery Center LLC**, a New Jersey limited liability company, **Lorient Capital Management, LLC** a Delaware limited liability company("**LCM**"), and **Lorient Continuum Investors, LLC ("LCI**") (collectively the "**Borrower Group**").

    C.    **Atlantic Neurosurgical Specialists, P.A.,** a New Jersey professional association ("**ANS**"), the individual shareholders of ANS Founders PC who elect to participate as set forth below or in the Plan (each a "**Settling Shareholder**"). ANS Founders PC ("**Founders**") and ANS Newco, LLC. ("**Newco**"). New Jersey Pain Consultants, P.C. (**NJP**), Morristown Intraoperative Monitoring. P.C. (**MIMO**), ANS, the Settling Shareholders, Founders Newco, NJP and MIMO are referred to collectively as the ("**ANS Group**").

    D.    On June 27 , 2024 the Office of the United States Trustee formed a committee of unsecured creditors (the "**Committee**").

### 2. Certain Defined Terms.

    All capitalized terms used but not otherwise defined in this Settlement Agreement shall have the same meanings ascribed to them in the Plan. All other defined terms are defined below:

    (i)    "**ANS Cases**" means the Chapter 11 Cases of the ANS Debtors.

    (ii)    "**ANS Bank Claims**" means all Claims (including, but not limited to, direct, indirect, derivative, statutory, third party, or claims of any kind or nature) alleged or held by the Bank against the ANS Group and any shareholder (not a Settling Shareholder) of any one of them, in each case arising prior to the filing of the Chapter 11 Cases; provided that under the Settlement Agreement and subject to approval of the Bankruptcy Court, the ANS Bank Claims includes the claims held by one or more of the Borrower Group against one or more of the

Docusign Envelope ID: C98820E7-C3E1-4996-91EF-9A703FF0123E

Execution Copy

ANS Group and any shareholder of any one of the ANS Group who is not a Settling Shareholder. The Bank and the Borrower Group represent that all of the Borrower Group's Claims against the ANS Group and any shareholder of any one of the ANS Group who is not a Settling Shareholder have been absolutely and forever assigned without reservation to the Bank.  The Claims of the Borrower Group may be asserted solely by the Bank in the Chapter 11 Cases or otherwise and such Claims shall be payable only to the Bank.

(iii)    "**Approval Order**" means an Order entered by the Bankruptcy Court in these Chapter 11 Cases approving the within Settlement Agreement.

(iv)    "**Budget**" means budget for the go-forward operation of the Debtors and funding of these Chapter 11 Cases through February 15, 2025. The Budget is attached hereto as Exhibit B.

(v)    "**Effective Date**" means the estimated date when the Plan having been confirmed goes effective.

(vi)    "**GRSD**" means Greenbaum, Rowe, Smith & Davis LLP.

(vii)    "**Debtor Hanover Hills**" means Hanover Hills Surgery Center LLC.

(viii)    "**HH Chapter 11 Case**" means the bankruptcy case filed by Debtor Hanover Hills.

(ix)    "**HH Bank Claims**" means all Claims of the Bank against the Debtor Hanover Hills arising under the Loan Documents.

(x)    "**Loan Documents**" means the documents and agreements executed by the Borrower Group in favor of the Bank evidencing the indebtedness of the Borrower Group to the Bank.

(xi)    "**Plan**" means the chapter 11 Amended Combined Disclosure Statement and Plan attached as Exhibit A to this Settlement Agreement and to which the Parties consent.

(xii)    "**Related Parties**" means, (i) with respect to an Entity, all of that Entity's past and current officers, directors, managers, managing members, principals, shareholders, members, partners, employees, agents, advisors, attorneys, professionals, accountants, investment bankers, consultants and other representatives; (ii) GRSD, Fox Rothschild, Epstein Becker & Green, Cole Schotz, Garfunkel Wild, Hellring Lindeman Goldstein and Siegal LLP, McCarter and English, Riker Danzig, Chiesa Shahinian & Giantomassi PC, B Riley, and LBCM Healthcare [name any financial advisors to the Settling Shareholders to be included]; and (iii) such Person's respective heirs, executors, estates, servants and nominees, in each case in their capacity as such; *provided, however*, Related Parties exclude any of the above in such capacity for a Shareholder who is not a Settling Shareholder.

(xiii)    "**Released Claims**" means all Claims of any kind including direct, indirect, statutory, derivative and third-party Claims released by the releasor.

Docusign Envelope ID: C98820E7-C3E1-4996-91EF-9A703FF0129E

Execution Copy

(xiv)   "**Retained Professionals**" means professionals retained by the Estates: GRSD, Fox Rothschild, Epstein Becker & Green, B. Riley, and EPIQ

(xv)   "**Rule 6004**" means the Bankruptcy Rule providing for a stay of the implementation of a bankruptcy Court Order for 14 days for certain transactions.

(xvi)   "**Settlement Contribution**" means the contribution by each Settling Shareholder to the ANS Debtors as provided in Section 3(A) of this Settlement Agreement and in the Plan.

(xvii)   "**Settlement Motion**" means the Rule 9019 motion to be filed in the Chapter 11 Cases seeking approval by the Bankruptcy Court of the Settlement Agreement.

(xviii)   "**Shareholders**", and each a "**Shareholder**," mean the eight (8) holders of equity interests in ANS Founders, Drs. Ronald Benitez, Kyle Chapple, Yaron Moshel, Jonathan Baskin, Jay Chun, John Knightly, Scott Meyer and Paul Saphier.

(xix)   "**Trust Account**" means the trust account of GRSD.

(xx)   "**Year End Bank Settlement Distribution**" means the distribution to the Bank in the amount of $2,500,000 to be made by the ANS Debtors to the Bank following the entry of an Approval Order.

3.   **Basic Terms of Shareholder Settlement.**

The Parties agree, subject to the conditions set forth herein, and with the understanding that once approved by the Bankruptcy Court the terms of the Settlement Agreement, which to the extent consistent with the Plan, shall be incorporated in the Plan; and that this Settlement Agreement, as incorporated into the Plan, achieves on the Effective Date of the Plan a final and global resolution of all disputes and Claims amongst each of them:

A.   The Shareholders identified below have elected to become Settling Shareholders under the Settlement Agreement and/or who opt-in to the Plan in accordance with the mechanism described in Article 10 of the Plan.   The Bank and the Committee agree that provided that the Settling Shareholders pay not less than the amounts set forth by their respective names, below and the aggregate amount of $3,000,000 to the Estate of Debtor ANS as and when provided in the Plan, that such payments from such Settling Shareholders, is adequate and sufficient consideration for the full, irrevocable  and complete releases contemplated to be delivered to each of the Settling Shareholders (which term is defined in the Plan to include their respective Affiliated Medical Practices) and Related Parties on the Effective Date of the Plan by the Bank, the Debtors, each of the Estates, the Borrower Group, the Lorient Parties and the Committee in favor of such Settling Shareholders (which include their respective Affiliated Medical Practices) and Related Parties.   The amount payable by each such Settling

Docusign Envelope ID: C98820E7-C3E1-4996-91EF-9A703FF0123E

Execution Copy

Shareholder is:

| | |
|---|---|
| Ronald Benitez | $500,000 |
| Yaron Moshel | $500,000 |
| Kyle Chapple | $500,000 |
| Jonathan Baskin | $500,000 |
| John Knightly | $500,000 |
| Jay Chun | $500,000 |

B.      The amounts set forth in Section 3(A) above shall be paid by each of the above Settling Shareholders to the Trust Account as provided in the Plan to be funded to Founders and then to the Debtors by GRSD on the Effective Date. Presently, GRSD holds in the Trust Account the aggregate amount of $600,000, which represents the good faith deposits from the above Settling Shareholders ($100,000 by each).

C.      In the event that the settlement contributions of the Settling Shareholders do not total the minimum gross amount of $3,000,000 then the Shareholder Settlement shall be revoked and be null and void as set forth in Article 10 of the Plan subject to a cure period of 3 business days (the "**Cure Period**"). In the event the event of default is cured during the Cure Period, the Settlement Agreement shall be deemed returned to good standing. In the event that the Settlement Agreement shall be revoked by written notice to the Parties, all funds in the Trust Account shall be returned by GRSD to each of the Shareholders making such a deposit. Additionally, in such event, the Debtors shall forfeit their exclusive right to file a plan of reorganization, and the Committee may proceed with doing so.

D.      Upon entry of the Approval Order by the Bankruptcy Court, the ANS Debtors shall distribute to the Bank the Year End Bank Settlement Distribution to be applied by the Bank against the ANS Bank Claim.

E.      The Bank and the Borrower Group acknowledge that they are fully familiar with the terms of the Plan and are satisfied that the Plan provides adequate information for approval by the Court. In consideration of the covenants contained in this Settlement Agreement, including, but not limited to, the payment of the Year End Bank Settlement Distribution, the Bank and the Borrower Group, as applicable, represent that they shall each irrevocably cast their ballot and opt in form under the Plan as an unsecured claim holder in the Chapter 11 Cases of the ANS Debtors in favor of confirmation of the Plan, and the Bank shall cast its ballots as a secured creditor and unsecured creditor in the HH Chapter 11 Case in favor of confirmation of the Plan.

F.      Subject to the terms of the Settlement Agreement and the Plan, during the period leading up to confirmation of the Plan, the Parties and their respective advisors agree to certain affirmative covenants to, among other things,

4

Docusign Envelope ID: C98820E7-C3E1-4996-91EF-9A703EF0123E

Execution Copy

(i) use reasonable efforts to support and cooperate with the Debtors and other Parties to obtain confirmation of the Plan and any other approvals necessary for the confirmation or effectiveness of the Plan, (ii) timely submit ballots accepting the Plan and/or use reasonable efforts to cause clients to timely submit ballots reflecting affirmative votes of the Plan; and (iii) support and cooperate with the Debtors in good faith in connection with the negotiation, drafting, execution, delivery and filing of any additional documents necessary to confirm the Plan.

G.     Subject to the terms of the Settlement Agreement and the Plan, during the period leading up to confirmation of the Plan, the Parties and their respective advisors agree to certain negative covenants to, among other things, refrain from: (i) objecting to or delaying in any way acceptance, confirmation, affirmation or implementation of the Plan, including, without limitation, support any request to terminate the Debtors' exclusive periods to file or solicit a plan of reorganization; (ii) soliciting approval or acceptance of, encourage, propose, file, support, or participate in the formulation of or vote for, any restructuring, sale of assets, merger, workout, or plan of reorganization for the Debtors other than the Plan or any settlement of Claims other than as set forth herein; (iii) otherwise taking any action that would interfere with, delay, impede, or postpone the solicitation of acceptances, consummation, or implementation of the Plan; (iv) taking any actions, or failing to take any actions, where such taking or failing to take actions would be, in either case, (a) materially inconsistent with the Plan or (b) otherwise materially inconsistent with, or reasonably expected to prevent, interfere with, delay or impede the implementation or consummation of, the Plan or this Settlement Agreement; or (v) encouraging any entity to undertake any action prohibited by the Plan or this Settlement Agreement.

H.     Attached hereto as <u>Exhibit B</u> is the Budget, which is a projection of expenses to be incurred by the ANS Debtors to wind down the Debtors' estates through February 15, 2025. The ANS Debtors agree that the cost of winding down the ANS Debtors' estates through February 15, 2025 shall not exceed the Budget without the prior written consent of the Bank and the Committee.

I.     Effective upon the Effective Date, the Retained Professionals consent to a discount as to all allowed professional fees in these Chapter 11 Cases equal to 15% of such allowed fees excluding expenses and other costs inclusive of any discounts taken to date. EPIQ agrees to a discount of 10% of allowed fees (exclusive of disbursements) to be deducted from final allowances. To the extent that B Riley and EPIQ do not submit fee applications, the aforementioned respective discounts shall be applied to the gross receipts (exclusive of disbursements) by each and deducted from final payment requests. In consideration for the discounts provided as of the Effective Date, none of the Parties shall object to the fee applications of the Retained Professionals. In the event that Retained Professionals do not provide the discounts set forth herein, this Settlement Agreement shall be rendered null and void.

J.     Notwithstanding any contrary term or provision of this Settlement Agreement, each  Shareholder that is currently not a Settling Shareholder, can

DMS_US.368115353.7

5

Execution Copy

hereafter become a Settling Shareholder by executing this Settlement Agreement and any other document required to effectuate the Settlement Agreement as determined by the Parties, and by each paying directly to the Trust Account $100,000 (subject to the rights set forth in the Plan), by January 15, 2025 and by agreeing to pay $500,000 each (including the $100,000 deposit) to the Debtors and complying with the opt in and other payment provisions of the Plan. In the event that a Shareholder does not deposit $100,000 into the Trust Account by January 15, 2025 and does not sign the Settlement Agreement by said date, such Shareholder can thereafter become a Settling Shareholder only by paying $625,000 (inclusive of any deposit) each to the Trust Account at least two weeks prior to the scheduled hearing on confirmation of the Plan and otherwise complying with the opt-in provisions of the Plan.

4. **Additional Material Terms of the Settlement.**

     (i)     The Borrower Group assigns and grants to the Bank, free and clear of any liens, claims, encumbrances and interests, any and all rights, causes of action, including direct, indirect and statutory claims of the Borrower Group of any kind, against each and all members of the ANS Group, each of the Shareholders (which includes each of the Shareholders' respective Affiliated Medical Practices) and each of the Shareholders' Related Parties, including, without limitation, any right to payment from any member of the ANS Group (and any Shareholder who does not elect to become a Settling Shareholder), and its right, if any, to participate as a creditor in the Chapter 11 Cases. On the Effective Date of the Plan, no obligations of any of the Borrower Group to any of the ANS Group shall be assigned or deemed assigned to the Bank. The Debtors and the ANS Group acknowledge and consent to the foregoing assignment for all purposes in the Chapter 11 Cases and agree that any and all amounts payable on account of the ANS Bank Claims or HH Bank Claims shall be paid only to the Bank pursuant to the Plan.

     (ii)     All Parties consent to the transfer of the funds in the bank accounts of NJ Pain Management, ANS Newco LLC and MIMO to the account of Atlantic Neurosurgical Specialists PA so as to fund the $2,500,000 to KeyBank.

     (iii)     All Parties consent to the waiver of the stay under Bankruptcy Rule 6004 with respect to the Approval Order.

     (iv)     Payment of the amounts set forth in Section 3(A) above to be paid by the Settling Shareholders, and the other consideration flowing from the Estate to the Liquidation Trust and/or the Bank under the Plan are in consideration for, among other things, comprehensive and complete releases as further described herein and in Article XIII of the Plan, to be provided by the Bank, the Estates, and the Borrower Group, and in full satisfaction of any Claim of the Bank, the Estates and members of the Borrower Group against each member of the ANS Group, including the Settling Shareholders, which includes their Affiliated Medical Practices and the Related Parties; provided, however, that any such

DMS_US.368115353.7

Docusign Envelope ID: C98820E7-C3E1-4996-91EF-9A703FF0123E

Execution Copy

release shall not release any Shareholder who is not a Settling Shareholder hereunder or under the Plan, or any Related Party to such non-settling Shareholder; provided further, however, that the Banks Claims against Debtor Hanover Hills and Florham Park are not included in the Bank's releases. It being expressly understood and agreed to among the Parties that any release provided by any Party in favor of a Settling Shareholder shall include a release of such Settling Shareholder in any capacity, including, but not limited to, such Settling Shareholder's capacity as an individual, a shareholder, director and officer of Founders, a member of Continuum Institute LLC, a member of ANS Continuum Holdco LLC, a director, manager and officer of any Debtor, and as a manager or officer of any member of the Borrower Group.

(v)    The Borrower Group specifically acknowledges that it has assigned all Claims against the Debtors and the members of the ANS Group, including each of their respective Affiliated Medical Practices and Related Parties arising from these matters to the Bank. Nevertheless and for the purpose of clarity, to the extent that the Borrower Group may retain any Claims against the ANS Group or its members including each of their respective Affiliated Medical Practices and Related Parties, the Borrower Group forever and absolutely releases any and all Claims that the Borrower Group may retain against the ANS Group and its members, including each of their respective Affiliated Medical Practices and Related Parties, and acknowledges that the Borrower Group is receiving as consideration for its participation in the Settlement Agreement and the Plan a full release of the Claims held by the Bank against the Borrower Group and its members. No further consideration of any kind shall be given or paid to the Borrower Group in connection with its participation in the Settlement Agreement, whether under the Plan or otherwise. The Borrower Group represents and warrants to the ANS Group, including each of their respective Affiliated Medical Practices and Related Parties, that other than on account of the Claims which it has assigned to the Bank which are part of the ANS Bank Claims against the ANS Group, it holds no Claim against the ANS Group or its members, including each of their respective Affiliated Medical Practices and Related Parties.

(vi)    Each of the Bank, the Debtors, Founders, the Borrower Group and each Settling Shareholder here under or under the Plan in any and all capacities shall exchange comprehensive mutual releases of any and all claims each may have against the other, in form as provided in the Plan which shall be effective on the Effective Date following Plan Confirmation. Notwithstanding anything to the contrary herein, the Settling Shareholders are not releasing any claims for contribution or indemnification relating to, or arising out of, the action captioned: Pinakin Jethwa, M.D. v. Atlantic Neurosurgical Specialists, P.A., Altair Health, Ronald Benitez, M.D., Yaron Moshel, M.D. and John Knightly, M.D., pending in the Superior Court of New Jersey, Law Division, Morris

Execution Copy

County, Docket No. MRS-L-209-21. Notwithstanding anything to the contrary herein Settling Shareholders Jay Chun, M.D. on the one hand and Ronald Benitez, M.D., Yaron Moshel, M.D., Kyle Chapple, M.D. and Jonathan Baskin, M.D. on the other hand, do not release claims amongst themselves and/or their Affiliated Medical Practices. Notwithstanding the foregoing, (a) no release by the Bank or the Borrower Group in favor of any member of the ANS Group, including each of their respective Affiliated Medical Practices and Related Parties, shall be effective unless each Settling Shareholder has made all of the payments to the Trust Account and the Bank has received the Year End Bank Settlement Distribution, and (b) no release of the Bank in favor of any Settling Shareholder including each of their respective Affiliated Medical Practices and Related Parties, shall be deemed to release any obligation of such Settling Shareholder to the Bank arising on account of any loan or other extension of credit made directly by the Bank or any affiliate of the Bank to such Settling Shareholder (including, without limitation, any obligations arising on account of any credit card issued by the Bank or any affiliate of the Bank). The releases provided by the Debtors shall be a release of all claims of the Debtors and their respective Bankruptcy Estates and shall bind all successors and assigns of the Debtors and respective Bankruptcy Estates, including any subsequent Chapter 11 or Chapter 7 trustee.

(vii)    The Settlement Agreement shall be expressly subject to the entry of an Approval Order by the Bankruptcy Court in the Chapter 11 Cases. Upon execution, the Settlement Agreement may only be amended or modified by a writing executed by all of the Parties which is approved by the Bankruptcy Court. If the Settlement Agreement is not approved by the Bankruptcy Court in form acceptable to all of the Parties, it shall be deemed void and unenforceable as to any of the Parties, and the Parties shall stipulate to any required Order of the Bankruptcy Court to effectuate the prompt return of the monies in the Trust Account to the respective Settling Shareholder depositing such funds.

5. **The Settlement Motion.**

In connection with the Settlement Motion, the following terms and conditions shall apply:

(i)    The Debtors will file the Settlement Motion within 3 business days of approval of the Settlement Agreement by all Parties. Provided that the Settlement Motion is consistent with the terms, conditions, and applicable limitations of this Settlement Agreement and that the Settlement Agreement is consistent with the Plan, each of the Parties agree to support, and not object to the Settlement Motion required to effectuate the terms and conditions of the Settlement Agreement.

(ii)    The terms and conditions of the Settlement Motion and any Order approving the Settlement Agreement must be reasonably acceptable to each of the Parties in all material respects.

Docusign Envelope ID: C98820E7-C3E1-4996-91EF-9A7C3FF0123E

Execution Copy

6. **Debtor Hanover Hills.**

The provisions in the Plan pertaining to Debtor Hanover Hills and the distribution of the sale proceeds shall remain intact.

7. **Provisions Regarding the D&O Policy.**

The provisions in the Plan pertaining to the D&O Policy and the pursuit of the proceeds of such D&O policy by the Committee or Liquidating Trustee shall remain intact.

8. **General Terms of the Settlement.**

a. The following general terms and conditions shall apply to the settlement:

i.    Except as otherwise expressly set forth in the Settlement Agreement, or pursuant to an order of the Bankruptcy Court in the Chapter 11 Cases all Parties bear their own costs and fees.

ii.    This Settlement Agreement may be signed in counterparts with the same effect as if the signatures thereto were upon the same instrument. Electronic copies of signatures shall be treated as original signatures for all purposes under this Settlement Agreement. Executed copies of the Settlement Agreement shall be provided by all Parties to GRSD for compilation and circulation. GRSD shall advise the Parties when the execution by all Parties is complete. If any Party deems it necessary to seal some or all of the Settlement Agreement that Party shall so advise all parties and shall be responsible for filing the appropriate motion with the Bankruptcy Court.

iii.    The material terms of the Settlement among the Parties are contained herein. This Settlement Agreement is to be interpreted as an integral part of the Plan. The definition of "Related Parties" set forth herein have been added to the Plan. Where a conflict exists between any term, provision or condition of the Plan and this Settlement Agreement, the terms of the Plan shall control.

iv.    This Settlement Agreement, while intended to include the material terms of the settlement between the Parties, is not intended to include all provisions of the Plan. It is to be viewed as a Supplement to the Plan and addresses the material terms that may have been in dispute and are now resolved.

v.    Once approved by an Approval Order of the Bankruptcy Court, this Settlement Agreement including the exhibits attached hereto are binding on the Parties their successors and assigns. Each Party consents to the jurisdiction of the Bankruptcy Court in the Cases to enforce and interpret the terms of this Settlement Agreement.

vi.    The Parties agree to cooperate with each other to accomplish the approval of the Settlement Agreement and confirmation of the Plan.

DMS_US.368115353.7

Docusign Envelope ID: C98820E7-C3E1-4996-91EF-9A703FE0123E

vii.    The Parties acknowledge that they have had ample opportunity to review this Settlement Agreement with professionals of their choosing and that they understand and agree to the terms herein and as set forth in the Plan.

Signature Pages Follow:

Docusign Envelope ID: C98820E7-C3E1-4996-91EF-9A70CF5643BE

Dated: _____, 2024

By:_____
Kyle Chapple

Dated: _____, 2024

By:_____
Jonathan Baskin

Dated: _____, 2024

By:_____
John Knightly

Dated: _____, 2024

By:_____
Jay Chun

Dated: _____, 2024

By:_____
Paul Saphier

Dated: _____, 2024

By:_____
Scott Meyer

Dated: _____, 2024

**New Jersey Pain Consultants, P.C.**

By:_____
Ronald Benitez, Pres.

Dated: _____, 2024

**Morristown Intraoperative
Monitoring, P.C.**

By:_____
Ronald Benitez, Pres.

Dated: _____~~V2/2~~_____, 2024

**Continuum Institute Atlantic, LLC**

By: *David Berman*
Its: Manager

DMS_US.368115353.7

Docusign Envelope ID: C98820E7-C3E1-4996-91EF-9A703FF0123E

Dated: _____, 2024

**Florham Park Investors, LLC**

By: _____
Ronald Benitez
Its: Manager

Dated: _____12/24_____, 2024

**Continuum Institute, LLC**

By: _David Berman_
Name: David Berman
Its: Manager

Dated: _____12/24_____, 2024

ANS **Continuum Holdco, LLC**

By: _David Berman_
Name: David Berman
Its: Manager

Dated: _____, 2024

**Hanover Hills Surgery Center, LLC**

By: _____
Name:
Its:

Dated: _12/24/24_, 2024

**Lorient Capital Management, LLC**

By: _David Berman_
Name: David Berman
Its: Manager

Dated: _____12/24_____, 2024

**Lorient Continuum Investors, LLC**

By: _David Berman_
Name: David Berman
Its: Manager

DMS_US.368115353.7

Dated: _____, 2024

**Key Bank National Association**

By: _____
Name:
Its: Senior Vice President

Dated: _____14/24_____, 2024

**Official Committee of Unsecured Creditors**

By: _____
Name: IGOR UGOREC
Its: Member

Dated: _____, 2024

**Atlantic Neurosurgical Specialists, P.A.**

By: _____
Ronald Benitez
Its: President

Dated: _____, 2024

**ANS Newco, LLC**

By: _____
Ronald Benitez
Its: Manager

Dated: _____, 2024

**ANS Founders PC**

By: _____
Ronald Benitez
Its: President

Dated: _____, 2024

By: _____
Ronald Benitez

Dated: _____, 2024

By: _____
Yaron Moshel

DMS_US.368115353.7

Dated: _____, 2024

By: _____
Kyle Chapple


Dated: _____, 2024

By: _____
Jonathan Baskin


Dated: _____, 2024

By: _____
John Knightly


Dated: __**12/24/24**__, 2024

By: _____
Jay Chun


Dated: _____, 2024

By: _____
Paul Saphier


Dated: _____, 2024

By: _____
Scott Meyer


Dated: _____, 2024

**New Jersey Pain Consultants, P.C.**

By: _____
Ronald Benitez, Pres.


Dated: _____, 2024

**Morristown Intraoperative
Monitoring, P.C.**

By: _____
Ronald Benitez, Pres.


Dated: _____, 2024

**Continuum Institute Atlantic, LLC**

By: _____
Its: _____


DMS_US.368115353.7

Dated:  December 23, 2024

**Key Bank National Association**

By: _____

Name:   Glen Bleeker

Its:     Senior Vice President


Dated: _____, 2024

**Official Committee of Unsecured Creditors**

By: _____

Name:

Its: Member


Dated: _____, 2024

**Atlantic Neurosurgical Specialists, P.A.**

By: _____

Ronald Benitez

Its:  President


Dated: _____, 2024

**ANS Newco, LLC**

By: _____

Ronald Benitez

Its:  Manager


Dated: _____, 2024

**ANS Founders PC**

By: _____

Ronald Benitez

Its:  President


Dated: _____, 2024

By: _____

Ronald Benitez


Dated: _____, 2024

By: _____

Yaron Moshel

Dated: _____, 2024

By: _____
Kyle Chapple

Dated: ____12/24____, 2024

By: _____
Jonathan Baskin

Dated: _____, 2024

By: _____
John Knightly

Dated: _____, 2024

By: _____
Jay Chun

Dated: _____, 2024

By: _____
Paul Saphier

Dated: _____, 2024

By: _____
Scott Meyer

Dated: _____, 2024

**New Jersey Pain Consultants, P.C.**

By: _____
Ronald Benitez, Pres.

Dated: _____, 2024

**Morristown Intraoperative
Monitoring, P.C.**

By: _____
Ronald Benitez, Pres.

Dated: _____, 2024

**Continuum Institute Atlantic, LLC**

By: _____
Its: _____

DMS_US.368115353.7

Dated: _____, 2024          **Key Bank National Association**

By:_____
Name:
Its:  Senior Vice President

Dated: _____, 2024          **Official Committee of Unsecured Creditors**

By: _____
Name:
Its: Member

Dated:_____, 2024          **Atlantic Neurosurgical Specialists, P.A.**

By:_____
Ronald Benitez
Its:  President

Dated: _____, 2024          **ANS Newco, LLC**

By:_____
Ronald Benitez
Its:  Manager

Dated: _____, 2024          **ANS Founders PC**

By:_____
Ronald Benitez
Its:  President

Dated: _____, 2024

By:_____
Ronald Benitez

Dated: _____, 2024

By:_____
Yaron Moshel

Dated: _____, 2024

**Key Bank National Association**

By:_____
Name:
Its:  Senior Vice President

Dated: _____, 2024

**Official Committee of Unsecured Creditors**

By: _____
Name:
Its: Member

Dated: _____, 2024

**Atlantic Neurosurgical Specialists, P.A.**

By:_____
Ronald Benitez
Its:  President

Dated: _____, 2024

**ANS Newco, LLC**

By:_____
Ronald Benitez
Its:  Manager

Dated: _____, 2024

**ANS Founder, LLC**

By:_____
Ronald Benitez
Its:  President

Dated: _____, 2024

By:_____
Ronald Benitez

Dated: _____, 2024

By:_____
Yaron Moshel

DMS_US.368115353.7

Dated: _____, 2024

By:_____
Kyle Chapple

Dated: _____, 2024

By:_____
Jonathan Baskin

Dated: _____, 2024

By:_____
John Knightly

Dated: _____, 2024

By:_____
Jay Chun

Dated: _____, 2024

By:_____
Paul Saphier

Dated: _____, 2024

By:_____
Scott Meyer

Dated: _____, 2024

**New Jersey Pain Consultants, P.C.**

By:_____
Ronald Benitez, Pres.

Dated: _____, 2024

**Morristown Intraoperative
Monitoring, P.C.**

By:_____
Ronald Benitez, Pres.

Dated: _____, 2024

**Continuum Institute Atlantic, LLC**

By:_____
Its:

DMS_US.368115353.7

Dated: _____, 2024          **Florham Park Investors, LLC**

By:_____
Ronald Benitez
Its: Manager

Dated: _____, 2024          **Continuum Institute, LLC**

By:_____
Name:
Its:

Dated: _____, 2024          **Continuum Holdco, LLC**

By:_____
Name:
Its:

Dated: _____, 2024          **Hanover Hills Surgery Center, LLC**

By:_____
Name:
Its:

Dated: _____, 2024          **Lorient Capital Management, LLC**

By:_____
Name:
Its:

Dated: _____, 2024          **Lorient Continuum Investors, LLC**

By:_____
Name:
Its:

DMS_US.368115353.7

Docusign Envelope ID: CA608478-3844-4717-87AC-B4D6DFCC5A81

Dated: _____, 2024        **Florham Park Investors, LLC**

By: David Berman
Ronald Benitez   David Berman
Its:  Manager


Dated: _____, 2024        **Continuum Institute, LLC**

By:_____
Name:
Its:


Dated: _____, 2024        **Continuum Holdco, LLC**

By:_____
Name:
Its:


Dated: _____, 2024        **Hanover Hills Surgery Center, LLC**

By: David Berman
Name: David Berman
Its: Manager


Dated: _____, 2024        **Lorient Capital Management, LLC**

By:_____
Name:
Its:


Dated: _____, 2024        **Lorient Continuum Investors, LLC**

By:_____
Name:
Its:


DMS_US.368115353.7

Docusign Envelope ID: 6DCDFED9-7A57-4ACC-8CCF-EDE36029A183

Dated: _____, 2024

**Florham Park Investors, LLC**

By: _____
Ronald Benitez
Its:  Manager

Dated: _____, 2024

**Continuum Institute, LLC**

By: *David Berman*
Name: David Berman
Its: Manager

Dated: 12/26, 2024

**Continuum Holdco, LLC**

By: *David Berman*
Name: David Berman
Its: Manager

Dated: _____, 2024

**Hanover Hills Surgery Center, LLC**

By: _____
Name: Ronald Benitez
Its: Authorized Signatory

Dated: _____, 2024

**Lorient Capital Management, LLC**

By: *David Berman*
Name: David Berman
Its: Manager

Dated: _____, 2024

**Lorient Continuum Investors, LLC**

By: *David Berman*
Name: David Berman
Its: Manager

DMS_US.368115353.7

Dated: _____, 2024

By: _____
Kyle Chapple


Dated: _____, 2024

By: _____
Jonathan Baskin


Dated: December 23_____, 2024

By: *John Knightly*_____
John Knightly


Dated: _____, 2024

By: _____
Jay Chun


Dated: _____, 2024

By: _____
Paul Saphier


Dated: _____, 2024

By: _____
Scott Meyer


Dated: _____, 2024

**New Jersey Pain Consultants, P.C.**

By: _____
Ronald Benitez, Pres.


Dated: _____, 2024

**Morristown Intraoperative
Monitoring, P.C.**

By: _____
Ronald Benitez, Pres.


Dated: _____, 2024

**Continuum Institute Atlantic, LLC**

By: _____
Its:

DMS_US.368115353.7

Dated: _____, 2024          **Key Bank National Association**

 

By:_____
Name:
Its:  Senior Vice President

Dated: _____, 2024          **Official Committee of Unsecured Creditors**

 

By: _____
Name:
Its: Member

Dated:_____, 2024          **Atlantic Neurosurgical Specialists, P.A.**

 

By:_____
Ronald Benitez
Its:  President

Dated: _____, 2024          **ANS Newco, LLC**

 

By:_____
Ronald Benitez
Its:  Manager

Dated: _____, 2024          **ANS Founders PC**

 

By:_____
Ronald Benitez
Its:  President

Dated: _____, 2024

 

By:_____
Ronald Benitez

Dated: ____12/23/2024____, 2024

 

By:_____
Yaron Moshel

DMS_US.368115353.7

Dated: **12/23** _____, 2024

By: _____
Kyle Chapple

Dated: _____, 2024

By: _____
Jonathan Baskin

Dated: _____, 2024

By: _____
John Knightly

Dated: _____, 2024

By: _____
Jay Chun

Dated: _____, 2024

By: _____
Paul Saphier

Dated: _____, 2024

By: _____
Scott Meyer

Dated: _____, 2024

**New Jersey Pain Consultants, P.C.**

By: _____
Ronald Benitez, Pres.

Dated: _____, 2024

**Morristown Intraoperative
Monitoring, P.C.**

By: _____
Ronald Benitez, Pres.

Dated: _____, 2024

**Continuum Institute Atlantic, LLC**

By: _____
Its:

DMS_US.368115353.7

# EXHIBIT A

| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>DISTRICT OF NEW JERSEY<br>**Caption in Compliance with D.N.J. LBR 9004-1** | |
| In re:<br><br>**ATLANTIC NEUROSURGICAL SPECIALISTS, P.A.**<br>***et al,*[1]**<br><br>              Debtors. | Chapter 11<br><br>**Case No. 24-15726(VFP)**<br><br>**Jointly Administered** |

## AMENDED COMBINED DISCLOSURE STATEMENT
## AND CHAPTER 11 PLAN OF LIQUIDATION

**GREENBAUM, ROWE, SMITH & DAVIS LLP**
David L. Bruck, Esq.
P.O. Box 5600
Woodbridge, New Jersey 07095
Telephone: (732) 549-5600
Facsimile: (732) 476-2441
dbruck@greenbaumlaw.com

*Counsel for the Debtors and Debtors in Possession,*
*Atlantic Neurosurgical Specialists PA and ANS Newco*
*LLC*

**FOX ROTHSCHILD LLP**
Joseph J. DiPasquale, Esq.
Michael R. Herz, Esq.
Agostino A. Zammiello, Esq.
49 Market Street
Morristown, New Jersey 07960
Telephone: (973) 992-4800
Facsimile: (973) 992-9125
jdipasquale@foxrothschild.com
mherz@foxrothschild.com
azammiello@foxrothschild.com

*Counsel to the Debtor and Debtor in Possession,*
*Hanover Hills Surgery Center LLC*

**FAEGRE DRINKER BIDDLE & REATH LLP**
Richard J. Bernard, Esq.
Frank F. Velocci, Esq.
600 Campus Dr.
Florham Park, New Jersey 07932
richard.bernard@faegredrinker.com
frank.velocci@faegredrinker.com

*Counsel to the Official Committee of*
*Unsecured Creditors of Atlantic*
*Neurosurgical Specialists, P.A., et al.*

Dated: December    , 2024

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are: Atlantic Neurosurgical Specialists, P.A., d/b/a Altair Health (0733); ANS Newco, LLC, d/b/a Atlantic Neurosurgical Specialists (7893); and Hanover Hills Surgery Center LLC, d/b/a Altair Health Surgical Center (8645).

i

## Table of Contents

Page

DISCLAIMER ................................................................................................................ 1

INTRODUCTION ......................................................................................................... 2

**ARTICLE I** DEFINITION AND CONSTRUCTION OF TERMS ............................. 3

**ARTICLE II** BACKGROUND ................................................................................... 3

    **2.01** General Background ............................................................................... 3

        **(a)** The ANS Debtors' History and Organizational Structure ................. 3

        **(b)** The Lorient Transaction ...................................................................... 4

        **(c)** Capital Structure of Debtor Hanover Hills .......................................... 5

**ARTICLE III** EVENTS GIVING RISE TO THESE CHAPTER 11 CASES .............. 5

**ARTICLE IV** CERTAIN PROCEEDINGS AND MOTIONS IN THESE CHAPTER
11 CASES ................................................................................................................... 6

        **(a)** The Debtors' Bankruptcy Filings and First Day Motions ................. 6

        **(b)** The Debtors' Post-Petition Operation ................................................. 9

**ARTICLE V** The Proposals For A Settlement ......................................................... 10

**ARTICLE VI** CONFIRMATION PROCEDURES ..................................................... 12

    **6.01** Confirmation Procedures ....................................................................... 12

    **6.02** Procedure for Objections ...................................................................... 13

    **6.03** Requirements for Confirmation ............................................................ 13

    **6.04** Classification of Claims and Interests .................................................. 13

    **6.05** Impaired Claims or Interests ................................................................ 15

    **6.06** Confirmation Without Necessary Acceptances; Cramdown .................. 15

    **6.07** Feasibility ............................................................................................. 16

    **6.08** Best Interests Test and Liquidation Analysis ....................................... 16

    **6.09** Acceptance of the Plan ......................................................................... 18

**ARTICLE VII** CLASSIFICATION OF CLAIMS AND INTERESTS AND
EXPECTED RECOVERIES ........................................................................................ 18

    **7.01** Overview of Classification ................................................................... 18

    **7.02** Identification and Treatment of Unclassified Claims ........................... 18

        **(a)** Administrative Claims ......................................................................... 18

        **(b)** U.S. Trustee Fees ................................................................................ 19

DMS_US.366435582.22

**(c)**    Priority Tax Claims. ........................................................................ 20

**(d)**    Ordinary Course Liabilities. .......................................................... 20

**7.03**    Identification and Treatment of Classes of Claims .................................... 20

**7.04**    Treatment of Classified Classes, Rights to Vote, and Estimated Distributions.......... 23

**7.05**    Controversy Concerning Classification, Impairment or Voting Rights...................... 29

**7.06**    Insurance Recourse as to Holders of Claims Against the Debtors ............................. 29

**ARTICLE VIII** CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO
VOTING .................................................................................................................. 29

**8.01**    The Plan May Not Be Accepted ................................................................ 29

**8.02**    The Plan May Not Be Confirmed.............................................................. 29

**8.03**    Distributions to Holders of Allowed Claims under the Plan May Be Inconsistent with
Projections............................................................................................... 30

**8.04**    Objections to Classification of Claims ..................................................... 30

**8.05**    Failure to Consummate the Plan............................................................... 31

**8.06**    Allowance of Claims May Substantially Dilute the Recovery to Holders of Claims
under the Plan ......................................................................................... 31

**8.07**    Certain Tax Considerations ...................................................................... 31

**ARTICLE IX** THE LIQUIDATION TRUST............................................................... 31

**9.01**    Liquidation Trust..................................................................................... 31

**9.02**    Establishment and Purpose of the Liquidation Trust .................................... 32

**9.03**    Authority and Role of the Liquidation Trustee ............................................ 32

**9.04**    Appointment of the Liquidation Trustee ..................................................... 32

**9.05**    Liquidation Trust Assets ......................................................................... 32

**9.06**    Treatment of Liquidation Trust for Federal Income Tax Purposes; No Successor-in-
Interest 33

**(a)**    Liquidation Trust as a "Grantor Trust." ......................................... 33

**(b)**    Valuation of Liquidation Trust Assets. ........................................... 33

**(c)**    Liquidation Trustee's Right and Power to Invest. ........................... 33

**9.07**    Responsibilities of the Liquidation Trustee ................................................ 34

**9.08**    Establishment of the Post-Confirmation Committee .................................... 34

**9.09**    Bankruptcy Court Approval of Liquidation Trustee Actions Not Required............... 36

**9.10**    Expenses of the Liquidation Trust ............................................................ 37

**9.11**    Compensation of the Liquidation Trustee .................................................. 37

**9.12**    Fiduciary Duties of the Liquidation Trustee................................................ 37

DMS_US.366435582.22

| | | |
|---|---|---|
| **9.13** | Transfer of Books and Records | 37 |
| **9.14** | Dissolution of the Liquidation Trust | 37 |
| **9.15** | Full and Final Satisfaction against Liquidation Trust | 37 |
| **ARTICLE X** | MEANS FOR IMPLEMENTATION OF THE PLAN | 38 |
| **10.01** | Interests in the Debtors | 38 |
| **10.02** | Causes of Action | 38 |
| **10.03** | Release of Liens | 38 |
| **10.04** | Accounts Receivable Reserve | 38 |
| **10.05** | Pension Plan Resolution | 38 |
| **10.06** | Vesting and Sale or Other Disposition of Assets; Representative of the Estates | 39 |
| **10.07** | Effectuating Documents; Further Transactions | 40 |
| **10.08** | Allocation of Assets Between Debtors | 40 |
| **10.09** | Shareholders Settlement | 40 |
| **10.10** | Records | 43 |
| **10.11** | Insurance Policies | 43 |
| | **(a)** Insurance Policies | 43 |
| | **(b)** Insurance Policies; Employment Practice Liability Policies; Professional Liability Policies; Similar Policies. | 44 |
| **10.12** | Dissolution of Committee | 44 |
| **10.13** | Transfer of Privilege/No Waiver | 44 |
| **10.14** | Final Decree | 44 |
| **10.15** | Winddown Debtors | 44 |
| **ARTICLE XI** | EXECUTORY CONTRACTS | 45 |
| **11.01** | Rejection of Executory Contracts | 45 |
| **11.02** | Bar Date for Rejection Damages | 45 |
| **ARTICLE XII** | PROVISIONS GOVERNING RESOLUTION OF CLAIMS AND DISTRIBUTIONS OF PROPERTY UNDER THE PLAN | 45 |
| **12.01** | Claim Objections | 45 |
| | **(a)** Right to Object to Claims. | 45 |
| | **(b)** Claims Objection Deadline. | 46 |
| | **(c)** Claim Estimation. | 46 |
| **12.02** | Distribution Provisions | 46 |
| | **(a)** Distributions to be Made. | 46 |

iv

| | (b) | Establishment of Reserves. ................................................ 46 |
|---|---|---|
| | (c) | Distribution Record Date. .................................................. 46 |
| | (d) | No Liability. ........................................................................ 47 |
| | (e) | Distributions on Account of Disputed Claims. .................... 47 |
| | (f) | No Distributions Pending Allowance. .................................. 47 |
| | (g) | Distributions in Cash. ......................................................... 47 |
| | (h) | Timing of Distributions. ..................................................... 47 |
| | (i) | Unclaimed Distributions. .................................................... 48 |
| | (j) | Delivery of Distributions and Undeliverable Distributions to Holders of Claims. ...................................................................... 48 |
| | (k) | Undeliverable Distributions. ............................................... 48 |
| | (l) | De Minimis Distributions. ................................................... 49 |
| | (m) | Remainder Amounts After Final Distribution. .................... 49 |

**12.03** Preservation and Assignment of Subordination Rights ................. 49

**ARTICLE XIII** EXCULPATION RELEASES AND INJUNCTION ........................ 49

**13.01** EXCULPATION. .............................................................................. 49

**13.02** DEBTORS AND SETTLING SHAREHOLDERS RELEASES ............... 50

**13.03** THIRD-PARTY RELEASES ............................................................. 51

**13.04** Consensual Release of Settling Shareholders. ............................. 53

**ARTICLE XIV** CONDITIONS TO CONFIRMATION AND EFFECTIVE DATE ................ 55

**14.01** [Intentionally Omitted] ................................................................ 55

**14.02** Conditions Precedent to the Effective Date.................................. 55

**14.03** Waiver of Conditions .................................................................... 55

**14.04** Effect of Failure of Conditions .................................................... 55

**14.05** Filing of Notice of the Effective Date. ........................................ 56

**ARTICLE XV** MODIFICATION, REVOCATION OR WITHDRAWAL OF PLAN .............. 56

**15.01** Modification and Amendments ..................................................... 56

**15.02** Effect of Confirmation on Modifications ..................................... 56

**15.03** Revocation or Withdrawal of the Plan.......................................... 56

**ARTICLE XVI** JURISDICTION ...................................................................... 57

**16.01** Bankruptcy Court Jurisdiction ..................................................... 57

**16.02** Limitation on Jurisdiction............................................................. 58

**ARTICLE XVII** MISCELLANEOUS ................................................................ 59

v

**17.01** Exemption from Taxes ................................................................................... 59

**17.02** Compliance with Tax Requirements................................................................. 59

**17.03** Retirement Plans ............................................................................................. 60

**17.04** Defenses and Setoff ........................................................................................ 60

**17.05** Governing Law................................................................................................. 60

**17.06** Successors and Assigns ................................................................................... 60

**17.07** Transfer of Claims........................................................................................... 60

**17.08** Post-Effective Date Service List ..................................................................... 61

**17.09** Notices 61

**17.10** Immediate Binding Effect ............................................................................... 62

**17.11** Severability of Plan Provisions....................................................................... 62

**17.12** Exhibits ............................................................................................................ 62

**17.13** Votes Solicited in Good Faith ......................................................................... 63

**17.14** Conflicts........................................................................................................... 63

**17.15** U.S. Trustee Fees............................................................................................. 63

**17.16** Implementation ................................................................................................ 63

**17.17** No Admissions................................................................................................. 63

DMS_US.366435582.22

## <u>DISCLAIMER</u>

THIS COMBINED DISCLOSURE STATEMENT AND PLAN WAS COMPILED FROM INFORMATION OBTAINED FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE TO THE BEST OF THE DEBTORS' AND THE COMMITTEE'S KNOWLEDGE, INFORMATION AND BELIEF. NO GOVERNMENTAL AUTHORITY HAS PASSED ON, CONFIRMED OR DETERMINED THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN.

NOTHING STATED HEREIN SHALL BE (I) DEEMED OR CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, (II) ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, OR (III) DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE COMBINED DISCLOSURE STATEMENT AND PLAN ON THE DEBTORS OR HOLDERS OF CLAIMS OR INTERESTS. CERTAIN STATEMENTS CONTAINED HEREIN, BY NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES.

THE STATEMENTS CONTAINED HEREIN ARE MADE AS OF THE DATE HEREOF, UNLESS ANOTHER TIME IS SPECIFIED. THE DELIVERY OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN SHALL NOT BE DEEMED OR CONSTRUED TO CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME AFTER THE DATE HEREOF. HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE. THEREFORE, EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL, AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE COMBINED DISCLOSURE STATEMENT AND PLAN AND THE TRANSACTIONS CONTEMPLATED HEREBY.

NO PARTY IS AUTHORIZED TO GIVE ANY INFORMATION WITH RESPECT TO THE COMBINED DISCLOSURE STATEMENT AND PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN. NO REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY HAVE BEEN AUTHORIZED BY THE DEBTORS OTHER THAN AS SET FORTH IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN. ANY INFORMATION, REPRESENTATIONS OR INDUCEMENTS MADE TO OBTAIN AN ACCEPTANCE OF THE COMBINED DISCLOSURE STATEMENT AND PLAN OTHER THAN, OR INCONSISTENT WITH, THE INFORMATION CONTAINED HEREIN SHOULD NOT BE RELIED UPON BY ANY HOLDER OF A CLAIM OR INTEREST. THIS COMBINED DISCLOSURE STATEMENT AND PLAN HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(b) AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-APPLICABLE BANKRUPTCY LAWS.

DMS_US.366435582.22

SEE ARTICLE VIII OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN, ENTITLED "CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING," FOR A DISCUSSION OF CERTAIN CONSIDERATIONS IN CONNECTION WITH A DECISION BY A HOLDER OF AN IMPAIRED CLAIM TO ACCEPT THE COMBINED DISCLOSURE STATEMENT AND PLAN.

## **INTRODUCTION**

The Debtors and the Committee propose this Combined Disclosure Statement and Plan pursuant to sections 1125 and 1129 of the Bankruptcy Code.

This Combined Disclosure Statement and Plan contemplates (1) the continued liquidation of the Debtors, (2) a resolution of creditor treatment with KeyBank, the largest creditor of each of the Debtors, (3) a global settlement offer between and among the Committee, KeyBank, the Debtors, the Lorient Parties, and the Settling Shareholders, (3) the formation of a Liquidation Trust to be the recipient for the assignment of the specified litigation claims as referred to hereinafter and remaining assets of the Debtors.

This Combined Disclosure Statement and Plan contains, among other things, (i) a discussion of the Debtors' history and businesses, (ii) a summary of the events leading to these Chapter 11 Cases, (iii) a description of the events and motions in these Chapter 11 Cases, (iv) a summary of the agreed upon and proposed settlements between numerous parties, (v) certain risk factors, (vi) a summary and analysis of this Combined Disclosure Statement and Plan, and (vii) certain other related matters.

ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS ARE ENCOURAGED TO READ THE COMBINED DISCLOSURE STATEMENT AND PLAN IN ITS ENTIRETY, AND TO CONSULT WITH AN ATTORNEY, BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. SUBJECT TO CERTAIN RESTRICTIONS AND REQUIREMENTS SET FORTH IN SECTION 1127 OF THE BANKRUPTCY CODE, BANKRUPTCY RULE 3019, AND IN THE COMBINED DISCLOSURE STATEMENT AND PLAN, THE PLAN PROPONENTS RESERVE THE RIGHT TO ALTER, AMEND, MODIFY, REVOKE OR WITHDRAW THE PLAN, OR ANY PART THEREOF, PRIOR TO ITS SUBSTANTIAL CONSUMMATION.

DMS_US.366435582.22

> **THE DEBTORS AND THE COMMITTEE ARE THE PLAN PROPONENTS. THE PLAN PROPONENTS URGE ALL HOLDERS OF IMPAIRED CLAIMS TO VOTE IN FAVOR OF THE PLAN.**

## ARTICLE I
## DEFINITION AND CONSTRUCTION OF TERMS

For purposes of the Plan, except as expressly provided or unless the context otherwise requires, (i) capitalized terms used herein shall have the meanings ascribed to them on **Exhibit A** (ii) any capitalized terms used in this Combined Disclosure Statement and Plan that are not defined herein or in **Exhibit A**, but are defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to those terms in the Bankruptcy Code or the Bankruptcy Rules, as applicable, (iii) whenever the context requires, each term stated in either the singular or the plural shall include the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter, (iv) any reference in the Plan to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions, (v) any reference in the Plan to an existing document or exhibit means such document or exhibit as it may be amended, modified, or supplemented from time to time, (vi) unless otherwise specified, all references in the Plan to sections, articles, schedules, and exhibits are references to sections, articles, schedules, and exhibits of or to the Plan, (vii) the words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to this Combined Disclosure Statement and Plan in its entirety rather than to any particular paragraph, subparagraph, or clause contained in the Plan, (viii) captions and headings to articles and sections are inserted for convenience of reference only and shall not limit or otherwise affect the provisions or the interpretation of the Plan hereof, and (ix) the rules of construction set forth in section 102 of the Bankruptcy Code and in the Bankruptcy Rules shall apply.

## ARTICLE II
## BACKGROUND

### 2.01    General Background

#### (a)    The ANS Debtors' History and Organizational Structure

Debtor ANS was a medical practice serving patients in the Northern and Central New Jersey area for many years. Debtor ANS is a professional association formed pursuant to the laws of the State of New Jersey. Debtor Newco was formed in 2021. According to the ANS Debtors, Debtor Newco was formed for the purpose of assuming by assignment the assets and obligations of Debtor ANS, but the transition from Debtor ANS to Debtor Newco was not completed. According to the ANS Debtors, Debtor Newco employed certain of the clinical employees at the practice. Debtor Newco is a limited liability company organized pursuant to the laws of the State of New Jersey. The ANS Debtors had their most recent main office at 60A Columbia Road, Morristown, New Jersey. Subsequent to the filing of the bankruptcy petitions the ANS Debtors vacated the Morristown offices.

3

As of the Petition Date, the shares and membership interests in Debtor ANS and Debtor Newco respectively are owned by ANS Founders. ANS Founders is owned in equal shares by the Shareholders, who are eight (8) practicing physicians.

### (b)    The Lorient Transaction

In 2017, Debtor ANS and the Shareholders entered into a transaction with Lorient, pursuant to which Debtor ANS formed ANS Continuum and Lorient formed CIA. CIA purchased a 40% interest in ANS Continuum for approximately $33 million plus a subordinated promissory note from CIA for $6 million, which was subsequently distributed to ANS Founders. Debtor ANS retained a 59% interest in ANS Continuum, and the Shareholders retained 1% of ANS Continuum. The subordinated note held by ANS Founders is in default. The approximate balance outstanding is $4 million. Based upon information received from CIA, it is believed that CIA has no assets. The subordinated note is subordinated to payments and obligations owed by CIA to KeyBank on account of the CIA loan from KeyBank that partially funded this transaction.

ANS Continuum and Debtor ANS entered into a long-term management agreement (the "Exclusive Management Agreement") dated October 11, 2017, pursuant to which ANS Continuum agreed to provide long term managerial services to Debtor ANS in exchange for certain management fees. In addition, on or about October 11, 2017, the Debtor ANS entered into employment agreements with non-compete clauses with each of the Shareholders. To fund the acquisition of its interest in ANS Continuum, CIA borrowed $35 million from KeyBank. The loan was guaranteed by ANS Continuum. CIA pledged its interest in ANS Continuum to KeyBank as collateral for the loan. Neither Debtor ANS nor the Shareholders were borrowers or guarantors of the loan from KeyBank to CIA. As a result of this transaction, each of the eight Shareholders received in excess of $3.5 million cash plus ANS Founders received a $6 million subordinated promissory note.

On or about January 10, 2019, KeyBank funded an additional loan in the amount of $3,500,000 to Florham Park Investors LLC ("Florham Park") which is owned 100% by ANS Continuum. Florham Park used the loan proceeds to purchase Debtor Hanover Hills which owns a license issued by the New Jersey Department of Health to operate a surgery center in Florham Park, New Jersey. Debtor Hanover Hills leases the premises where the surgery center is located from Hanover Associates LLC (the "Hanover Landlord") (an unrelated entity). The surgery center closed in 2023, and the Hanover Landlord issued a notice of default under the lease.

In connection with the above-described transaction, CIA, Florham Park Investors, LLC, Continuum Institute, LLC, and ANS Continuum participated in obtaining certain loans from KeyBank described as follows (collectively the "Loans"): (a) $14,000,000 line of credit to CIA ("Revolving Credit A"), (b) $14,000,000 term loan to CIA ("Term Loan A"), (c) $7,000,000 term loan to CIA ("Term Loan B"), and (d) $3,500,000 term loan to Florham Park ("Term Loan C"). Any and all documents and agreements executed in favor of KeyBank evidencing and relating to the Loans are hereinafter referred to as the "Loan Documents").

4

Other than some equipment financing, neither Debtor ANS nor Debtor Newco has any secured debt. KeyBank asserts that it is the holder of accrued and unpaid management fees under the Exclusive Management Agreement alleged to be owed by Debtor ANS to ANS Continuum in the approximate amount of $20,000,000 (the "MSO Claim") and further asserts claims against the ANS Debtors in the approximate amount of $29 million, inclusive of the MSO Claim. In its Statement of Assets and Liabilities filed on July 2, 2024, Debtor ANS lists its assets at $6,026,030 and unsecured liabilities at $22,568,480 with priority claims at $3,678. The ANS Debtors' primary assets as of the Petition Date were cash in banks in the amount of $2,798,755.13 and accounts receivable less doubtful accounts in the net amount of $2,038,920. In addition, it owns an interest in ANS Continuum (valued at zero) and litigation claims which value is speculative. A description of the values of the assets and liabilities as of the Petition Date are set forth in the Statement of Assets and Liabilities [Docket No. 63].

In its Statement of Assets and Liabilities [Docket No. 38 24-15727], Debtor Newco lists assets at $4,626, unsecured claims at $20,618,892 (inclusive of the approximately $20,000,000 MSO Claim held by KeyBank; KeyBank also assets claims in excess of $29 million against Debtor Newco, inclusive of the MSO Claim), and priority claims consisting of employee claims at $141,408. Other than the priority claims of employees, the unsecured claims in the Debtor Newco case are substantially duplicative of the claims listed in the Debtor ANS case.

### (c)    Capital Structure of Debtor Hanover Hills

Debtor Hanover Hills is a subsidiary of Florham Park Investors, LLC, which is owned by ANS Continuum. Debtor Hanover Hills owns a license to conduct surgeries at its location in Florham Park, New Jersey, as issued by the New Jersey Department of Health, and a lease to the premises from Hanover Landlord. The Hanover Landlord is an unrelated entity. The surgery center is not operating, and the Hanover Landlord issued a notice of default. As set forth in the Summary of Assets and Liabilities filed on August 16, 2024 [Docket No. 130], the assets of Debtor Hanover Hills are scheduled at $817,050 with the value of the license being undetermined. KeyBank asserts a claim in an amount exceeding $29 million against Debtor Hanover Hills secured by the assets of Debtor Hanover Hills. Debtor Hanover Hills has unsecured claims of other creditors totaling approximately $3,704,596, which sum includes the unsecured claims of affiliates aggregating $3,486,264.18 (which KeyBank holds a lien against) and the Hanover Landlord in the scheduled amount of $107,021.14.  Exclusive of the KeyBank and the Hanover Landlord claims, the Debtor Hanover Hills' scheduled unsecured claims aggregate the amount of $111,310.68.

### ARTICLE III
### EVENTS GIVING RISE TO THESE CHAPTER 11 CASES

The Debtors had been negotiating with KeyBank and the Lorient Parties in an effort to resolve outstanding issues. KeyBank was included in the negotiations because CIA was its borrower, and ANS Continuum was the guarantor of KeyBank's loan to CIA. When Debtor ANS finally stopped paying the management fees to ANS Continuum in October 2022 (as the ANS Debtors contend or earlier as reflected in certain records), CIA stopped making payments to KeyBank. Certain parties entered into a forbearance agreement to permit for negotiations and the potential resolution of the various issues. In particular, KeyBank and CIA, Florham Park Investors,

5

LLC, Continuum Institute, LLC, ANS Continuum executed that certain Forbearance Agreement dated July 23, 2021 and that certain Second Forbearance Agreement dated as of April 27, 2022, (the "Forbearance Agreements"). The negotiations between KeyBank, Lorient and the Debtors reached a standstill in late 2023. By December 15, 2023, all of the Debtors ceased operations and terminated nearly all employees. On April 6, 2024, KeyBank filed an Order to Show Cause together with a complaint seeking the appointment of a receiver for the Debtor ANS. The Complaint was filed in the Superior Court of New Jersey, Morris County [Docket # MRS-C-000029-24]. On June 5, 2024, prior to the return date of the hearing scheduled for the receivership application, Debtor ANS and Debtor Newco each filed chapter 11 petitions. Later, on July 12, 2024, Debtor Hanover Hills filed its chapter 11 petition to run a process to sell substantially all of its assets in the Chapter 11 Cases.

## ARTICLE IV
## CERTAIN PROCEEDINGS AND MOTIONS IN THESE CHAPTER 11 CASES

### (a)    The Debtors' Bankruptcy Filings and First Day Motions

On June 5, 2024, each of the ANS Debtors filed a voluntary chapter 11 bankruptcy petition. On June 7, 2024 the ANS Debtors filed a number of "first day" motions together with an application for an expedited hearing, including (i) a motion for continued use of its cash management systems and bank accounts [Docket No. 9], (ii) a motion to appoint Epiq as noticing and claims agent for the jointly administered cases [Docket No. 14], (iii) a motion for joint administration [Docket No. 11], (iv) a motion to retain Thomas Buck as Chief Restructuring Officer of the ANS Debtors [Docket No. 12], (v) a motion for an extension of time to file schedules [Docket No. 13], and (vi) a motion for authority to pay insurance premiums and to assume and continue under existing insurance policies [Docket No. 10] (collectively, the "ANS First Day Motions").

On July 12, 2024, Debtor Hanover Hills filed its chapter 11 petition in the Bankruptcy Court (Chapter 11 Case No. 24-16995 (VFP)) as a related case to the ANS Debtors. On July 18, 2024, Debtor Hanover Hills filed several "first day" motions, including (i) a motion for joint administration with the ANS Debtors' cases [Debtor Hanover Hills Docket No. 13[2]], (ii) a motion for an extension of time to file schedules (Debtor Hanover Hills Docket No. 14], (iii) a motion for continuation of utility service [Debtor Hanover Hills Docket No. 15], and (iv) a motion to reject an executory contract between Debtor Hanover Hills and Sasso Consulting LLC [Debtor Hanover Hills Docket No. 16] (collectively, the "Hanover Hills First Day Motions").

The ANS Debtors cases and the case of Debtor Hanover Hills are jointly administered [see Docket Nos. 32 and 91].

Other notable events in the Debtors' Chapter 11 Cases include:

(1)    The Bankruptcy Court granted each of the ANS First Day Motions and the Hanover Hills First Day Motions (together the "First Day Motions") on an interim or final basis, as applicable, and the First Day Motions previously approved on an interim

---

[2] References to "Debtor Hanover Hills Docket" shall refer to Debtor Hanover Hills' individual case docket under case number 24-16995 (VFP).

DMS_US.366435582.22

basis were subsequently approved on a final basis. The First Day Motions included a cash management motion that provided for the funding of a professional fee escrow for purposes of earmarking monies to pay Allowed Professional Fees of the ANS Debtors, which funds are held at Veritex (the "Professional Fee Escrow").

(2)    On June 27, 2024 the Bankruptcy Court entered an order excusing the ANS Debtors from complying with the requirement that a patient ombudsman be appointed with respect to the ANS Debtors [Docket No. 56].

(3)    On June 27, 2024, pursuant to section 1102(a) of the Bankruptcy Code, the Office of United States Trustee filed a *Notice of Appointment of Official Committee of Unsecured Creditors* (the "Appointment Notice") [Docket No. 54], appointing the following members to the Committee: (i) KeyBank, (ii) Dr. Richard P. Winne Jr., (iii) Dr. Gautam Malhotra, (iv) NeuroPoint Alliance, and (v) Dr. Igor Ugorec. On August 6, 2024, following Debtor Hanover Hills' bankruptcy filing and the joint administration of Debtor Hanover Hills' case with the ANS Debtors' cases,, the Office of United States Trustee filed an amendment of the Appointment Notice to add Eastman Management Corp. as a member of the Committee [Docket No. 111].

(4)    On July 2, 2024 the ANS Debtors filed their schedules of assets and liabilities and their statement of financial affairs [Docket Nos. 62 and 63 and Docket Nos. 38 and 39 24-15727].

(5)    On July 9, 2024, the Bankruptcy Court entered an order approving the ANS Debtors' motion to reject certain executory contracts, including but not limited to the Exclusive Management Agreement with ANS Continuum [Docket No. 67].

(6)    On July 18, 2024, the Bankruptcy Court entered an order granting the application of the ANS Debtors to employ Greenbaum Rowe Smith & Davis LLP as ANS Debtors' counsel [Docket No. 76].

(7)    On July 19, 2024, the Bankruptcy Court entered an order granting the application of the ANS Debtors to retain Epstein Becker & Green PC as special counsel to the ANS Debtors [Docket No. 78].

(8)    The U.S. Trustee conducted the ANS Debtors' section 341(a) meeting on July 19, 2024 and the Hanover Hills section 341(a) meeting on September 21, 2024.

(9)    On August 9, 2024, Hanover Hills filed a *Motion for Entry of an Order (I)(A) Approving the Auction and Bidding Procedures, (B) Approving Stalking Horse Bid Protections, (C) Scheduling Bid Deadlines and an Auction, (D) Approving the Form and Manner of Notice Thereof, and (III)(A) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (B) Authorizing the Assumption and Assignment of Assumed Contracts and Leases, (C) Authorizing the Sale of Assets, and (D) Granting Related Relief* (the "Bidding Procedures Motion") [Docket No. 118].

(10)    On August 14, 2024, the Bankruptcy Court entered an order authorizing the Debtors' retention of ordinary course professionals [Docket No. 127].

(11)    On August 14, 2024, the Bankruptcy Court entered an order authorizing the retention and employment of The Bloom Organization LLC as investment banker to the Debtor Hanover Hills [Docket No. 126].

(12)    On August 16, 2024, Debtor Hanover Hills filed its schedules of assets and liabilities and statement of financial affairs [Docket Nos. 130 and 131].

(13)    On August 21, 2024, Bankruptcy Court entered an order excusing the ANS Debtor Hanover Hills from complying with the requirement that a patient ombudsman be appointed with respect to the Debtor Hanover Hills [Debtor Hanover Hills Docket No. 47].

(14)    On August 23, 2024, the Bankruptcy Court entered an order (the "Bidding Procedures Order") granting the Bidding Procedures Motion, including approving bidding procedures (the "Bidding Procedures") for a sale process of Debtor Hanover Hills' assets [Docket No. 147].

(15)    On August 26, 2024, the Bankruptcy Court entered an order granting the application of the Debtor Hanover Hills to retain Fox Rothschild LLP as Debtor Hanover Hills' counsel [Docket No. 152].

(16)    On August 27, 2024, the Bankruptcy Court entered the Bar Date Order which, among other relief, established the Bar Dates for Creditors to file Claims, including (a) the General Bar Date for all Debtors of October 3, 2024 at 4:00 pm EST, (b) the Governmental Unit Bar Date of December 2, 2024 at 4:00 pm EST for the ANS Debtors, and (c) the Government Bar Date of January 8, 2024 at 4:00 pm EST for Debtor Hanover Hills. Notice of the Bar Dates was provided in accordance with the Bar Date Order.

(17)    On September 4, 2024 the Bankruptcy Court entered an interim order authorizing the ANS Debtors to make certain postpetition financing loans to Debtor Hanover Hills and permitting Debtor Hanover Hills to use the cash collateral of KeyBank [Docket No. 169].

(18)    On September 12, 2024, the Bankruptcy Court entered an order authorizing the ANS Debtors to purchase replacement D&O insurance for the benefit of the members of the Debtors' governing boards at a cost of no more than $55,000 [Docket No. 185]. On or about September 20, 2024, the Debtors replaced the existing policy of D&O insurance for the benefit of the directors and officers of the Debtors and ANS Continuum.

(19)    On September 23, 2024, Hanover Hills filed a *Notice of Designation of Stalking Horse Bidder Pursuant to Bidding Procedures Order* advising that Debtor Hanover

8

Hills negotiated a stalking horse agreement with AOP for $3,000,000 subject to higher and better offers [Docket No. 202].[3]

(20)   On September 30, 2024, the Bankruptcy Court entered an order approving the disposal of patient records [Docket No. 221].

(21)   On October 2, 2024, the Debtors filed a Combined Disclosure Statement and Plan

(22)   On October 11, 2024, the Debtors' filed a *Joint Motion for Conditional Approval of Disclosure Statement (II) Scheduling a Combined Hearing on Final Approval of the Disclosure Statement and Confirmation of the Joint Chapter 11 Liquidating Plan, (III) Approving Notices Related Thereto, and (IV) Granting Related Relief* [Docket No. 244] the ("Solicitation Procedures Motion").

(22)   On October 15, 2024, the Committee filed its motion seeking to terminate the Debtors' exclusive right to file a plan [Docket No. 251].

(23)   On October 25 , 2024, KeyBank filed an objection to the Solicitation Procedures Motion.

(24)   On October 18, 2024, the Bankruptcy Court entered the order (i) authorizing Debtor Hanover Hills to sell substantially all of its assets, free and clear of all liens, claims, encumbrances and interests, and (ii) authorizing the assumption and assignment of executory contracts and leases [Docket No. 260].

(25)   On October 22, 2024, the Bankruptcy Court entered an *Order Authorizing the Appointment of Epiq Corporate Restructuring, LLC as Solicitation and Balloting Agent Effective as of the Petition Date and (II) Granting Related Relief* [Docket No. 265] authorizing Epiq to serve as solicitation and balloting agent with respect to the Plan.

(26)   On November 22, 2024 counsel to KeyBank, the Debtors, the Committee and the Shareholders met with Chief Bankruptcy Judge Michael Kaplan to mediate the disputes between the Parties. A further mediation session was scheduled for December 13, 2024 but was adjourned.

(27)   On December 16, 2024, the Debtors filed a motion under Bankruptcy Rule 9019 to approve a settlement of disputes agreed upon by the Parties thereto which is scheduled to be heard on December 23, 2024.

**(b)      The Debtors' Post-Petition Operation**

Since the Petition Date, the Debtors have continued to manage their assets in liquidation. Tom Buck, the CRO, oversees the day-to-day affairs of the Debtors, including the collection of

---

[3] A *First Amended Notice of Designation of Stalking Horse Bidder Pursuant to Bidding Procedures Orders* was filed on October 3, 2024 [Docket No. 228].

accounts receivable, the liquidation of assets and maintenance of insurance, and provides such additional services as are requested by the Debtors' executive committee.

## ARTICLE V
## The Proposals For A Settlement

This section of the Combined Disclosure Statement and Plan describes the various discussions between the parties including the Debtors, the Shareholders, KeyBank, the Lorient Parties, and, after its formation, the Committee in an effort to reach a global settlement.

a.    The statements of financial affairs filed by the ANS Debtors identify certain avoidance claims arising within the year prior to the Petition Date against the Shareholders with respect to certain distributions while the ANS Debtors may have been insolvent. The Committee investigated these and additional transfers of distributions made by the ANS Debtors to the Shareholders within four (4) years prior to the Petition Date. The Committee also investigated payments to or for the benefit of ANS Continuum on account of management service fees, and it appears, based on information provided by the Debtors, that sometime in 2020 or 2021, the Debtors accrued management service fees – i.e. paying less than the full contractual amount pursuant to amendment and/or forbearance of the Exclusive Management Services Agreement. After August 2022, the Debtors stopped paying management services fees. The Committee has taken the position that the distributions made to the Shareholders during the four (4) year period prior to the Petition Date constitute avoidable dividends, but the Shareholders contest such characterization and assert that the distributions were part of each Shareholders' reasonable compensation.

b.    In addition to the claims for avoidance of the four-year distributions to the Shareholders, the Committee's investigation indicated other potential causes of actions against each of the Shareholders individually and against certain of the Shareholders as directors and officers. The Committee described these potential causes of action in its demand letter to the Debtors dated August 15, 2024, as supplemented by letter dated August 28, 2024. These claims against the Shareholders, as alleged by the Committee, include: (i) actual and constructive fraudulent transfers for dividend payments to the Shareholders totaling in excess of $16 million; (ii) actual and constructive fraudulent transfers of the Debtors' business assets to the Shareholders' new practices; (iii) tortious interference with the Debtors' contractual relationships with the Shareholders and the associate doctors; (iv) mere continuation of the Shareholders' new practices through continuity of management, personnel, geographic location, assets and general business operations; and (v) breach of the Shareholders' employment/non-compete agreements. With respect to the Debtors' directors and officers, the Committee alleged their breach of fiduciary duty by assisting and participating with the Shareholders' alleged conduct and by taking no action for the Debtors to protect and enforce the Debtors' rights as to the Shareholders' alleged actions.

c.    In its complaint filed in the Superior Court of New Jersey, Morris County, filed on April 6, 2024, KeyBank, as the alleged transferee/assignee of claims originally held by the Lorient Parties, alleged that the Debtor ANS, as well as the directors and officers thereof, had breached contractual obligations and other representations involving additional breaches of fiduciary obligations pertaining, among other things, to the failure to pay the management fees to ANS Continuum in accordance with the Management Agreement. KeyBank alleges that the damages

DMS_US.366435582.22

arising from such breaches aggregate in excess of $20,000,000. KeyBank has also asserted claims against the Debtor ANS for damages exceeding $29 million.

     d.     The claims asserted by the ANS Debtors, the Committee, the Lorient Parties, and KeyBank recited in paragraphs a, b. and c. above are disputed by the Shareholders in their individual capacity and (as applicable) directors and officers of the Debtors. The Shareholders have advised the Debtors through counsel that absent a settlement they will vigorously defend the allegations against them.

     e.     In an effort to avoid the expenditure of substantial time and assets of the Estates pursuing the claims against the Shareholders, the Debtors, KeyBank, and the Lorient Parties negotiated a non-binding settlement term sheet dated June 28, 2024 with certain Shareholders. In summary, this non-binding term sheet according to the ANS Debtors provided the following material terms:

1. The six participating Shareholders would contribute $2,800,000 in settlement to be allocated 50-50 between the Estates and KeyBank.

2. The ANS Debtors would cooperate with KeyBank to bring about the chapter 11 filing of Hanover Hills and the marketing and sale of the assets of Hanover Hills. The gross proceeds of the sale of the Hanover Hills assets would be allocated as follows: (i) to the costs of sale including payment to the Bloom Organization in accordance with its court approved retention, (ii) to the repayment to the ANS Debtors of Bankruptcy Court approved loans by the ANS Debtors to Debtor Hanover Hills by way of post-petition financing as approved by the Bankruptcy Court, (iii) to pay the allowed administrative expenses of Debtor Hanover Hills, (iv) to KeyBank on account of its allowed secured claim against the assets of Debtor Hanover Hills, and (v) to the allowed claims of the general unsecured creditors of Debtor Hanover Hills.

3. ANS Continuum would confirm that it has transferred and assigned its claim against the ANS Debtors to KeyBank, and ANS Continuum shall not file a claim in any of the Chapter 11 Cases.

4. The two (2) remaining non-settling Shareholders could join the settlement by contributing $625,000 each to KeyBank.

5. The participating Shareholders would receive, provided that they each fulfill their respective commitments to fund their share of the $2,800,000, full and absolute releases from KeyBank, the Estates, and the Lorient Parties as part of an order confirming a Debtors' plan of liquidation.

6. The ANS Debtors' proposed plan of liquidation would provide for distribution to KeyBank on its effective date in the amount of $1,400,000.

11

7. Provided that KeyBank received its allowed secured claim against the net proceeds of the sale of the assets of Hanover Hills, KeyBank would release the Lorient Parties from any liability pertaining to the KeyBank loans.

8. Provided that the Debtors' plan complied with the terms of the settlement KeyBank would vote in favor of the Plan.

f.    This non-binding settlement term sheet also had deadlines for the parties to execute a settlement agreement and to seek Bankruptcy Court approval of such settlement agreement; however, these deadlines have lapsed and, to date, the parties to the non-binding settlement term sheet have not executed a settlement agreement.

g.    The Committee, upon review of the non-binding settlement term sheet, expressed its objections thereto and asked the Debtors to either include the Committee in settlement negotiations or to move forward with seeking approval of the settlement in line with the terms of the non-binding settlement term sheet over the Committee's objection.

h.    On August 15 and 28, 2024, the Committee served its demand letter on the Debtors to make a timely claim under the D&O Liability Insurance Policy (issued in the amount of $5,000,000 for loss plus $1,000,000 for non-indemnified loss). Further weeks lapsed, during which time the Debtors began negotiations with the Committee to try to move this case forward.

i.    The Committee and the Debtors provided notice of these D&O Claims on the D&O Insurer, and the Debtors have followed up with the D&O Insurer to confirm coverage of these D&O Claims; however, the D&O Insurer has not responded.

j.    Using the non-binding settlement term sheet as a starting point, the Committee proposed global settlement terms, which terms have been incorporated in this Plan in Article 10.09 as to which Key Bank, ANS Founders, the Lorient Parties and each of the Shareholders may elect to participate in the settlement.

k.    The parties requested that Chief Bankruptcy Judge Michael B Kaplan serve as a mediator to assist the parties to reach a global settlement.  The parties met with Judge Kaplan on November 22, 2024 and December 13, 2024. On December 16, 2024, the Debtors filed a Rule 9019 Motion to approve a settlement among the parties to such Motion, which Motion is pending before the Court.

## ARTICLE VI
## CONFIRMATION PROCEDURES

### 6.01    Confirmation Procedures

On October 11, 2024, the Debtors filed the Solicitation Procedures Motion. The Committee filed a motion to terminate exclusivity and KeyBank filed an Objection to the Solicitation Procedures Motion.  The hearings on the Solicitation Procedures Motion and the Committee's motion to terminate exclusivity as well as KeyBank's Objection were adjourned from time to time while the Parties negotiated a settlement.

12

Among other things, the Solicitation Procedures Motion seeks an order approving the adequacy of the disclosures in this Combined Disclosure Statement and Plan on an interim basis and setting certain deadlines for the solicitation of the Plan, voting on the Plan, filing objections to the Plan, and a hearing to consider approval of the Plan. The Confirmation Hearing will be scheduled for the Bankruptcy Court to consider (a) final approval of the Combined Disclosure Statement and Plan as providing adequate information pursuant to section 1125 of the Bankruptcy Code and (b) confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code. The Confirmation Hearing may be adjourned from time to time by the Plan Proponents without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing or by Filing a notice with the Bankruptcy Court. The Plan Proponents may file supplements or modifications to the Plan as it deems appropriate without delaying or extending the scheduled hearing dates.

### 6.02    Procedure for Objections

Any objection to final approval of the Combined Disclosure Statement and Plan as providing adequate information pursuant to section 1125 of the Bankruptcy Code and/or Confirmation of the Plan must be made in writing and Filed with the Bankruptcy Court and served on the following parties so as to be actually received at least seven (7) days prior to the date set for the Confirmation Hearing upon (i) counsel to the ANS Debtors, Greenbaum Rowe Smith & Davis LLP, Attention: David L Bruck, Esq., dbruck@greenbaumlaw.com; (ii) counsel for the Committee, Faegre Drinker Biddle & Reath LLP, Attention: Richard Bernard, Esq. and Frank Velocci, Esq.; (iii) the Office of the United States Trustee, Attention: Fran Steele, Esq. and Peter D'Auria, Esq.; (iv) counsel to Debtor Hanover Hills, Fox Rothschild LLP, Attention: Joseph DiPasquale, Esq and Michael Herz, Esq., and (v) counsel to KeyBank, Duane Morris LLP, Attention: Morris Bauer, Esq.  Unless an objection is timely Filed and served, it may not be considered by the Bankruptcy Court at the Confirmation Hearing.

### 6.03    Requirements for Confirmation

The Bankruptcy Court will confirm the Plan only if the Plan meets all the applicable requirements of section 1129 of the Bankruptcy Code. Among other requirements, the Plan (a) must be accepted by all Impaired Classes of Claims or Interests or, if rejected by an Impaired Class, the Plan must not "discriminate unfairly" against and be "fair and equitable" with respect to, such Class; and (b) must be feasible. The Bankruptcy Court must also find that: (i) the Plan has classified Claims and Interests in a permissible manner; (ii) the Plan complies with the technical requirements of Chapter 11 of the Bankruptcy Code; and (iii) the Plan has been proposed in good faith.

### 6.04    Classification of Claims and Interests

Section 1123 of the Bankruptcy Code provides that a plan must classify the claims and interests of a debtor's creditors and equity interest holders. In accordance with section 1123 of the Bankruptcy Code, the Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than those claims which pursuant to section 1123(a)(1) of the Bankruptcy Code need not be and have not been classified). The Plan Proponents also are required, under

13

section 1122 of the Bankruptcy Code, to classify Claims and Interests into Classes that contain Claims or Interests that are substantially similar to the other Claims or Interests in such Class.

The Bankruptcy Code also requires that a plan provide the same treatment for each claim or interest of a particular class unless the claim holder or interest holder agrees to a less favorable treatment of its claim or interest. The Plan Proponents believe that the Plan complies with such standards. If the Bankruptcy Court finds otherwise, however, it could deny confirmation of the Plan if the Holders of Claims or Interests affected do not consent to the treatment afforded them under the Plan.

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim also is placed in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class, and such Claim has not been paid, released or otherwise settled prior to the Effective Date. The Plan Proponents believe that the Plan has classified all Claims and Interests in compliance with the provisions of section 1122 of the Bankruptcy Code and applicable case law. It is possible that a Holder of a Claim or Interest may challenge the Plan Proponents' classification of Claims or Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed. If such a situation develops, the Plan Proponents intend, in accordance with the terms of the Plan, to make such permissible modifications to the Plan as may be necessary to permit its Confirmation. Any such reclassification could adversely affect Holders of Claims by changing the composition of one or more Classes and the vote required of such Class or Classes for approval of the Plan.

EXCEPT AS SET FORTH IN THE PLAN, UNLESS SUCH MODIFICATION MATERIALLY ADVERSELY AFFECTS THE TREATMENT OF A HOLDER OF A CLAIM AND REQUIRES RE-SOLICITATION, ACCEPTANCE OF THE PLAN BY ANY HOLDER OF A CLAIM PURSUANT TO THIS SOLICITATION WILL BE DEEMED TO BE A CONSENT TO THE PLAN'S TREATMENT OF SUCH HOLDER OF A CLAIM REGARDLESS OF THE CLASS AS TO WHICH SUCH HOLDER ULTIMATELY IS DEEMED TO BE A MEMBER.

The amount of any Impaired Claim that ultimately is Allowed by the Bankruptcy Court may vary from any estimated Allowed amount of such Claim and, accordingly, the total Claims that are ultimately Allowed by the Bankruptcy Court with respect to each Impaired Class of Claims may also vary from any estimates contained herein with respect to the aggregate Claims in any Impaired Class. Thus, the actual recovery ultimately received by a particular Holder of an Allowed Claim may be adversely or favorably affected by the aggregate amount of Claims Allowed in the applicable Class. Additionally, any changes to any of the assumptions underlying the estimated Allowed amounts could result in material adjustments to recovery estimates provided herein and/or the actual Distribution received by Creditors. The projected recoveries are based on information available to the Debtors as of the date hereof and reflect the Plan Proponents' views as of the date hereof only.

The classification of Claims and Interests and the nature of Distributions to members of each Class are summarized herein. The Plan Proponents believe that the consideration, if any,

14

provided under the Plan to Holders of Claims reflects an appropriate resolution of their Claims taking into account the differing nature and priority (including applicable contractual or judicial subordination) of such Claims and Interests. The Bankruptcy Court must find, however, that a number of statutory tests are met before it may confirm the Plan. Many of these tests are designed to protect the interests of Holders of Claims or Interests who are not entitled to vote on the Plan, or do not vote to accept the Plan, but who will be bound by the provisions of the Plan if it is confirmed by the Bankruptcy Court.

### 6.05    Impaired Claims or Interests

Pursuant to the provisions of the Bankruptcy Code, only classes of claims or interests that are "impaired" (as defined in section 1124 of the Bankruptcy Code) under a plan may vote to accept or reject such plan. Generally, a claim or interest is impaired under a plan if the holder's legal, equitable or contractual rights are changed under such plan. In addition, if the holders of claims or interests in an impaired class do not receive or retain any property under a plan on account of such claims or interests, such impaired class is deemed to have rejected such plan under section 1126(g) of the Bankruptcy Code and, therefore, such holders are not entitled to vote on such plan.

Under the Plan, Holders of Claims in Classes 3, 4, 5, 6, 7, and 8 are Impaired and are entitled to vote on the Plan. Under the Plan, Intercompany Claims in Class 9 and Holders of Interests in Class 10 are Impaired and will not receive or retain any property under the Plan on account of such Interests and, therefore, are not entitled to vote on the Plan and are deemed to reject the Plan. Under the Plan, Holders of Claims in Classes 1 and 2, and are Unimpaired and, therefore, not entitled to vote on the Plan and are deemed to accept the Plan.

ACCORDINGLY, A BALLOT FOR ACCEPTANCE OR REJECTION OF THE PLAN IS BEING PROVIDED ONLY TO HOLDERS OF CLAIMS IN CLASSES 3, 4, 5, 6, 7, AND 8.

### 6.06    Confirmation Without Necessary Acceptances; Cramdown

In the event that any impaired class of claims or interests does not accept a plan, a debtor nevertheless may move for confirmation of the plan. A plan may be confirmed, even if it is not accepted by all impaired classes, if the plan has been accepted by at least one impaired class of claims, and the plan meets the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code. Section 1129(b) of the Bankruptcy Code requires that a court find that a plan (a) "does not discriminate unfairly" and (b) is "fair and equitable," with respect to each non-accepting impaired class of claims or interests. Here, because Holders of Claims and Interests in Classes 9 and 10 are deemed to reject the Plan, the Plan Proponents will seek confirmation of the Plan from the Bankruptcy Court by satisfying the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code. The Plan Proponents believe that such requirements are satisfied, as no Holder of a Claim or Interest junior to those in Classes 9 and 10 respectively, will receive or retain any property under the Plan

A plan does not "discriminate unfairly" if (a) the legal rights of a non-accepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are similar to those of the non-accepting class and (b) no class receives payments in excess of that

15

which it is legally entitled to receive for its claims or interests. The Plan Proponents believe that, under the Plan, all Impaired Classes of Claims or Interests are treated in a manner that is consistent with the treatment of other Classes of Claims or Interests that are similarly situated, if any, and no Class of Claims or Interests will receive payments or property with an aggregate value greater than the aggregate value of the Allowed Claims or Allowed Interests in such Class. Accordingly, the Plan Proponents believe that the Plan does not discriminate unfairly as to any Impaired Class of Claims or Interests.

The Bankruptcy Code provides a nonexclusive definition of the phrase "fair and equitable." In order to determine whether a plan is "fair and equitable," the Bankruptcy Code establishes "cram down" tests for secured creditors, unsecured creditors and equity holders, as follows:

a. <u>Secured Creditors</u>. Either (i) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred Cash payments having a present value equal to the amount of its allowed secured claim, (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim or (iii) the property securing the claim is sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as otherwise set forth herein.

b. <u>Unsecured Creditors</u>. Either (i) each impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

c. <u>Equity Interests</u>. Either (i) each holder of an equity interest will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of the interest or (ii) the holder of an interest that is junior to the non-accepting class will not receive or retain any property under the plan. As discussed above, the Plan Proponents believe that the Distributions provided under the Plan satisfy the absolute priority rule described above, where required.

**6.07    Feasibility**

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan will not likely be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors (unless such liquidation or reorganization is proposed in the Plan). Because the Plan as proposed is a plan of liquidation the Plan meets the feasibility requirements of the Bankruptcy Code.

**6.08    Best Interests Test and Liquidation Analysis**

Even if a plan is accepted by the holders of each class of claims and interests, the Bankruptcy Code requires a court to determine that such plan is in the best interests of all holders of claims or interests that are impaired by that plan and that have not accepted the plan. The "best

16

interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a court to find either that all members of an impaired class of claims or interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code. To calculate the probable distribution to holders of each impaired class of claims and interests if the debtor was liquidated under chapter 7, a court must first determine the aggregate dollar amount that would be generated from a debtor's assets if its chapter 11 cases were converted to chapter 7 cases under the Bankruptcy Code. To determine if a plan is in the best interests of each impaired class, the present value of the distributions from the proceeds of a liquidation of the debtors' unencumbered assets and properties, after subtracting the amounts attributable to the costs, expenses and administrative claims associated with a chapter 7 liquidation, must be compared with the value offered to such impaired classes under the plan. If the hypothetical liquidation distribution to holders of claims or interests in any impaired class is greater than the Distributions to be received by such parties under the Plan, then such plan is not in the best interests of the holders of claims or interests in such impaired class. A Liquidation Analysis will be provided as a supplement to the Plan prior to the Confirmation Hearing.

Because the Plan is a liquidating plan, the "liquidation value" in the hypothetical chapter 7 liquidation analysis for purposes of the "best interests" test is substantially similar to the estimates of the results of the chapter 11 liquidation contemplated by the Plan. However, the Plan Proponents believe that, in a chapter 7 liquidation, there would be additional time and delays caused by the chapter 7 trustee and its professionals to understand the history and status of the case and the litigation causes of action. The Plan Proponents also believe that, in lieu of the economic sensibility of the potential settlement under this Plan, the chapter 7 trustee may be more inclined to litigate issues, which would also increase the delay and cost of liquidating the Estates in chapter 7. The costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a chapter 7 trustee, as well as the costs of counsel and other professionals retained by the chapter 7 trustee.

The litigation would take an extended amount of time to bring to conclusion and, as with all litigation, success is not guaranteed. The directors and officers of the Debtors and the shareholders have all retained counsel and are prepared to defend vigorously the claims in the litigation.

The Plan Proponents believe the cost of the litigation will far exceed the expenses that would be incurred in implementing the Plan and winding up the affairs of the Debtors as proposed in this Plan. Moreover, if the Plan is confirmed as proposed distribution to stakeholders will be accomplished in a matter of months not years as will be the case in chapter 7.

The Estates would also be obligated to pay all unpaid expenses incurred by the Debtors and the Committee during these Chapter 11 Cases (such as compensation for Professionals) that are allowed in the chapter 7 case. Conversion also would as stated delay the liquidation process and ultimate distribution of whatever value remains in the Estates. Under the Plan, estimated recoveries to Holders of Allowed General Unsecured Claims are approximately 10% whereas under a chapter 7 case, estimated recoveries for such parties are speculative and are estimated at 0%.

DMS_US.366435582.22

Accordingly, the Plan Proponents believe that Holders of Allowed Claims would receive less than anticipated under the Plan if these Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code, and therefore, the requirements of Section 1129(a)(7) of the Bankruptcy Code have been satisfied.

**6.09    Acceptance of the Plan**

The rules and procedures governing eligibility to vote on the Plan, solicitation of votes, and submission of ballots are set forth in the Solicitation Procedures Order. In order for the Plan to be accepted by an Impaired Class of Claims, a majority in number and two-thirds in dollar amount of the Claims voting in such Class must vote to accept the Plan. At least one Impaired Voting Class, excluding the votes of Insiders, must actually vote to accept the Plan.

IF YOU ARE ENTITLED TO VOTE ON THE PLAN, YOU ARE URGED TO COMPLETE, DATE, SIGN AND PROMPTLY MAIL THE BALLOT YOU RECEIVE. PLEASE BE SURE TO COMPLETE THE BALLOT PROPERLY AND LEGIBLY AND TO IDENTIFY THE EXACT AMOUNT OF YOUR CLAIM AND THE NAME OF THE HOLDER. IF YOU ARE A HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN AND YOU DID NOT RECEIVE A BALLOT, YOU RECEIVED A DAMAGED BALLOT OR YOU LOST YOUR BALLOT OR IF YOU HAVE ANY QUESTIONS CONCERNING THE PLAN OR PROCEDURES FOR VOTING ON THE PLAN, PLEASE CONTACT COUNSEL TO THE DEBTOR AT GREENBAUM ROWE SMITH & DAVIS LLP, 99 WOOD AVENUE SOUTH, ISELIN, NEW JERSEY 08830 OR BY EMAIL AT dbruck@greenbaumlaw.com OR THE COMMITTEE AT FAEGRE DRINKER BIDDLE & REATH LLP 600 CAMPUS DRIVE, FLORHAM PARK, NEW JERSEY 07932 OR BY EMAIL AT richard.bernared@faegredrinker.com. NEITHER COUNSEL TO THE DEBTOR NOR COUNSEL TO THE COMMITTEE WILL PROVIDE LEGAL ADVICE.

**ARTICLE VII**
**CLASSIFICATION OF CLAIMS AND INTERESTS AND EXPECTED RECOVERIES**

**7.01    Overview of Classification.**

Pursuant to section 1122 of the Bankruptcy Code, a Claim or Interest is placed in a particular Class for purposes of voting on the Plan and receiving Distributions under the Plan only to the extent (i) the Claim or Interest qualifies within the description of that Class; and (ii) the Claim or Interest has not been paid, released, or otherwise compromised before the Effective Date. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Compensation Claims, and Priority Tax Claims are not classified under the Plan and are excluded from the following Classes. All treatment provided in this Article VII is subject to the Effective Date.

**7.02    Identification and Treatment of Unclassified Claims**

**(a)    Administrative Claims.**

On the Effective Date, each Holder of an Allowed Administrative Claim, other than Professional Fee Claims, shall receive in full and final satisfaction, settlement, and release of and

18

in exchange for such Allowed Administrative Claim: (a) Cash equal to the amount of such Allowed Administrative Claim; or (b) such other treatment as to which the Plan Proponents and the Holder of such Allowed Administrative Claim shall have agreed upon in writing.

(i)    Final Administrative Claims Bar Date.

Any Holders of an Administrative Claim accruing from the Petition Date through the Effective Date, other than Professional Fee Claims, shall File and serve on the Plan Proponents a request for payment, in writing, together with supporting documents, substantially complying with the Bankruptcy Code, the Bankruptcy Rules and the Local Rules, so as to actually be received on or before the Final Administrative Claims Bar Date. Any such Claim not Filed by the Final Administrative Claims Bar Date shall be deemed waived, and the Holder of such Claim shall be forever barred from receiving payment on account thereof. The notice of confirmation to be delivered pursuant to the Bankruptcy Rules 2002(c)(3) and 2002(f) shall set forth the Final Administrative Claims Bar Date and shall constitute notice of such Bar Date.

(ii)    Bar Date for Payment on Applications for Professional Fees.

Professional Fee Claims are Administrative Claims and all applications for allowance and payment of Professional Fee Claims shall be Filed with the Bankruptcy Court on or before the Professional Fee Bar Date. If an application for a Professional Fee Claim is not Filed by the Professional Fee Bar Date, such Professional Fee Claim shall be deemed waived and the Holder of such Claim shall be forever barred from receiving payment on account thereof. The notice of confirmation to be delivered pursuant to the Bankruptcy Rules 2002(c)(3) and 2002(f) shall set forth the Professional Fee Bar Date and shall constitute notice of such Bar Date.

Except for Professional Fee Claims against the Debtor Hanover Hills, Professional Fee Claims shall be paid by the Liquidation Trustee to the holder thereof subsequent to the entry of an order granting final allowances to such holder from the Professional Fee Escrow. With respect to the holder of a Professional Fee Claim against the Debtor Hanover Hills, such holder shall be paid by the Liquidation Trustee from the proceeds of the sale of Debtor Hanover Hills' assets upon closing of sale to AOP pursuant to the Hanover Sale Order.

(iii)    Section 503(b)(9) Claims.

For the avoidance of doubt, (i) the deadline for Filing requests for payment of 503(b)(9) Claims was the General Bar Date and (ii) the deadline for Filing requests for payment of Administrative Claims that arose between the Petition Date through the Effective Date is the initial Administrative Claim Bar Date, and neither deadline is extended by this Plan or the Confirmation Order.

**(b)    U.S. Trustee Fees.**

All Quarterly Fees due prior to the Effective Date shall be paid by the Debtors on the Effective Date. On and after the Effective Date, the Liquidating Trustee, shall be responsible for filing post-Confirmation quarterly reports and any pre-Confirmation monthly reports not filed as of the Confirmation Hearing in conformity with the U.S. Trustee guidelines. Each of the Debtors

19

and the Liquidating Trustee shall be jointly and severally liable for the payment of all applicable Quarterly Fees in the Debtors' Chapter 11 Cases until (i) the entry of a final decree in the Chapter 11 Cases or (ii) the Chapter 11 Cases are closed, converted, or dismissed. The U.S. Trustee shall not be required to file any Administrative Claim in the case and shall not be treated as providing any release under the Plan.

### (c) Priority Tax Claims.

On the Effective Date, each Holder of an Allowed Priority Tax Claim shall receive in full and final satisfaction, settlement, and release of and in exchange for such Allowed Priority Tax Claim: (a) Cash equal to the amount of such Allowed Priority Tax Claim; (b) payment in accordance with 11 U.S.C. § 1129(a)(9)(C); or (c) such other treatment as to which the Plan Proponents and the Holder of such Allowed Priority Tax Claim shall have agreed upon in writing.

### (d) Ordinary Course Liabilities.

All Ordinary Course Liabilities are deemed to be Allowed Claims to the extent supported by an invoice and any other appropriate documentation and not disputed by the Plan Proponents prior to the Effective Date. Holders of Administrative Claims on account of Ordinary Course Liabilities are not required to File or serve any request for payment of the Ordinary Course Liability. To the extent applicable, the Estates shall continue to pay each Ordinary Course Liability accrued prior to the Effective Date, pursuant to the payment terms and conditions of the particular transaction giving rise to the Ordinary Course Liability.

### 7.03 Identification and Treatment of Classes of Claims

### (a) Class 1: Other Secured Claims against the Debtors

Except to the extent previously paid in full, to the extent any Other Secured Claims against the Debtors exist, at the option of the Plan Proponents or the Liquidation Trustee, as applicable, one of the following treatments shall be provided: (i) the Holder of such Claim shall retain its Lien on its collateral until such collateral is sold, and the proceeds of such sale, less costs and expenses of disposing of such collateral, shall be paid to such Holder in full satisfaction and release of such Allowed Other Secured Claim; (ii) on or as soon as practicable after the later of (a) the Effective Date, or (b) the date upon which the Bankruptcy Court enters a Final Order determining or allowing such Claim, or as otherwise agreed between the Holder of such Claim and the Plan Proponents or the Liquidation Trustee, as applicable, the Holder of such Other Secured Claim will receive a Cash payment equal to the amount of its Allowed Other Secured Claim in full satisfaction and release of such Other Secured Claim; or (iii) the collateral securing the Creditor's Other Secured Claim shall be abandoned to such Creditor, in full satisfaction of such Other Secured Claim. Class 1 Claims are unimpaired and not entitled to vote.

### (b) Class 2: Priority Non-Tax Claims against the Debtors

Each Holder of an Allowed Priority Non-Tax Claim against the Debtors shall receive on the Effective Date, on account of and in full and complete settlement, release of, and in exchange for, such Allowed Priority Non-Tax Claim, either (A) Cash equal to the full unpaid amount of such

Allowed Priority Non-Tax Claim or (B) such other treatment as the Plan Proponents and the holder of such Allowed Priority Non-Tax Claim shall have agreed upon in writing. Such Class 2 Claims are therefore unimpaired and not entitled to vote.

### (c) Class 3: General Unsecured Claims, Excluding the KeyBank Claims, Against the Debtor ANS

Each Holder of an Allowed General Unsecured Claim against Debtor ANS, exclusive of KeyBank, shall receive a distribution of up to 10% of its Allowed General Unsecured Claim, capped at an aggregate distribution in the amount of $250,000 between Classes 3, 5 and 8, plus a distribution of a Pro Rata share of 10% of any net recovery related to the D&O Liability Insurance Policy (shared between Classes 3, 5 and 8 Claims). To the extent that the Holder of a Class 3 Claim has been scheduled or has filed a proof of claim against Debtor Newco for the same Claim, such Holder shall only be entitled to Distributions on only one of such Claims. The Liquidation Trustee shall make one or more Distributions on account of such Allowed General Unsecured Claims to each Holder of such Allowed General Unsecured Claims on each Distribution Date (or the date on which such Claim becomes an Allowed General Unsecured Claim) on a Pro Rata basis. The Class 3 Claims are impaired and are entitled to vote.

### (d) Class 4: KeyBank Claims against Debtor ANS

KeyBank has an Allowed General Unsecured Claim against Debtor ANS in the amount of $29,000,000, which as of the Effective Date no Person or party in interest shall have the right to contest by way of a Claim Objection or otherwise. After satisfaction in full of all Administrative Expense Claims against Debtor ANS, Allowed Professional Fee Claims against Debtor ANS, Allowed Priority Tax Claims against Debtor ANS, and Allowed Priority Non-Tax Claims against Debtor ANS, and the escrowing/earmarking with the Liquidation Trust of $250,000 to be used for distributions for Classes 3, 5 and 8 Allowed Claims, KeyBank shall receive the remaining Assets of Debtor ANS; *provided, however*, any such Distributions shall account for any reserves required by the Liquidation Trustee for the Liquidation Trust. The Class 4 Claim is impaired and entitled to vote on the Plan.

### (e) Class 5: General Unsecured Claims, Excluding the KeyBank Claim, Against Debtor Newco

Each Holder of an Allowed General Unsecured Claim against Debtor Newco, exclusive of KeyBank, shall receive a distribution of up to 10% of its Allowed General Unsecured Claim, capped at an aggregate distribution in the amount of $250,000 between Classes 3, 5 and 8, plus a distribution of a Pro Rata share of 10% of any net recovery related to the D&O Liability Insurance Policy (shared between Classes 3, 5 and 8 Claims). To the extent that the Holder of a Class 5 Claim has been scheduled or has filed a proof of claim against Debtor ANS for the same Claim, such Holder shall only be entitled to Distributions on only one of such Claims. The Liquidation Trustee shall make one or more Distributions on account of such Allowed General Unsecured Claims to each Holder of such Allowed General Unsecured Claims on each Distribution Date (or the date on which such Claim becomes an Allowed General Unsecured Claim) on a Pro Rata basis. The Class 5 Claims are impaired and are entitled to vote.

DMS_US.366435582.22

### (f) Class 6: KeyBank Claims Against Debtor Newco

KeyBank has an Allowed General Unsecured Claim against Debtor Newco in the amount of $29,000,000, which as of the Effective Date no Person or party in interest shall have the right to contest by way of a Claim Objection or otherwise. After satisfaction in full of all Administrative Expense Claims against Debtor Newco, Allowed Professional Fee Claims against Debtor Newco, Allowed Priority Tax Claims against Debtor Newco, and Allowed Priority Non-Tax Claims against Debtor Newco, and the escrowing/earmarking with the Liquidation Trust of $250,000 to be used for distributions for Classes 3, 5 and 8 Allowed Claims, KeyBank shall receive the remaining Assets of Debtor Newco; *provided, however*, any such Distributions shall account for any reserves required by the Liquidation Trustee for the Liquidation Trust. The Class 6 Claim is impaired and entitled to vote on the Plan.

### (g) Class 7: KeyBank Claim Against Debtor Hanover Hills

KeyBank has an Allowed Secured Claim against Debtor Hanover Hills in the amount of $29,000,000, including an Allowed Unsecured Claim against Debtor Hanover Hills for the balance of such Secured Claim not satisfied by the collateral or proceeds thereof. KeyBank's lien will continue against its collateral after the Effective Date and shall attach to the net available proceeds of the sale of Debtor Hanover Hills' assets upon closing of sale to AOP pursuant to the Hanover Sale Order. In satisfaction of the KeyBank Secured Claim against Debtor Hanover Hills, KeyBank shall receive the net available proceeds from the sale of the Assets of Debtor Hanover Hills after payment of the following at closing: (1) costs and expenses related to the sale closing in accordance with the terms of the Hanover APA and Hanover Sale Order, (2) all Allowed Administrative Claims, including without limitation the postpetition loans advanced by the ANS Debtors as approved by the Bankruptcy Court, and Allowed Professional Fee Claims in the Chapter 11 Case of Debtor Hanover Hills as an allowed carveout from KeyBank's collateral / lien under section 506(c) of the Bankruptcy Code, (3) an amount equal to that portion of the escrowing/earmarking with the Liquidation Trust of $250,000 from the ANS Debtors to be used for distributions for Classes 3, 5 and 8 Allowed Claims that is attributed to the distribution payable to holders of Class 8 Allowed General Unsecured Claims, and (4) any post-Confirmation loans, if any, made by the Liquidation Trustee with approval by the Post-Confirmation Committee to the Debtor Hanover Hills. The Class 7 Claim is impaired and is entitled to vote on the Plan.

### (h) Class 8: General Unsecured Claims, Excluding KeyBank Claims, Against Debtor Hanover Hills

Each Holder of an Allowed General Unsecured Claim in the Chapter 11 Case of the Debtor Hanover Hills shall receive a distribution of up to 10% of its Allowed General Unsecured Claim, capped at an aggregate distribution in the amount of $250,000 between Classes 3, 5 and 8, plus a distribution of a Pro Rata share of 10% of any net recovery related to the D&O Liability Insurance Policy (shared between Classes 3, 5 and 8 Claims). The Liquidation Trustee shall make one or more Distributions on account of such Allowed General Unsecured Claims to each Holder of such Allowed General Unsecured Claims on each Distribution Date (or the date on which such Claim

22

becomes an Allowed General Unsecured Claim) on a Pro Rata basis. The Class 8 Claims are impaired and are entitled to vote.

### (i) Class 9: Intercompany Claims

On the Effective Date, all Intercompany Claims in Class 9 shall be deemed canceled, extinguished, and of no further force or effect. Holders of Intercompany Claims in Class 9 shall not be entitled to receive or retain any property on account of such Class 9 Claims. Accordingly, Class 9 Claims are impaired, deemed to reject the Plan, and are not entitled to vote.

### (j) Class 10: Interests

On the Effective Date, all Interests shall be deemed canceled, extinguished, and of no further force or effect. Holders of Interests shall not be entitled to receive or retain any property on account of such Class 10 Interests. Accordingly, Class 10 Interests are impaired, deemed to reject the Plan, and are not entitled to vote.

### 7.04   Treatment of Classified Classes, Rights to Vote, and Estimated Distributions

The information in the table below is provided in summary form for illustrative purposes only and is subject to material change based on certain contingencies, including related to the amount of proofs of claims that are filed after the Bar Date, and the amount of Claims that exist after the claims reconciliation process. Actual recoveries may widely vary within these ranges, and any changes to any of the assumptions underlying these amounts could result in material adjustments to recovery estimates provided herein and/or the actual Distributions received by Creditors. The projected recoveries are based on information available to the Plan Proponents as of the date hereof and reflect the Plan Proponents' best estimates as of the date hereof only. In addition to the cautionary notes and risk factors contained elsewhere in the Combined Disclosure Statement and Plan, it is underscored that the Plan Proponents make no representation as to the accuracy of these recovery estimates. The Plan Proponents expressly disclaim any obligation to update any estimates or assumptions after the date hereof on any basis (including new or different information received and/or errors discovered). A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim or Interest is also placed in a particular Class for the purpose of receiving Distributions pursuant to this Combined Disclosure Statement and Plan only to the extent that such Claim or Interest is an Allowed Claim in that Class and such Claim or Interest has not been paid, released or otherwise settled prior to the Effective Date.

All Claims and Interests, except Administrative Claims and Priority Tax Claims, are placed in the Classes set forth below. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims, as described herein, have not been classified, and the respective treatment of such unclassified Claims is as otherwise set forth herein. The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including voting, confirmation and Distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

23

| Class/Designation | Plan Treatment | Status | Estimated Claim Pool/Projected Recovery |
|---|---|---|---|
| Class 1: Other Secured Claims | Except to the extent previously paid in full, to the extent any Other Secured Claims against the Debtors exist, at the option of the Plan Proponents or the Liquidation Trustee, as applicable, one of the following treatments shall be provided: (i) the Holder of such Claim shall retain its Lien on its collateral until such collateral is sold, and the proceeds of such sale, less costs and expenses of disposing of such collateral, shall be paid to such Holder in full satisfaction and release of such Allowed Other Secured Claim; (ii) on or as soon as practicable after the later of (a) the Effective Date, or (b) the date upon which the Bankruptcy Court enters a Final Order determining or allowing such Claim, or as otherwise agreed between the Holder of such Claim and the Plan Proponents or the Liquidation Trustee, as applicable, the Holder of such Other Secured Claim will receive a Cash payment equal to the amount of its Allowed Other Secured Claim in full satisfaction and release of such Other Secured Claim; or (iii) the collateral securing the Creditor's Other Secured Claim shall be abandoned to such Creditor, in full satisfaction of such Other Secured Claim. | Unimpaired; Deemed to accept Plan | Approx Amount: Unknown<br><br>Projected Recovery: 100% |
| Class 2: Priority Non-Tax Claims | Each Holder of an Allowed Priority Non-Tax Claim against the Debtors shall receive on the Effective Date, on account of and in full and complete settlement, release of, and in exchange for, such Allowed Priority Non-Tax Claim, either (A) Cash equal to the full unpaid amount of such Allowed Priority Non-Tax Claim or (B) such other treatment as the Plan Proponents and the holder of such Allowed Priority Non-Tax Claim shall have agreed upon in writing. | Unimpaired; Not entitled to vote; Deemed to accept Plan | Approx. Amount: $140,000 (consisting primarily of employment claims held by former associate doctors employed by Debtor Newco)<br><br>Projected Recovery: 100% |

| Class/Designation | Plan Treatment | Status | Estimated Claim Pool/Projected Recovery |
|---|---|---|---|
| Class 3: General Unsecured Claims, Excluding the KeyBank Claims, Against the Debtor ANS | Each Holder of an Allowed General Unsecured Claim against Debtor ANS, exclusive of KeyBank, shall receive a distribution of up to 10% of its Allowed General Unsecured Claim, capped at an aggregate distribution in the amount of $250,000 between Classes 3, 5 and 8, plus a distribution of a Pro Rata share of 10% of any net recovery related to the D&O Liability Insurance Policy (shared between Classes 3, 5 and 8 Claims). To the extent that the Holder of a Class 3 Claim has been scheduled or has filed a proof of claim against Debtor Newco for the same Claim, such Holder shall only be entitled to Distributions on only one of such Claims. | Impaired; Entitled to vote | Approx. Amount: Unknown<br><br>Estimated Recovery: 10% |
| Class 4: KeyBank Claims against Debtor ANS | KeyBank has an Allowed General Unsecured Claim against Debtor ANS in the amount of $29,000,000, which as of the Effective Date no Person or party in interest shall have the right to contest by way of a Claim Objection or otherwise. After satisfaction in full of all Administrative Expense Claims against Debtor ANS, Allowed Professional Fee Claims against Debtor ANS, Allowed Priority Tax Claims against Debtor ANS, and Allowed Priority Non-Tax Claims against Debtor ANS, and the escrowing/earmarking with the Liquidation Trust of $250,000 to be used for distributions for Classes 3, 5 and 8 Allowed Claims, KeyBank shall receive the remaining Assets of Debtor ANS; *provided, however*, any such Distributions shall account for any reserves required by the Liquidation Trustee for the Liquidation Trust. | Impaired; Entitled to vote | Approx. Amount: $29,000,000<br><br>Estimated Recovery: 10% (in the aggregate from both ANS Debtors) |

DMS_US.366435582.22

| Class/Designation | Plan Treatment | Status | Estimated Claim Pool/Projected Recovery |
|---|---|---|---|
| Class 5: General Unsecured Claims, Excluding the KeyBank Claim, Against Debtor Newco | Each Holder of an Allowed General Unsecured Claim against Debtor Newco, exclusive of KeyBank, shall receive a distribution of up to 10% of its Allowed General Unsecured Claim, capped at an aggregate distribution in the amount of $250,000 between Classes 3, 5 and 8, plus a distribution of a Pro Rata share of 10% of any net recovery related to the D&O Liability Insurance Policy (shared between Classes 3, 5 and 8 Claims). To the extent that the Holder of a Class 5 Claim has been scheduled or has filed a proof of claim against Debtor ANS for the same Claim, such Holder shall only be entitled to Distributions on only one of such Claims. | Impaired; Entitled to vote | Approx. Amount: Unknown<br><br>Estimated Recovery: 10% |
| Class 6: KeyBank Claims Against Debtor Newco | KeyBank has an Allowed General Unsecured Claim against Debtor Newco in the amount of $29,000,000, which as of the Effective Date no Person or party in interest shall have the right to contest by way of a Claim Objection or otherwise. After satisfaction in full of all Administrative Expense Claims against Debtor Newco, Allowed Professional Fee Claims against Debtor Newco, Allowed Priority Tax Claims against Debtor Newco, and Allowed Priority Non-Tax Claims against Debtor Newco, and the escrowing/earmarking with the Liquidation Trust of $250,000 to be used for distributions for Classes 3, 5 and 8 Allowed Claims, KeyBank shall receive the remaining Assets of Debtor Newco; *provided, however,* any such Distributions shall account for any reserves required by the Liquidation Trustee for the Liquidation Trust. | Impaired; Entitled to vote | Approx. Amount: $29,000,000<br><br>Estimated Recovery: 10% (in the aggregate from both ANS Debtors) |

26

| Class/Designation | Plan Treatment | Status | Estimated Claim Pool/Projected Recovery |
|---|---|---|---|
| Class 7: KeyBank Claim Against Debtor Hanover Hills | KeyBank has an Allowed Secured Claim against Debtor Hanover Hills in the amount of $29,000,000, including an Allowed Unsecured Claim against Debtor Hanover Hills for the balance of such Secured Claim not satisfied by the collateral or proceeds thereof. KeyBank's lien will continue against its collateral after the Effective Date and shall attach to the net available proceeds of the sale of Debtor Hanover Hills' assets upon closing of sale to AOP pursuant to the Hanover Sale Order. In satisfaction of the KeyBank Secured Claim against Debtor Hanover Hills, KeyBank shall receive the net available proceeds from the sale of the Assets of Debtor Hanover Hills after payment of the following at closing: (1) costs and expenses related to the sale closing in accordance with the terms of the Hanover APA and Hanover Sale Order, (2) all Allowed Administrative Claims, including without limitation the postpetition loans advanced by the ANS Debtors as approved by the Bankruptcy Court, and Allowed Professional Fee Claims in the Chapter 11 Case of Debtor Hanover Hills as an allowed carveout from KeyBank's collateral / lien under section 506(c) of the Bankruptcy Code, (3) an amount equal to that portion of the escrowing/earmarking with the Liquidation Trust of $250,000 from the ANS Debtors to be used for distributions for Classes 3, 5 and 8 Allowed Claims that is attributed to the distribution payable to holders of Class 8 Allowed General Unsecured Claims, and (4) any post-Confirmation loans, if any, made by the Liquidation Trustee with approval by the Post-Confirmation Committee to the Debtor Hanover Hills. | Impaired; Entitled to vote | Approx. Amount: $29,000,000<br><br>Estimated Recovery: Unknown |

27

| Class/Designation | Plan Treatment | Status | Estimated Claim Pool/Projected Recovery |
|---|---|---|---|
| Class 8: General Unsecured Claims, Excluding KeyBank Claims, Against Debtor Hanover Hills | Each Holder of an Allowed General Unsecured Claim in the Chapter 11 Case of the Debtor Hanover Hills shall receive a distribution of up to 10% of its Allowed General Unsecured Claim, capped at an aggregate distribution in the amount of $250,000 between Classes 3, 5 and 8, plus a distribution of a Pro Rata share of 10% of any net recovery related to the D&O Liability Insurance Policy (shared between Classes 3, 5 and 8 Claims). The Liquidation Trustee shall make one or more Distributions on account of such Allowed General Unsecured Claims to each Holder of such Allowed General Unsecured Claims on each Distribution Date (or the date on which such Claim becomes an Allowed General Unsecured Claim) on a Pro Rata basis. | Impaired; Entitled to vote | Approx. Amount: Unknown<br><br>Estimated Recovery: 10% |
| Class 9: Intercompany Claims | On the Effective Date, all Intercompany Claims in Class 9 shall be deemed canceled, extinguished, and of no further force or effect. Holders of Intercompany Claims in Class 9 shall not be entitled to receive or retain any property on account of such Class 9 Claims. | Impaired; Deemed rejected | N/A |
| Class 10: Interests | On the Effective Date, all Interests shall be deemed canceled, extinguished, and of no further force or effect. Holders of Interests shall not be entitled to receive or retain any property on account of such Class 10 Interests. | Impaired; Deemed rejected | N/A |

28

### 7.05    Controversy Concerning Classification, Impairment or Voting Rights

In the event a controversy or dispute should arise related to the classification, impairment or voting rights of any Creditor or Interest Holder under the Plan, whether before or after the Confirmation Date, the Bankruptcy Court may, after notice and a hearing, determine such controversy. Without limiting the foregoing, the Bankruptcy Court may estimate for voting purposes (i) the amount of any contingent or unliquidated Claim the fixing or liquidation of, as the case may be, would unduly delay the administration of these Chapter 11 Cases and (ii) any right to payment arising from an equitable remedy for breach of performance.

### 7.06    Insurance Recourse as to Holders of Claims Against the Debtors

Notwithstanding anything to the contrary herein, except for the Claims of KeyBank, unless elected otherwise by the Plan Proponents or as the case may be, if any Allowed Claim is directly covered by an Insurance Policy, such Claim shall first be paid from proceeds of such Insurance Policy to the extent such proceeds are available, with the balance, if any, treated in accordance with the provisions of the Plan governing the Class applicable to such Claim.

### ARTICLE VIII
### CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING

THE PLAN AND ITS IMPLEMENTATION ARE SUBJECT TO CERTAIN RISKS, INCLUDING, BUT NOT LIMITED TO, THE RISK FACTORS SET FORTH BELOW. HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS, AS WELL AS THE OTHER INFORMATION SET FORTH IN THE PLAN AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH OR REFERRED TO OR INCORPORATED BY REFERENCE HEREIN, BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN. THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

### 8.01    The Plan May Not Be Accepted

The Plan Proponents can make no assurances that the requisite acceptances to the Plan will be received, and the Plan Proponents may need to obtain acceptances to an alternative plan of liquidation for the Debtors, or otherwise, that may not have the support of the Creditors and/or may be required to liquidate the Estates under chapter 7 of the Bankruptcy Code. There can be no assurance that the terms of any such alternative restructuring arrangement or plan would be similar to or as favorable to Creditors as those proposed in the Plan.

### 8.02    The Plan May Not Be Confirmed

Even if the Plan Proponents receive the requisite acceptances, there is no assurance that the Bankruptcy Court, which may exercise substantial discretion as a court of equity, will confirm the Plan. Even if the Bankruptcy Court determined that the Combined Disclosure Statement and Plan and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline

to confirm the Plan if it finds that any of the statutory requirements for confirmation have not been met. Moreover, there can be no assurance that modifications to the Combined Disclosure Statement and Plan will not be required for confirmation or that such modifications would not necessitate the re-solicitation of votes. If the Plan is not confirmed, it is unclear what distributions Holders of Claims or Interests ultimately would receive with respect to their Claims or Interests in a subsequent plan of liquidation.

### 8.03    Distributions to Holders of Allowed Claims under the Plan May Be Inconsistent with Projections

Projected Distributions are based upon good faith estimates of the total amount of Claims ultimately Allowed and the funds available for Distribution. There can be no assurance that the estimated Claim amounts set forth in the Plan are correct. These estimated amounts are based on certain assumptions with respect to a variety of factors. Both the actual amount of Allowed Claims in a particular Class and the funds available for Distribution to such Class may differ from the Plan Proponents' estimates. If the total amount of Allowed Claims in a Class is higher than the Plan Proponents' estimates, or the funds available for Distribution to such Class are lower than the Plan Proponents' estimates, the percentage recovery to Holders of Allowed Claims in such Class will be less than projected.

### 8.04    Objections to Classification of Claims

Section 1122 of the Bankruptcy Code requires that the Plan classify Claims and Interests. The Bankruptcy Code also provides that the Plan may place a Claim or Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests of such Class. The Plan Proponents believe that all Claims and Interests have been appropriately classified in the Plan. To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Plan Proponents will seek to (i) modify the Plan to provide for whatever classification might be required for confirmation and (ii) use the acceptances received from any Holder of Claims pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such Holder ultimately is deemed to be a member. Any such reclassification of Claims, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which such Holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required for approval of the Plan. There can be no assurance that the Bankruptcy Court, after finding that a classification was inappropriate and requiring a reclassification, would approve the Plan based upon such reclassification. Except to the extent that modification of classification in the Plan requires re-solicitation, the Plan Proponents will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Plan by any Holder of Claims pursuant to this solicitation will constitute a consent to the Plan's treatment of such Holder, regardless of the Class as to which such Holder is ultimately deemed to be a member. The Plan Proponents believe that under the Bankruptcy Rules, it would be required to re-solicit votes for or against the Plan only when a modification adversely affects the treatment of the Claim or Interest of any Holder. The Bankruptcy Code also requires that the Plan provide the same treatment for each Claim or Interest of a particular Class unless the Holder of a particular Claim or Interest agrees to a less favorable treatment of its Claim or Interest. The Plan Proponents believe that the Plan complies with the requirement of equal treatment. To the extent that the Bankruptcy Court

30

finds that the Plan does not satisfy such requirement, the Bankruptcy Court could deny confirmation of the Plan. Issues or disputes relating to classification and/or treatment could result in a delay in the confirmation and Consummation of the Plan and could increase the risk that the Plan will not be consummated.

### 8.05    Failure to Consummate the Plan

The Plan provides for certain conditions that must be satisfied (or waived) prior to confirmation and for certain other conditions that must be satisfied (or waived) prior to the Effective Date. See Articles 14.01 and 14.02. As of the date of the Plan, there can be no assurance that any or all of the conditions in the Plan will be satisfied (or waived). Accordingly, there can be no assurance that the Plan will be confirmed by the Bankruptcy Court. Further, if the Plan is confirmed, there can be no assurance that the Plan will be consummated.

### 8.06    Allowance of Claims May Substantially Dilute the Recovery to Holders of Claims under the Plan

There can be no assurance that the estimated Claim amounts set forth in the Plan are correct, and the actual Allowed amounts of Claims may differ from the estimates. The estimated amounts are based on certain assumptions with respect to a variety of factors, including with respect to any Disputed Administrative Claims, Disputed Priority Tax Claims, Disputed Priority Non-Tax Claims. Should these underlying assumptions prove incorrect, the actual Allowed amounts of Claims may vary from those estimated herein, thereby materially reducing the recovery to the Holders of Allowed General Unsecured Claims under the Plan.

### 8.07    Certain Tax Considerations

There are a number of material income tax considerations, risks and uncertainties associated with the plan of liquidation of the Debtors described in this Combined Disclosure Statement and Plan.

THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. NOTHING HEREIN SHALL CONSTITUTE TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE AND LOCAL AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

**ARTICLE IX**
**THE LIQUIDATION TRUST**

### 9.01    Liquidation Trust

The Liquidation Trust Agreement, attached hereto as **Exhibit B**, as may be amended or revised prior to the Confirmation Hearing, is incorporated into and made a part of this Combined Disclosure Statement and Plan.

31

**9.02    Establishment and Purpose of the Liquidation Trust**

On or before the Effective Date, the Debtors and the Liquidation Trustee shall execute the Liquidation Trust Agreement and shall have established the Liquidation Trust pursuant to the Plan. The Liquidation Trust shall be established for the primary purpose of liquidation and distributing the assets transferred to it, in accordance with Treas. Reg. § 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidation purpose of the Liquidation Trust.

**9.03    Authority and Role of the Liquidation Trustee**

The authority and role of the Liquidation Trustee shall be in accordance with the provisions of the Liquidation Trust Agreement and the Plan.  In furtherance of and consistent with the purpose of the Liquidation Trust Agreement and the Plan, solely for the purpose of carrying out the Plan and discharging the duties in the Liquidation Trust Agreement, the Liquidation Trustee shall be, pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and applicable State corporate law, appointed as the representative of the Estates for the retention, enforcement, settlement, or adjustment of all claims and rights, known and unknown, and all rights and interests belonging to the Debtors or their Estates, which arose prior to the Effective Date. Notwithstanding anything to the contrary herein, the Liquidation Trustee shall comply with the terms of and be bound by the Hanover Sale Order and the Hanover APA. Further, the Liquidation Trustee  is bound by the terms of the Settlement Agreement between KeyBank, the Settling Shareholders, the Borrower Group, the Lorient Parties  and the ANS Group dated as of December  , 2024 and approved by the entry of an Order of the Bankruptcy Court on December , 2024 The Liquidation Trustee may not modify or amend the provisions of the Plan or the settlement agreements between the Settling Shareholders, KeyBank, the Lorient Parties, the Debtors and the Committee in any manner without Court approval on notice to and with the prior written consent of all affected parties.

**9.04    Appointment of the Liquidation Trustee**

The appointment of the Liquidation Trustee shall be approved in the Confirmation Order, and such appointment shall be effective as of the Effective Date.  In accordance with the Liquidation Trust Agreement, the Liquidation Trustee shall serve in such capacity through the earlier of (i) the date that the Liquidation Trust is dissolved in accordance with the Liquidation Trust Agreement or (ii) the date such Liquidation Trustee resigns, is terminated, or is otherwise unable to serve; provided, however, that, in the event that the Liquidation Trustee resigns, is terminated, or is unable to serve, then the Court, upon the motion of any party-in-interest, including, but not limited to, counsel to the Liquidation Trust, shall approve a successor to serve as the Liquidation Trustee, and such successor Liquidation Trustee shall serve in such capacity until the Liquidation Trust is dissolved.

**9.05    Liquidation Trust Assets**

On the Effective Date, the Liquidation Trust Assets shall vest automatically in the Liquidation Trust. The Plan shall be considered a motion pursuant to Sections 105, 363 and 365 of the Bankruptcy Code for such relief. Upon vesting of the Liquidation Trust Assets, the

DMS_US.366435582.22

Liquidation Trust shall succeed to all of the Debtors' right title and interest in the Liquidation Trust Assets free and clear of all liens, claims and encumbrances and the Debtors shall have no further interest in or with respect to the Liquidation Trust Assets or the Liquidation Trust.

### 9.06   Treatment of Liquidation Trust for Federal Income Tax Purposes; No Successor-in- Interest

In accordance with Treas. Reg. § 301.7701-4(d), the Liquidation Trustee shall, in an expeditious but orderly manner, liquidate and convert to Cash the Liquidation Trust Assets, make timely Distributions pursuant to the Plan, and not unduly prolong its duration. The Liquidation Trust shall not be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth herein or in the Liquidation Trust Agreement.

#### (a)   Liquidation Trust as a "Grantor Trust."

The Liquidation Trust is intended to qualify as a "grantor trust" for federal income tax purposes with the Liquidation Trust Beneficiaries treated as grantors and owners of the Liquidation Trust. For all federal income tax purposes, all parties (including, without limitation, the Debtors, the Liquidation Trustee, and the Liquidation Trust Beneficiaries) shall treat the transfer of the Liquidation Trust Assets by the Debtors to the Liquidation Trust, as set forth in the Liquidation Trust Agreement, as a transfer of such assets by the Debtors to the Holders of Allowed Claims of the Liquidation Trust Beneficiaries entitled to Distributions from the Liquidation Trust Assets, followed by a transfer by such Holders to the Liquidation Trust. Thus, the Liquidation Trust Beneficiaries shall be treated as the grantors and owners of a grantor trust for federal income tax purposes.

#### (b)   Valuation of Liquidation Trust Assets.

As soon as reasonably practicable after the Effective Date, the Liquidation Trustee (to the extent that the Liquidation Trustee deems it necessary or appropriate in its absolute sole discretion) shall value the Liquidation Trust Assets based on the good faith determination of the value of such Liquidation Trust Assets. The valuation shall be used consistently by the Liquidation Trustee and the Liquidation Trust Beneficiaries for all federal income tax purposes.   The Bankruptcy Court shall resolve any dispute regarding the valuation of the Liquidation Trust Assets.

#### (c)   Liquidation Trustee's Right and Power to Invest.

The right and power of the Liquidation Trustee to invest the Liquidation Trust Assets transferred to the Liquidation Trust, the proceeds thereof, or any income earned by the Liquidation Trust, shall be limited to the right and power to invest such Liquidation Trust Assets (pending distributions in accordance with the Plan) in accordance with the Liquidation Trust Agreement; *provided, however*, that the scope of any such Permissible Investments shall be limited to include only those investments that a "liquidation trust," within the meaning of Treas. Reg. § 301.7701-4(d), may be permitted to hold, pursuant to the Treasury Regulations, or any modification in the IRS guidelines, whether set forth in IRS rulings, other IRS pronouncements, or otherwise.

DMS_US.366435582.22

### 9.07    Responsibilities of the Liquidation Trustee

The responsibilities of the Liquidation Trustee shall include, but shall not be limited to:

(1)    the making of Distributions as contemplated herein;

(2)    establishing and maintaining the Reserves in accordance with the terms of the Plan;

(3)    conducting an analysis of any Claims and prosecuting objections thereto or settling or otherwise compromising such Claims if necessary and appropriate;

(4)    preparing and filing post-Effective Date operating reports for the Debtors;

(5)    filing appropriate tax returns with respect to the Liquidation Trust and Debtors and paying taxes properly payable by the Liquidation Trust and Debtors, if any, and to the extent that a Debtor has sufficient monies to pay said taxes, in the exercise of its fiduciary obligations;

(6)    taking such actions as are necessary to wind down the Debtors under applicable law;

(7)    fulfilling any obligations of the Debtors pursuant to the Hanover Sale Order or Hanover APA

(8)    retaining such professionals as are necessary and appropriate in furtherance of its fiduciary obligations;

(9)    taking such actions as are necessary and reasonable to carry out the purposes of the Liquidation Trust;

(10)    pursuing the Causes of Action transferred to the Liquidation Trust to the extent provided for and permitted in the Plan.

(11)    protecting and enforcing the rights to the Liquidation Trust Assets vested in the Liquidation Trustee by any method reasonably determined to be appropriate, including, without limitation, by judicial proceedings or pursuant to any applicable bankruptcy, insolvency, moratorium or similar law and general principles of equity; and

(12)    terminating the Liquidation Trust and seeking to close the Chapter 11 Cases pursuant to section 350(a) of the Bankruptcy Code.

### 9.08    Establishment of the Post-Confirmation Committee

On the Effective Date, the Post-Confirmation Committee, which shall consist of one (1) to three (3) members, shall be formed to serve as an advisory board to the Liquidation Trustee. The initial members of the Post-Confirmation Committee shall be set forth in a Filing with the Court by the Committee one-week prior to the commencement of the Confirmation Hearing; provided, however, KeyBank shall have the right, in its sole discretion, to select one of the members. The Post-Confirmation Committee shall have the rights and obligations set forth in the Plan and in the

34

Liquidation Trust Agreement. The Post-Confirmation Committee's decisions shall be made by an affirmative vote of a majority of its members with each member having one vote. The Post-Confirmation Committee shall have the responsibility of overseeing, advising and directing the Liquidation Trustee with respect to the liquidation and distribution of the Liquidation Trust's assets in accordance with the Plan, as specified below. A member of the Post-Confirmation Committee shall recuse him/herself from considering any matter in which he/she is not disinterested; *provided, however,* such member shall not be considered not disinterested solely as a result of such member's affiliation with or employment by the (i) Holder of a Claim or (ii) Debtors. The proposed members of the Post-Confirmation Committee will be identified by the Committee, in its sole discretion, one-week prior to the commencement of the Confirmation Hearing; *provided, however*, KeyBank shall have the right, in its sole discretion, to select one of the members. Vacancies on the Post-Confirmation Committee shall be filled by a person designated by the remaining member or members of the Post-Confirmation Committee from among the holders of General Unsecured Claims. A majority of the Post-Confirmation Committee may remove or replace members of the Post-Confirmation Committee for cause, and any party-in-interest shall have the authority to seek an order from the Bankruptcy Court removing or replacing members of the Post-Confirmation Committee for cause. Any successor appointed pursuant to this Section shall become fully vested with all of the rights, powers, duties and obligations of his or her predecessor. For the avoidance of doubt, no member of the Post-Confirmation Committee shall be compensated for serving as a member of the Post-Confirmation Committee except as provided in the Liquidation Trust Agreement; provided, however, that such members may be reimbursed by the Liquidation Trust, from funds in the Post-Effective Date Liquidation Trust Expense Reserve for documented reasonable out-of-pocket costs and expenses up to a cap of $1,000 per member. Beginning after the Effective Date, the Post-Confirmation Committee shall receive a quarterly report from the Liquidation Trustee showing receipts and disbursements, together with a narrative explanation regarding the activities of the Liquidation Trustee and any retained professionals.

The rights, powers and duties of the Post-Confirmation Committee shall be as follows:

(i) To terminate by majority vote in accordance with the Liquidation Trust Agreement, the Liquidation Trustee for cause, and upon such termination (or upon the resignation, death or incapacity of the Liquidation Trustee), appoint a successor Liquidation Trustee in accordance with the terms of the Plan;

(ii) Prior to the commencement of any litigation by the Liquidation Trustee the Liquidation Trustee shall present to the Post-Confirmation Committee a written description of the theory of liability and quantum of damages of the claims proposed to be asserted.   An affirmative vote of the Post-Confirmation Committee shall be required to authorize the commencement of litigation provided that, if authorization is obtained, prior to commencement of litigation the Liquidation Trustee shall mediate with the proposed defendants before a mutually agreeable mediator or in the absence of such agreement, as designated by the Court (the "Mediation Action"). If the matter is not successfully resolved by mediation, the Liquidation Trustee shall be authorized to commence litigation If the potential

DMS_US.366435582.22

expiration of an applicable statute of limitation prevents the completion of the Mediation Obligation, the Mediation Obligation shall be suspended and, provided that the Post-Confirmation Committee has authorized an action, the Liquidation Trustee shall be authorized to commence such action provided further that the Liquidation Trustee has made an unsuccessful good faith effort to obtain a tolling of such statute of limitation.

(iii) To approve the settlement of any Cause of Action or dispute, for which the amount in controversy exceeds $100,000;

(iv) To approve the allowance of any Disputed Claim if the proposed Allowed amount of such Claim exceeds $100,000;

(v) To approve the sale of any assets by the Liquidation Trustee, other than the sale of assets pursuant to the Hanover Sale Order and Hanover APA unless such Hanover APA is terminated and then under such circumstance the Liquidation Trustee on behalf of the Liquidation Trust shall administer in concert with KeyBank the assets that are the subject of the Hanover APA;

(vi) To approve any budget in connection with the administration of the Plan and the winding down of the Debtors' affairs prepared by the Liquidation Trustee at the request of the Post-Confirmation Committee;

(vii) To review and object to fees and expenses of professionals retained by the Liquidation Trustee on a quarterly basis and in accordance with the terms of the Plan and the Liquidation Trust Agreement; and

(viii) To consider and, if appropriate, approve any action proposed by the Liquidation Trustee that is not specifically authorized by the Plan that would have a material effect upon the administration of the Estates and/or the Post-Effective Date Debtors or the Liquidation Trust, provided, however, nothing contained herein shall be deemed to authorize the Liquidation Trustee to take any action that is inconsistent with the terms of the Plan or the Liquidation Trust.

**9.09    Bankruptcy Court Approval of Liquidation Trustee Actions Not Required.**

Unless otherwise specified herein or in the Liquidation Trust Agreement, the Liquidation Trustee need not obtain an order or approval of the Bankruptcy Court in the exercise of any power, right, or discretion conferred hereunder or in the Liquidation Trust Agreement, or account to the Bankruptcy Court, including, but not limited to, with respect settling, compromising, or otherwise resolving any Causes of Action or objections to Claims. The Liquidation Trustee shall exercise his business judgment for the benefit of the Estates' beneficiaries in order to maximize the value of the Assets and distributions, giving due regarding to the cost, risk, and delay of any course of action.

DMS_US.366435582.22

**9.10    Expenses of the Liquidation Trust**

Fees and expenses incurred by the Liquidation Trustee shall be paid from the Liquidation Trust Expense Reserve as approved by the Post-Confirmation Committee.

**9.11    Compensation of the Liquidation Trustee**

The Liquidation Trustee shall be entitled to receive compensation for services rendered on behalf of the Liquidation Trust in an amount and payable as agreed upon by the Liquidation Trustee and the Post-Confirmation Committee. For the avoidance of doubt, all compensation of the Liquidation Trustee shall be a Liquidation Trust Expense.

**9.12    Fiduciary Duties of the Liquidation Trustee**

Pursuant to the Plan and the Liquidation Trust Agreement, the Liquidation Trustee shall act in a fiduciary capacity on behalf of the interests of all Holders of Claims against the Debtors that will receive Distributions pursuant to the terms of the Plan.

**9.13    Transfer of Books and Records**

On the Effective Date, subject to any applicable privilege, the Debtors will transfer and assign, or cause to be transferred and assigned, to the Liquidation Trust, all of the books and records of the Debtors, including but not limited to a copy of the information on all the Debtors' servers and a copy of the Debtors' servers.

**9.14    Dissolution of the Liquidation Trust**

The Liquidation Trust shall be dissolved no later than five (5) years from the Effective Date unless the Bankruptcy Court, upon a motion Filed prior to the fourth anniversary of the Effective Date or the end of any extension period approved by the Bankruptcy Court (the filing of which shall automatically extend the term of the Liquidation Trust pending the entry of an order by the Bankruptcy Court granting or denying the motion), determines that a fixed period extension is necessary to facilitate or complete the recovery and liquidation of the Liquidation Trust Assets. After (a) the final Distribution of the balance of the assets or proceeds of the Liquidation Trust pursuant to the Plan, (b) the filing by or on behalf of the Liquidation Trust of a certification of dissolution with the Bankruptcy Court in accordance with the Plan, and (c) any other action deemed appropriate by the Liquidation Trustee, the Liquidation Trust shall be deemed dissolved for all purposes without the necessity for any other or further actions.

**9.15    Full and Final Satisfaction against Liquidation Trust**

On and after the Effective Date, the Liquidation Trust shall have no liability on account of any Claims or Interests except as set forth in the Plan and in the Liquidation Trust Agreement. All payments and all Distributions made by the Liquidation Trustee under the Plan shall be in full and final satisfaction, settlement, and release of and in exchange for all Claims or Interests against the Settling Shareholders, as applicable.

DMS_US.366435582.22

## ARTICLE X
## MEANS FOR IMPLEMENTATION OF THE PLAN

### 10.01  Interests in the Debtors

Except as otherwise may be provided in the Plan, on or after the later of 60 days from the Effective Date or dissolution of the Debtors, the Interests in the Debtors shall be cancelled and of no force and effect.

### 10.02  Causes of Action

On the Effective Date, all Causes of Action, except for any Causes of Action specifically exculpated or released under Article XIII of the Plan, shall be vested in and retained by the Liquidation Trust. Following the Effective Date, except as otherwise expressly provided herein, the Liquidation Trustee may assert, compromise or dispose of the preserved Causes of Action without further notice to Creditors or Interest Holders or authorization of the Bankruptcy Court.

### 10.03  Release of Liens

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date and concurrently with the applicable Distributions made pursuant to the Plan, all Liens against the property of any Estates will be fully released, and all of the right, title and interest of any holder of such Liens, including any rights to any collateral thereunder, shall attach to and be enforceable solely against any net proceeds of sales of such assets. For the avoidance of doubt, except as otherwise provided in the Plan, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estates shall be fully released on the Effective Date without any further action of any party, including, but not limited to, further order of the Bankruptcy Court or filing updated schedules or statements typically filed pursuant to the Uniform Commercial Code.

### 10.04  Accounts Receivable Reserve

The Debtors and Liquidation Trustee shall establish a reserve in the amount of $10,000 specifically for the payment of refunds to patients.

### 10.05  Pension Plan Resolution

(a) PBGC Claims

Each of the Debtors is a contributing sponsor of the Pension Plan, 29 U.S.C. § 1301(a)(13), or a member of the contributing sponsor's controlled group, 29 U.S.C. § 1301(a)(14).  The Pension Plan is covered by Title IV of ERISA.

PBGC has filed contingent claims against each of the Debtors based on the contingency that the Pension Plan will terminate under 29 U.S.C. §§ 1341(c) or 1342.  PBGC's claims are for (1) the Pension Plan's unfunded benefit liabilities under 29 U.S.C. § 1362(b); (2) any minimum funding contributions owed to the Pension Plan under 29 U.S.C. § 1082(b) and 26 U.S.C. §§ 412 and 430; and (3) the pension insurance premiums due under 29 U.S.C. §§ 1306 and 1307

38

(collectively, the "PBGC Claims"). If the Pension Plan terminates under 29 U.S.C. §§ 1341(c) or 1342, each Debtor will be jointly and severally liable for the PBGC Claims, to the extent Allowed. See 29 U.S.C. § 1362(a), 26 U.S.C. § 412, and 29 U.S.C. § 1307.

Debtor ANS intends to complete a standard termination of the Pension Plan in accordance with 29 U.S.C. § 1341(a) and (b), and the regulations thereunder, including compliance with any PBGC audit under 29 U.S.C. § 1303(a), as part of the liquidation.

In conjunction with the Pension Plan's standard termination, PBGC has reserved its rights as to any outstanding premiums owed to PBGC. Additionally, if, for any reason, Debtor ANS is unable to complete the standard termination, the PBGC Claims shall be treated as General Unsecured Claims pursuant to Section 7.03 hereof without prejudice to the Debtors' right to object to the specific amount of the PBGC Claims.

(b) No Release of ERISA Obligations

Notwithstanding any provision of this Plan or the Confirmation Order to the contrary, neither the Plan nor the Confirmation Order shall discharge, release, limit, or relieve the Debtors or any other Person from any liability or responsibility with respect to the Pension Plan; or release any Person from fiduciary breach related to the Pension Plan; or enjoin or prevent PBGC or the Pension Plan from collecting such liability from a liable party.

Prior to and following the Effective Date, Debtor ANS and the Liquidation Trustee shall remain obligated to effectuate the prompt termination of the Pension Plan pursuant to applicable law. The Liquidation Trustee is hereby authorized to take all necessary steps to effectuate the termination of the Pension Plan, including but not limited to employing the Pension Plan's actuary and other service providers to assist in such termination.   Until the Pension Plan is properly terminated pursuant to ERISA, prior to and following the Effective Date, Debtor ANS and the Liquidation Trustee are obligated to administer the Pension Plan pursuant to applicable law, and the Debtors remain liable for all obligations relating to the Pension Plan.

If the Pension Plan properly terminates in a standard termination pursuant to 29 U.S.C. § 1341(b), as determined by PBGC, then the Debtors and Liquidation Trustee have no further obligation to the Pension Plan.  If the Pension Plan terminates other than through a standard termination pursuant to 29 U.S.C. § 1341(b), the Debtors and the Liquidation Trust are liable for the PBGC Claims.

Notwithstanding anything herein to the contrary, all Claims asserted by PBGC against the Debtors is limited solely to recourse against the overfunding of the Pension Plan.

### 10.06   Vesting and Sale or Other Disposition of Assets; Representative of the Estates

Except as otherwise provided in this Combined Disclosure Statement and Plan, on the Effective Date, all property of the Debtors' Estates, including the Professional Fee Escrow (which shall remain segregated and maintained at Veritex under the control of the Liquidation Trustee), shall be vested in the Liquidation Trust, free and clear of all claims, liens, charges, other

39

encumbrances, Interests or other interests; *provided, however*, the Assets of Debtor Hanover Hills shall remain subject to the liens of KeyBank pending closing of sale to AOP pursuant to the Hanover Sale Order, at which time, the liens of KeyBank shall attach to the net available proceeds of sale as set forth in Section 7.03(g) and 7.04 above. On and after the Effective Date, the Liquidation Trustee may use, acquire and dispose of property and compromise or settle any claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions imposed by the Plan, the Confirmation Order, or the Hanover Sale Order. The Liquidation Trustee, on and after the Effective Date, may conduct any sales or liquidations of assets on any terms it deems appropriate, without further order of the Bankruptcy Court, except as otherwise provided in the Plan, the Confirmation Order or the Liquidation Trust Agreement. For the avoidance of doubt, notwithstanding anything to the contrary herein, the Liquidation Trustee shall be bound by the terms of the Hanover Sale Order and the Hanover APA.

### 10.07  **Effectuating Documents; Further Transactions**

On and after the Effective Date, the Liquidation Trustee is authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan and the transactions contemplated thereby, in each case, in the name of and on behalf of the Debtors and the Liquidation Trust, without the need for any approvals, authorization or consents except those expressly required pursuant to the Plan.

### 10.08  **Allocation of Assets Between Debtors**

On the Effective Date, each of the Debtors shall have sufficient Assets (whether as proceeds of sale or settlement of Causes of Action) to fund its Plan obligations to Holders of Allowed Claims in Classes 1, 2, 3, 4, 5, 6, 7, and 8.

### 10.09  **Shareholders Settlement**

The following comprises the terms of the Shareholder Settlement by and between the Settling Shareholders, Debtors, KeyBank, Lorient Parties and the Committee which terms are incorporated into and made a part of this Disclosure Statement and Plan.

1. Each Shareholder who elects to opt into the Shareholder Settlement shall submit to the balloting agent  an executed opt-in form (annexed hereto as **Exhibit C**) no later than two (2) weeks prior to the Confirmation Hearing, electing to participate in the Shareholder Settlement and to provide the consensual third party releases set forth in Article XIII of the Plan, and pay  the aggregate amount of $500,000 (inclusive of the $100,000 good faith deposits from each Settling Shareholder) by wire transfer to the  trust account maintained by Greenbaum Rowe Smith & Davis LLP (GRSD)  (pursuant to an escrow agreement as may be agreed to between GRSD and  the Shareholders) no later than two (2) weeks prior to the Confirmation Hearing (or such other time as the Plan Proponents and KeyBank may agree).

40

On the Effective Date, GRSD will release each Settling Shareholder's $500,000 settlement contributions as follows: $150,000 to the Liquidation Trust, to be distributed in accordance with the Plan, and $350,000 to KeyBank. As to the $350,000 of each Settling Shareholder contribution being forwarded to KeyBank, the Settling Shareholder making such payment shall have the right to treat such payment for tax reporting purposes as a capital contribution Counter Income or a Return of Fees/Distributions previously directly or indirectly paid or funded by the ANS Debtors. As to the $150,000 of each Settling Shareholders contribution being forwarded to the Liquidation Trust, the ANS Debtors, ANS Founders, the Committee, the Liquidation Trust, and the Settling Shareholders have been unable to reach an agreement with respect to the tax characterization and treatment of each Settling Shareholder's $150,000 settlement contribution to the Liquidation Trust. Notwithstanding the foregoing, each of the ANS Debtors, ANS Founders, the Committee, the Liquidation Trust and each Settling Shareholder are reserving, to the fullest extent permitted by law, their respective rights, claims, positions, and defenses with respect to how each Settling Shareholder's $150,000.00 settlement contribution that is paid over to the Liquidation Trust should be treated/characterized in their respective Federal and State tax filing and, none of them shall contest, dispute, challenge or interfere with the tax filings made by the others.

GRSD shall notify the Plan Proponents as settlement contributions are received from the Shareholders.

In the event that the settlement contributions of the Settling Shareholders do not total the minimum gross amount of $3,000,000, then the Shareholder Settlement shall be revoked and be null and void.

In the event that the Plan is not confirmed or does not become effective or the Shareholder Settlement is revoked, GRSD shall return the settlement contributions to each contributing Shareholder.

2. On the Effective Date, each Settling Shareholder is released from all direct, indirect, derivative, statutory and other claims and Causes of Action held by the Debtors' estates against them to the extent that such Settling Shareholder's liability exceeds the D&O Recovery as set forth in Section 13.02 of the Plan. For a Settling Shareholder that is not an Insured, the D&O Recovery amount is $0.00.

3. On the Effective Date, each Settling Shareholder releases the Debtors and waives all claims against the Debtors as set forth in Section 13.02 of the Plan, except for, as and to the extent applicable and notwithstanding any contrary term, provision or condition included in this Plan, (i) claims for which coverage is or would be afforded under the D&O Liability Insurance Policy or the Debtors' other Insurance Policies, including the Debtors' professional liability Insurance Policies, and (ii) the Settling Shareholders' rights and interests in their accounts as participants in the Debtors' retirement plans (excluding rights and interests in the aggregate amount of $657,541 of overfunding contributed to such retirement plans).

4. On the Effective Date, each Settling Shareholder releases the other as and to the extent set forth in Paragraph 4 (vii) of the Settlement Agreement and in Section 13.04 of the Plan.

41

5.  On the Effective Date, each Settling Shareholder, the Lorient Parties, and KeyBank mutually release each other for any direct, indirect, derivative, statutory and other claims and Causes of Action related to the Debtors and ANS Founders as set forth in Section 13.03 of the Plan.

The Lorient Parties and KeyBank shall submit their opt-in elections as provided for the opt in elections for the Settling Shareholders. The release provided by KeyBank is limited by the following:

a.  This release does not release any obligation of any Settling Shareholder to KeyBank arising on account of any loan or other extension of credit made directly by KeyBank or any affiliate of KeyBank to such Settling Shareholder (including, without limitation, any obligations arising on account of any credit card issued by KeyBank or any affiliate of KeyBank.

b.  This Release does not release any of the Obligors, as such term is defined in the Forbearance Agreements, from (i) any Letter of Credit Obligations arising in connection with KeyBank's issuance of Standby Letter of Credit No. S325645 issued by the lender for the account of Atlantic Neuro Surgical Specialist PA (the "Letter of Credit"). The Obligors acknowledge and agree that KeyBank may apply any Letter of Credit Cash Collateral held by KeyBank in respect of the Letter of Credit Obligations and to the Obligations of the Obligors arising under the Loan Documents in accordance with the terms and conditions of the Loan Documents and the Forbearance Agreements, and that such Letter of Credit may not be renewed by KeyBank upon its stated expiration. Obligors shall cooperate reasonably with KeyBank to effectuate cancellation of the Letter of Credit as soon as reasonably possible.

c.  This Release does not release any of the Obligors from any obligations at any time arising relating to treasury management fees, if any, owing by the Obligors to KeyBank in accordance with the agreements between them, which fees will be invoiced separately and for which fees the Obligors remain liable. The Obligors may, subject to KeyBank's right to terminate such accounts, maintain general accounts, including, but not limited to, checking accounts, deposit accounts and payroll accounts at KeyBank which accrue fees, service charges, and other charges in accordance with the related agreements (collectively, with such treasury management fees, the "Account Fees"). Until the Obligors terminate such treasury management services and all such accounts are closed, all related Account Fees will accrue and be payable by the Obligors in accordance with the terms of the related agreements.

d.  This Release does not release any of the Obligors from any obligation of any of the Obligors to KeyBank arising on account of agreements unrelated to the Loan Documents and the transactions evidenced thereby.

e.  Key Bank acknowledges that the term "Obligors" as used in subparagraphs (b.)- (d) above does not include and of the Settling Shareholders or the ANS Debtors and that neither the Settling Shareholders nor the ANS Debtors are part of the Forbearance Agreements as that term is used.

42

6. Nothing in this settlement shall prejudice the ability of the Debtors, the Committee or the Liquidation Trustee to make, assert, prosecute and recover against Insureds on claims for which coverage is or would be afforded under the D&O Liability Insurance Policy, except that the prosecuting party agrees to seek pre-litigation mediation with the Insureds and the D&O Insurer and, solely as against Settling Shareholders, shall not seek a recovery in excess of the coverage under the D&O Liability Insurance Policy.

7. In the event that the D&O Insurer denies coverage, the Estates or Liquidation Trust, as applicable, shall set aside the amount of $100,000 for the payment of reasonable legal fees and expenses for the Settling Shareholders who are Insureds in their capacity as such (the "D&O Reserve"). Upon exhaustion of the D&O Reserve, each Settling Shareholder shall be responsible to pay his legal fees and costs, which reasonable defense fees and costs shall be reimbursed as a first priority payment from and a surcharge on any D&O Recovery prior to allocation and distribution thereof to any party or professional under the Plan.

8. If the D&O Insurer accepts coverage for defense fees and costs for the Insureds, then there will be no D&O Reserve. If the D&O Insurer revokes its acceptance of coverage of defense fees and costs, then the D&O Reserve will be put in place.

9. All conditions precedent to the Effective Date shall occur.

**10.10  <u>Records</u>**

On and after the Effective Date, subject to any applicable privilege which shall not be waived and shall be preserved (including for the benefit of the Liquidation Trust as set forth in Article 10.12 of the Plan), all documents and records of the Debtors, including a copy of the information contained on the Debtors' server, shall be transferred to the Liquidation Trust, which shall preserve and maintain all of the Debtors' documents and records according to practices and terms that it deems reasonable and appropriate in its sole and independent discretion and in accordance with applicable law.  After such transfer, the Debtors shall be granted access to such documents and records at reasonable dates, times and places.  At any time following the Effective Date, the Liquidation Trustee shall be entitled to destroy any documents and records of the Debtors (a) following the filing of an appropriate notice with the Bankruptcy Court setting forth the Liquidation Trustee's intent to destroy some or all of the Debtors' documents or records, without further order of the Bankruptcy Court, *provided that*, no objections are Filed to such notice on or before the fourteenth (14th) day following the filing of such notice, (b) upon entry of an order by the Bankruptcy Court authorizing the destruction of some or all of the Debtors' documents and records, or (c) upon dissolution of the Liquidation Trust without the need for further approval of the Bankruptcy Court.

**10.11  <u>Insurance Policies</u>**

**(a)      Insurance Policies**

At the sole cost and expense of the Liquidation Trust, and in the sole discretion of the Liquidation Trustee up to and including their policy expiration date(s), any and all Insurance Policies in effect as of the Effective Date may remain in full force and effect according to their

terms and the coverage obligations of the insurers and third-party administrators under such Insurance Policies as determined by the Liquidation Trustee shall continue following the Effective Date (including any obligations to pay, defend and process insured claims).

**(b)** **Insurance Policies; Employment Practice Liability Policies; Professional Liability Policies; Similar Policies.**

Except as expressly set forth herein, nothing contained in this Plan or the Liquidation Trust shall affect or impair the rights of any Debtor and non-Debtor insured persons covered under any Insurance Policy, which expressly includes any director and officer, employment practices, professional liability, or similar liability Insurance Policies (including, without limitation, policies for the benefit of the Debtors' directors, officers, employees, members, managers, or similar persons who served in such capacity either before or after the Petition Date).

## 10.12   Dissolution of Committee

On the Effective Date, the Committee shall be dissolved, and the members of the Committee shall be released and discharged from any further authority, duties, responsibilities, and obligations related to, or arising from, these Chapter 11 Cases, except with respect to the limited purpose of preparing and prosecuting applications for the payment of fees and reimbursement of expenses incurred by the Committee or its respective Professionals that accrued prior to dissolution of the Committee.

## 10.13   Transfer of Privilege/No Waiver

On the Effective Date, all the Debtors' evidentiary privileges, including the attorney/client privilege, shall be deemed transferred to the Liquidation Trust. The Plan shall be considered a motion pursuant to sections 105, 363, and 365 of the Bankruptcy Code for such relief. Upon such transfer, except as otherwise provided by applicable law, the Debtors and the Estates shall have no other further rights or obligations with respect thereto. Nothing herein shall be deemed a waiver of the Debtors' or the Estates' rights of privilege.

## 10.14   Final Decree

At any time following the later of (a) the Effective Date or (b) the close or termination of the transactions contemplated in the Hanover APA, the Liquidation Trustee shall be authorized to File a motion for entry of a final decree closing any or all of the Chapter 11 Cases.

## 10.15   Winddown Debtors

After the Effective Date, the Liquidation Trustee shall take such actions as are necessary or appropriate to winddown the Debtors as expeditiously and efficiently as reasonably practicable, including the establishment of any winddown accounts or the retention of appropriate professionals. The fees and expenses (including attorneys' and advisors' fees and expenses) incurred by the Liquidation Trustee for the winding-down of the Debtors shall be paid by the Liquidation Trust, in the ordinary course of business and shall not be subject to Bankruptcy Court approval; *provided, however*, any disputes related to such fees and expenses shall be brought before the Bankruptcy Court.

44

## ARTICLE XI
## EXECUTORY CONTRACTS

### 11.01   Rejection of Executory Contracts

(a)      Except for any Executory Contracts of the Debtors: (i) that previously
were assumed or rejected by an order of the Bankruptcy Court, pursuant to section 365 of the
Bankruptcy Code; (ii) as to which a motion for approval of the assumption or rejection of such
contract or lease has been Filed and served prior to, and remains pending as of, the
Confirmation Date; or (iii) that will be assumed and assigned to AOP pursuant to the Hanover
APA, each Executory Contract and Unexpired Lease entered into by the Debtors prior to the
Petition Date that has not previously expired or terminated pursuant to its own terms shall be
deemed rejected pursuant to section 365 of the Bankruptcy Code as of the Effective Date. The
Confirmation Order shall constitute an order of the Bankruptcy Court approving such rejection,
pursuant to section 365 of the Bankruptcy Code, as of the Effective Date. Nothing herein is
intended to affect the validity of contracts and leases entered into by the Debtors on or after
the Petition Date, or the rights of the Debtors thereunder, which shall remain in full force and
effect after the Effective Date in accordance with their terms.

(b)      The Insurance Policies shall not be considered Executory Contracts for
purposes of subsection (a) above. As discussed in Article 10.10 of the Plan, the Insurance
Policies shall remain in full force and effect following the Effective Date pursuant to their
terms.

### 11.02   Bar Date for Rejection Damages

If the rejection of an Executory Contract pursuant to the Plan or otherwise gives rise to
a Claim by the other party or parties to such contract or lease, such Claim shall be forever barred
and shall not be enforceable against the Debtors, Estates, or Liquidation Trust, unless a Proof
of Claim is Filed with the Bankruptcy Court by the Rejection Damages Bar Date.

## ARTICLE XII
## PROVISIONS GOVERNING RESOLUTION OF CLAIMS
## AND DISTRIBUTIONS OF PROPERTY UNDER THE PLAN

### 12.01   Claim Objections

### (a)      Right to Object to Claims.

Subject to the terms of the Plan and the Liquidation Trust Agreement, notwithstanding any
requirements that may be imposed pursuant to Bankruptcy Rule 9019, except insofar as a Claim
is Allowed under the Plan on and after the Effective Date, the Liquidation Trustee will have the
authority, but not the obligation, to do any of the following with respect to any Claims or Interests:
(1) File, withdraw or litigate to judgment objections to and requests for estimation of Claims; (2)
settle or compromise any Disputed Claim without any further notice to or action, order or approval
by the Bankruptcy Court; and (3) administer and adjust the Claims register to reflect any such
settlements or compromises without any further notice to or action, order or approval by the

DMS_US.366435582.22

Bankruptcy Court. The Liquidation Trustee shall succeed to any pending objections to Claims Filed by the Debtors prior to the Effective Date and shall have and retain any and all rights and defenses the Debtors had immediately prior to the Effective Date with respect to any Disputed Claim.

   **(b)**  **Claims Objection Deadline.**

   Objections to Claims must be Filed with the Bankruptcy Court and a copy of the objection must be served on the subject Creditor before the expiration of the Claims Objection Deadline; otherwise, such Claims shall be deemed Allowed in accordance with section 502 of the Bankruptcy Code. The objection shall notify the Creditor of the deadline for responding to such objection. The Bankruptcy Court may extend the Claim Objection Deadline from time to time upon a motion Filed by the Liquidation Trustee on notice and an opportunity for a hearing.

   **(c)**  **Claim Estimation.**

   Pursuant to section 502(c) of the Bankruptcy Code, the Liquidation Trustee may request estimation or liquidation of any Disputed Claim that is contingent or unliquidated or any Disputed Claim arising from a right to an equitable remedy or breach of performance.

  **12.02** <u>**Distribution Provisions**</u>

   **(a)**  **Distributions to be Made.**

   Except to the extent that distributions have been made on or prior to the Effective Date, the Liquidation Trustee shall be responsible for making Distributions required or permitted to be made under the Plan.

   **(b)**  **Establishment of Reserves.**

   On the Effective Date, the Liquidation Trustee shall establish and maintain a Reserve of Cash from the Liquidation Trust Assets as the Liquidation Trustee deems reasonably necessary to satisfy any Disputed Claims and any Ordinary Course Liabilities, as well as for the Liquidation Trust Expense Reserve. Further, upon the Professional Fee Bar Date, the Liquidation Trustee shall establish a Reserve of Cash from the Liquidation Trust Assets in an amount that the Liquidation Trustee deems reasonably necessary to satisfy all Professional Fee Claims.

   **(c)**  **Distribution Record Date.**

   As of 5:00 p.m. (Eastern Time) on the Distribution Record Date, the transfer registers for Claims shall be closed. The Liquidation Trustee shall have no obligation to recognize the transfer or sale of any Claim that occurs after such time on the Distribution Record Date and shall be entitled for all purposes herein to recognize and make Distributions only to those Holders who are Holders of Claims as of 5:00 p.m. (Eastern Time) on the Distribution Record Date. Except as otherwise provided in a Final Order of the Bankruptcy Court, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 on or prior to 5:00 p.m. (Eastern Time) on the Distribution Record Date shall be treated as the Holders of such Claims for all purposes, notwithstanding that

DMS_US.366435582.22

any period provided by Bankruptcy Rule 3001 for objecting to such transfer has not expired by the Distribution Record Date.

### (d)    No Liability.

The Liquidation Trustee shall only be required to make Distributions in accordance with the terms of the Plan. Except on account of gross negligence, fraud, illegality or willful misconduct, the Liquidation Trustee shall have no (i) liability to any party for actions taken in accordance with the Plan or in reasonable reliance upon information provided to it in accordance with the Plan, or (ii) obligation or liability for Distributions under the Plan to any party who does not hold a Claim against the Debtors as of the Distribution Record Date or any other date on which a Distribution is made or who does not otherwise comply with the terms of the Plan.

### (e)    Distributions on Account of Disputed Claims.

Except as otherwise provided in a Final Order or as agreed by the relevant parties, Distributions on account of Disputed Claims, if any, that become Allowed, shall be made by the Liquidation Trustee at such periodic intervals as the Liquidation Trustee determines to be reasonably prudent.

### (f)    No Distributions Pending Allowance.

Notwithstanding anything herein to the contrary: (a) no Distribution shall be made with respect to any Disputed Claim until such Claim becomes an Allowed Claim (as applicable), and (b) unless agreed otherwise by the Liquidation Trustee, no Distribution shall be made to any Person that holds both an Allowed Claim and a Disputed Claim until such Person's Disputed Claims have been resolved by settlement or Final Order.

### (g)    Distributions in Cash.

Any required Cash payments to the Holders of Allowed Claims or Interests shall be made by the Liquidation Trustee: (a) in U.S. dollars by check drawn on a domestic bank, or by wire transfer from a domestic bank, and (b) by first-class mail (or by other equivalent or superior means as determined by the Liquidation Trustee).

### (h)    Timing of Distributions.

Except as specifically set forth in the Plan, the Liquidation Trustee may determine, in its discretion, the appropriate timing, amount, and cadence for Distributions, except that the Liquidation Trustee shall use its best efforts to make initial Distributions to Holders of Claims as soon as practicable after the Effective Date as follows: (a) as previously stated, $350,000 of each Settling Shareholders' contribution is to be paid to KeyBank within five (5) business days' of the Effective Date; and (b) with respect to cash on hand, the Liquidation Trustee will (i) deposit additional amounts in the Professional Fee Escrow to cover Professional Fee Claims that accrued prior to the Effective Date and remain unpaid; (ii) reserve $140,000 for distribution to Allowed Priority Non-Tax Claims; (iii) reserve $250,000 for the up to 10% distribution to Holders of Allowed Claims in Classes 3, 5 and 8); (iv) retain $1,000,000 (or some other amount within the

47

discretion of the Liquidation Trustee in consultation with the Post-Confirmation Committee); and (v) disburse to KeyBank any remaining cash above after the reserving for items (i) through (iv) set forth herein.

### (i)    Unclaimed Distributions.

Any entity which fails to claim any Cash within 90 days from the date upon which a Distribution is first made to such entity shall forfeit all rights to any Distribution under the Plan, and the Liquidation Trustee shall be authorized to cancel any Distribution that is not timely claimed. Pursuant to section 347(b) of the Bankruptcy Code, upon forfeiture, such Cash (including interest thereon, if any) shall revert to the source of such Distribution (*i.e.,* the Liquidation Trust or the applicable Reserve) free of any restrictions under the Plan, the Bankruptcy Code or the Bankruptcy Rules. Upon forfeiture, the claim of any Creditor or Interest Holder with respect to such funds shall be irrevocably waived and forever barred against all of the Debtors, the Estates, and the Liquidation Trustee, notwithstanding any federal or state escheat laws to the contrary, and such Creditor or Interest Holder shall have no claim whatsoever against the any of the foregoing or to any Holder of a Claim to whom Distributions are made.

### (j)    Delivery of Distributions and Undeliverable Distributions to Holders of Claims.

Except as otherwise provided in the Plan, Distributions to Holders of Allowed Claims shall be made to Holders of record as of the Distribution Record Date by the Liquidation Trustee, as set forth on the latest date of the following documents: (a) at the address of payment set forth on any of the Proofs of Claim Filed by such Holder or other representative identified therein (or at the last known addresses of such Holder if no Proof of Claim is Filed); (b) at the addresses set forth in any written notices of address changes delivered to the Debtors after the date of any related Proof of Claim and prior to the Effective Date; and (c) at the addresses reflected in the Schedules if no Proof of Claim has been Filed and the Debtors have not received a written notice of a change of address prior to the Effective Date.

### (k)    Undeliverable Distributions.

The Liquidation Trustee shall make one attempt to make the Distributions contemplated hereunder in accordance with the procedures set forth herein. The Liquidation Trustee in its sole discretion may, but shall have no obligation to, attempt to locate Holders of undeliverable Distributions. Any Distributions returned to the Liquidation Trustee as undeliverable or otherwise shall remain in the possession of the Liquidation Trust, until such time as a Distribution becomes deliverable, and no further Distributions shall be made to such Holder unless such Holder notifies the Liquidation Trustee of its then current address. Any Holder of an Allowed Claim or Interest entitled to a Distribution of property under this Plan that does not assert a claim pursuant to the Plan for an undeliverable Distribution, or notify the Liquidation Trustee of such Holder's then current address, within 60 days of such Distribution shall have its claim for such undeliverable Distribution irrevocably waived and shall be forever barred from asserting any such claim against the Debtors, the Estates, and/or the Liquidation Trustee or their respective property, and such Distribution shall be deemed an Unclaimed Distribution under Section 12.02(i).

DMS_US.366435582.22

(l)    **De Minimis Distributions.**

If any interim distribution under the Plan to the Holder of an Allowed Claim would be less than $100.00, the Liquidation Trustee may withhold such Distribution until a final Distribution is made to such Holder. If any final Distribution under the Plan to the Holder of an Allowed Claim is less than $50.00, the Liquidation Trustee may cancel such Distribution. Any potential Distributions pursuant to this Section shall be treated as an Unclaimed Distributions under Section 12.02(i) of the Plan.

(m)    **Remainder Amounts After Final Distribution.**

After final Distributions have been made in accordance with the terms of the Plan, the Liquidation Trustee may donate any remaining Liquidation Trust Assets to one or more charitable organizations as may be determined by the Liquidation Trustee in its sole discretion.

### 12.03  Preservation and Assignment of Subordination Rights

Except as may be provided for herein, all subordination rights and claims relating to the subordination by the Debtors or the Liquidation Trustee of any Allowed Claims shall remain valid, enforceable, and unimpaired in accordance with section 510 of the Bankruptcy Code or otherwise.

### ARTICLE XIII
### EXCULPATION RELEASES AND INJUNCTION

### 13.01  EXCULPATION

**NEITHER (A) THE DEBTORS NOR, SOLELY IN SUCH CAPACITIES, THE DEBTORS' OFFICERS, DIRECTORS, EMPLOYEES, CONTROL PERSONS, BANKRUPTCY COURT APPOINTED PROFESSIONALS, AND THE SETTLING SHAREHOLDERS AND EACH OF THEIR RELATED PARTIES AND, IN SUCH CAPACITIES, PROFESSIONALS RETAINED BY THE SETTLING SHAREHOLDERS IN CONNECTION WITH THESE CHAPTER 11 CASES, AND (B) THE COMMITTEE, ANY OF ITS APPOINTED MEMBERS, NOR, SOLELY IN SUCH CAPACITIES, ANY OF ITS BANKRUPTCY COURT APPOINTED PROFESSIONALS SHALL HAVE OR INCUR ANY LIABILITY TO ANY HOLDER OF A CLAIM, FOR ANY ACT OR OMISSION SOLELY IN CONNECTION WITH, RELATED TO, OR ARISING OUT OF, THE CHAPTER 11 CASES, THE PURSUIT OF CONFIRMATION OF THE PLAN, THE CONSUMMATION OF THE PLAN OR THE ADMINISTRATION OF THE PLAN OR THE PROPERTY OF THE DEBTORS TO BE REALIZED, LIQUIDATED, RETAINED OR DISTRIBUTED UNDER THE PLAN, EXCEPT FOR WILLFUL MISCONDUCT, GROSS NEGLIGENCE, OR A BREACH OF FIDUCIARY DUTY, AND, IN ALL RESPECTS, THE COMMITTEE, ITS APPOINTED MEMBERS, AND ITS BANKRUPTCY COURT APPOINTED ATTORNEYS AND PROFESSIONALS SHALL BE ENTITLED TO RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND RESPONSIBILITIES UNDER THE PLAN.**

## 13.02   DEBTORS AND SETTLING SHAREHOLDERS RELEASES

**Debtors Releases.** On the Effective Date, pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, for good and valuable consideration, on and after and subject to the occurrence of the Effective Date, the Debtors and the Estates to the extent that each Settling Shareholder's liability exceeds the D&O Recovery shall release each Settling Shareholder (which includes each's Affiliated Medical Practice) and their Related Parties and each Settling Shareholder and their Related Parties are deemed released by the Debtors and the Estates, from any and all claims, obligations, rights, suits, damages, Causes of Action, remedies, liabilities whatsoever, including any derivative claims, asserted or assertable by any of the Debtors or the Estates, as applicable, whether known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, matured or unmatured, determined or determinable, disputed or undisputed, liquidated or unliquidated, or due or to become due, existing or hereinafter arising, in law, equity, based on or related to or in any manner arising from, in whole or in part, ANS Founders, the Debtors, the Debtors' liquidation, the Chapter 11 Cases, the purchase, sale and transfer of any security, assets, rights or interests of the Debtors, the subject matter of or the transaction or events giving rise to any Claim or Interest that is treated in the Plan, the business, or contractual arrangements between any Debtors and any Settling Shareholder and their respective Related Parties in such capacities, the negotiation, formation or preparation of the Plan or related agreements, instruments or other documents, any other act or omission, transaction, agreement, event or other occurrence taking place on and before the Effective Date; provided that the foregoing Debtor Release shall not operate to waive or release any obligations of any party under the Plan, or any other document, instrument or agreement executed to implement the Plan; and further provided that nothing herein shall act as a discharge of the Debtors.

On the Effective Date for good and valuable consideration, on after and subject to the occurrence of the Effective Date, the Debtors and the Estates, for itself and its respective successors and assigns, does hereby absolutely, forever and irrevocably release waive, relinquish, acquit, satisfy and forever discharge KeyBank and its Related Parties from all known and unknown charges, complaints, allegations, counterclaims, grievances, liabilities, obligations, causes of action, promises, agreements (whether written or oral) damages, penalties, fees, wages, medical costs, pain and suffering, mental anguish, emotional distress, expenses (including attorneys' fees and costs actually incurred) and any and all claims for punitive or consequential damages of all kinds, and further including, but not limited to, any and all manner of debts, accountings, bonds, warranties, representations, covenants, controversies, liabilities, judgments, executions, actions, suits, claims, counterclaims, demands, defenses, setoffs, recoupments, objections, and claims that may be based on allegations of breach of contract, failure to lend, fraud, promissory estoppel, libel, slander, usury, negligence, misrepresentation, breach of fiduciary duty, bad faith, lender liability, undue influence, duress, tortious interference with contractual relations, interference with management, or misuse of control, or any other cause of action, in each case whether in law or in equity, known or unknown, held derivatively or otherwise, the Debtors or the Estates have or may have against KeyBank, whether or not apparent or yet to be discovered from the beginning of time to the Effective Date based on or related to or in any manner arising

from, in whole or in part, ANS Founders, the Debtors, the Debtors' liquidation, the Chapter 11 Cases, and the Loan Documents with KeyBank

Entry of the Confirmation Order shall constitute Bankruptcy Court approval of the Debtors' releases herein, which includes by reference to each of the related provisions and definitions contained herein, and further, constitutes the Bankruptcy Court's finding that the Debtors' releases are: (a) in exchange for the good and valuable consideration provided by the Settling Shareholders and KeyBank; (b) in the best interest of the Debtors and all Holders of Claims and interests; (c) fair, equitable and reasonable; (d) given after due notice and an opportunity to be heard; and (e) a bar to any of the Debtors or the Estates asserting any Claim or Cause of Action released pursuant to the Debtors' releases.

Settling Shareholders Release. For good and valuable consideration, on and after and subject to the occurrence of the Effective Date, each of the Settling Shareholders and their respective Related Parties shall release each of the Debtors and Estates, and each of the Debtors and Estates is deemed released by the Settling Shareholders and their respective Related Parties from any and all claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, asserted or assertable on behalf of any of the Settling Shareholders and each of their respective Related Parties, as applicable, whether known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, matured or unmatured, determined or determinable, disputed or undisputed, liquidated or unliquidated, or due or to become due, existing or hereinafter arising, in law, equity or otherwise, that the Settling Shareholders and each of their respective Related Parties would have been legally entitled to assert in their own right or on behalf of the Holder of a Claim or Interest or other entity, based on or relating to, or in any manner arising from, in whole or in part, ANS Founders, the Debtors, the Debtors' liquidation, the Chapter 11 Cases, the purchase, sale, transfer of any security, asset, right or interest of the Debtors, the subject matter of or the transactions or events giving rise to any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtors and any Settling Shareholders and each of their respective Related Parties, the negotiation, formulation or preparation of the Plan or related agreements or documents, any other act or omission, transaction, agreement, event or other occurrence taking place on and before the Petition Date; provided that the foregoing Settling Shareholder release shall not operate or waive or release (i) any obligations of any party under the Plan, the Plan Documents, or any document to implement the Plan, including but not limited to the Liquidation Trust Agreement, (ii) each of the Settling Shareholders' rights and interests in any retirement plans maintained by the Debtors for the benefit of the Settling Shareholders (except as to the 2023 overfunding thereof in the aggregate amount of $657,541), and (iii) each of the Settling Shareholders' rights and entitlement to insurance coverage, including, without limitation, any employment practice insurance, professional liability insurance policy and the D&O Liability Insurance Policy.

### 13.03  THIRD-PARTY RELEASES

Consensual, Mutual Releases of Settling Shareholders, Lorient Parties and KeyBank. On and after and subject to the occurrence of the Effective Date, except as otherwise provided in the Plan, pursuant to applicable provisions of the Bankruptcy Code and to the

51

fullest extent permitted by applicable law, and for good and valuable consideration, the Settling Shareholders, the Lorient Parties, and KeyBank and each of their respective Related Parties shall release each other, in each case on behalf of themselves and their respective Related Parties, the adequacy of which is hereby acknowledged and confirmed, each Settling Shareholder, the Lorient Parties and KeyBank and each of their respective Related Parties shall be deemed to have conclusively, absolutely unconditionally and irrevocably and forever provided a full waiver and release to each other respectively (and each such party so released shall be deemed forever released, waived and discharged by the other party) and their respective properties and assets from any and all claims, causes of action, and debts, obligations, suits rights, damages, demands, judgments, actions, remedies, liabilities, whatsoever, whether known or unknown, foreseen or unforeseen, existing as of the Effective Date arising, in law or at equity, whether for tort, contract, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way, in whole or in part, to ANS Founders, the Debtors, the Chapter 11 Cases, the asset sales, the pursuit of confirmation of the Plan, or the Plan, that the Settling Shareholders, the Lorient Parties, and KeyBank, and each of their respective Related Parties, would have been legally entitled to assert against any of the Settling Shareholders, the Lorient Parties, and KeyBank and each of their respective Related Parties; *provided however*, that KeyBank does not release any of its Claims against Debtor Hanover Hills, ANS Continuum or Florham Park.

The foregoing release shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule and without need for any notice to or any vote, consent, authorization, approval, ratification, or other action by any entity or other person or any director, stockholder, security holder, manager, member, or partner (or board thereof) of any entity. The court order approving the Plan will permanently enjoin the commencement or prosecution by any person or entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, or liabilities released pursuant to this release.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or entity under the Plan or any document, instrument, or agreement executed to implement the Plan.

Further, notwithstanding anything to the contrary in the foregoing, the release provided by KeyBank to the Settling Shareholders, and each of their respective Related Parties is limited by the following:

a.   This mutual release does not release any obligation of any Settling Shareholder, or any of their respective Related Parties to KeyBank arising on account of any loan or other extension of credit made directly by KeyBank or any affiliate of KeyBank to such Settling Shareholder or any of their respective Related Parties (including, without limitation, any obligations arising on account of any credit card issued by KeyBank or any affiliate of KeyBank.

DMS_US.366435582.22

b.      This release does not release any of the Obligors, as such term is defined in the Forbearance Agreements, from (i) any Letter of Credit Obligations arising in connection with KeyBank's issuance of Standby Letter of Credit No. S325645 issued by the lender for the account of Atlantic Neuro Surgical Specialist PA (the "Letter of Credit"). The Obligors acknowledge and agree that KeyBank may apply any Letter of Credit Cash Collateral held by KeyBank in respect of the Letter of Credit Obligations and to the Obligations of the Obligors arising under the Loan Documents in accordance with the terms and conditions of the Loan Documents and the Forbearance Agreements, and that such the Letter of Credit may not be renewed by KeyBank upon its stated expiration. Obligors shall cooperate reasonably with KeyBank to effectuate cancellation of the Letter of Credit as soon as reasonably possible.

c.      This Release does not release any of the Obligors from any obligations at any time arising relating to treasury management fees, if any, owing by the Obligors to KeyBank in accordance with the agreements between them, which fees will be invoiced separately and for which fees the Obligors remain liable. The Obligors may, subject to KeyBank's right to terminate such accounts, maintain general accounts, including, but not limited to, checking accounts, deposit accounts and payroll accounts at KeyBank which accrue fees, service charges, and other charges in accordance with the related agreements (collectively, with such treasury management fees, the "Account Fees"). Until the Obligors terminate such treasury management services and all such accounts are closed, all related Account Fees will accrue and be payable by the Obligors in accordance with the terms of the related agreements.

d.      This Release does not release any of the Obligors from any obligation of any of the Obligors to KeyBank arising on account of agreements unrelated to the Loan Documents and the transactions evidenced thereby. Key Bank acknowledges that the term "Obligors" does not include any of the Settling Shareholders or the ANS Debtors and that neither the Settling Shareholders nor the ANS Debtors are parties to the Forbearance Agreements as that term is used.

e.      For the avoidance of doubt, and except as otherwise expressly stated in Article 13.04, the Settling Shareholders, Key Bank, the Lorient Parties and the Debtors are releasing the Settling Shareholders in any and every capacity including but not limited to, as individuals, officers, directors, shareholders, members, agents, employees, and representatives of the members of the Borrower Group, the Lorient Parties, the ANS Group and ANS Founders.

13.04   **Consensual Release of Settling Shareholders.**

On and after and subject to the occurrence of the Effective Date, except as otherwise provided in the Plan, pursuant to applicable provisions of the Bankruptcy Code and to the fullest extent permitted by applicable law, and for good and valuable

53

consideration provided, the Settling Shareholders and each of their respective Related Parties shall release each other in each case on behalf of themselves and their respective successors, assigns, representatives and Related Parties, the adequacy of which is hereby acknowledged and confirmed, each Settling Shareholder and each of their respective Related Parties, will be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever provided a full waiver and release to each other Settling Shareholder and each of their respective Related Parties (and each such party so released shall be deemed forever released, waived and discharged by the other party) and their respective properties and assets from any and all claims, causes of action, and any other debts, obligations, rights, suits, damages, demands, judgments, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing as of December 15, 2023, arising, in law or at equity, whether for tort, contract, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to the [Debtors/Chapter 11 Cases only] that each of the Settling Shareholders and each of their respective Related Parties would have been legally entitled to assert against each other. The foregoing release shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule and without need for any notice to or any vote, consent, authorization, approval, ratification, or other action by any entity or other person or any director, stockholder, security holder, manager, member, or partner (or board thereof) of any entity. The court order approving the Plan will permanently enjoin the commencement or prosecution by any person or entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, or liabilities released pursuant to this release.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or entity under the Plan or any document, instrument, or agreement executed to implement the Plan.

Notwithstanding anything to the contrary herein, the Settling Shareholders are not releasing any claims for contribution or indemnification relating to, or arising out of, the action captioned: Pinakin Jethwa, M.D. v. Atlantic Neurosurgical Specialists, P.A., Altair Health, Ronald Benitez, M.D., Yaron Moshel, M.D. and John Knightly, M.D., pending in the Superior Court of New Jersey, Law Division, Morris County, Docket No. MRS-L-209-21. Notwithstanding anything to the contrary herein Settling Shareholders Jay Chun, M.D. on the one hand and Ronald Benitez, M.D., Yaron

**Moshel, M.D., Kyle Chapple, M.D. and Jonathan Baskin, M.D. on the other hand, do not release claims amongst themselves.**

## ARTICLE XIV
## CONDITIONS TO CONFIRMATION AND EFFECTIVE DATE

**14.01    [Intentionally Omitted]**

**14.02    Conditions Precedent to the Effective Date**

It shall be a condition to the Effective Date that the following provisions, terms and conditions shall have been satisfied or waived pursuant to Section 14.03.

(a)    The Bankruptcy Court shall have entered the order approving the Disclosure Statement as containing adequate information within the meaning of section 1125 of the Bankruptcy Code and the Confirmation Order confirming the Plan pursuant to section 1129 of the Bankruptcy Code and such order shall have become final and non-appealable, in form and substance reasonably acceptable to the Plan Proponents, Settling Shareholders and KeyBank.

(b)    No stay of the Confirmation Order shall then be in effect.

(c)    The Liquidation Trust Agreement shall be executed, the Liquidation Trust shall be created, and the Liquidation Trustee and members of the Post-Confirmation Committee shall have been appointed and accepted such appointment.

(d)    The opt-in election forms attached hereto as Exhibits C, D, and E, shall have been executed and delivered by the Settling Shareholders, the Lorient Parties, and KeyBank respectively and have not been revoked or rescinded as provided for in this Plan or the respective opt-in election forms.

**14.03    Waiver of Conditions**

The conditions to confirmation of the Plan set forth in this Article XIV, except Section 14.02(d), may be waived at any time by the Plan Proponents without an order of the Bankruptcy Court. The conditions to the occurrence of the Effective Date set forth in this Article XIV may be waived by the Plan Proponents on notice to parties in interest with approval of the Bankruptcy Court.

**14.04    Effect of Failure of Conditions**

If the Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan shall: (i) constitute a waiver or release of any claims by or Claims against the Debtors; (ii) prejudice in any manner the rights of the Debtors, any Holders of a Claim or Interest or any other entity; or (iii) constitute an admission, acknowledgment, offer or undertaking by the Debtors, the Committee, any Creditors or Interest Holders or any other entity in any respect.

**14.05    Filing of Notice of the Effective Date.**

On the Effective Date or as shortly thereafter as reasonably practicable, the Plan Proponents shall File a notice of the Effective Date with the Bankruptcy Court.

## ARTICLE XV
## MODIFICATION, REVOCATION OR WITHDRAWAL OF PLAN

**15.01    Modification and Amendments**

Except as otherwise specifically provided herein, the Plan Proponents reserves the right to modify the Plan as to material terms and seek confirmation consistent with the Bankruptcy Code and Bankruptcy Rules and, as appropriate, not re-solicit votes on such modified Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Plan Proponents expressly reserve their rights to alter, amend or modify materially the Plan with respect to any or all Debtors, one or more times, after confirmation and before the Effective Date, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend or modify the Plan or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan. Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with this Article and with the consent of the Plan Proponents. In addition, prior to the Effective Date, the Plan Proponents may make appropriate technical adjustments and modifications to the Plan, without further order or approval of the Bankruptcy Court; provided, however, that such technical adjustments and modifications do not adversely affect in a material way the treatment of Holders of Allowed Claims or Interests. Notwithstanding the foregoing, any modifications of the Shareholder Settlement in the Plan shall require the approval of the Plan Proponents, the Settling Shareholders and KeyBank.

**15.02    Effect of Confirmation on Modifications**

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the commencement of the solicitation of votes on the Plan are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

**15.03    Revocation or Withdrawal of the Plan**

The Plan Proponents reserve the right to revoke or withdraw the Plan before the Effective Date. If the Plan Proponents revoke or withdraws the Plan, or if the Confirmation Date or the Effective Date does not occur on or before 60 days after the entry of the Confirmation Order, then: (i) the Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of any Executory Contracts effected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void; and (iii) nothing contained in the Plan shall (a) constitute a waiver or release of any Claims or Interests

56

or Claims by any Debtor against any other entity; (b) prejudice in any manner the rights of such Debtor, the Committee, the Holder of any Claim or Interest or any other entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by such Debtor, the Committee or any other entity.

## ARTICLE XVI
## JURISDICTION

### 16.01    Bankruptcy Court Jurisdiction

Notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date, the Bankruptcy Court shall retain and have exclusive jurisdiction over these Chapter 11 Cases to the maximum extent as is legally permissible, including, without limitation, for the following purposes:

(a)    To allow, disallow, determine, liquidate, classify or establish the priority or secured or unsecured status of or estimate any Claim or Interest, including, without limitation, the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of Claims or Interests;

(b)    To ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

(c)    To determine any and all applications or motions pending before the Bankruptcy Court on the Effective Date of the Plan, including without limitation any motions for the rejection, assumption or assumption and assignment of any Executory Contract;

(d)    To consider and approve any modification of the Plan, remedy any defect or omission, or reconcile any inconsistency in the Plan, or any order of the Bankruptcy Court, including the Confirmation Order;

(e)    To determine all controversies, suits and disputes that may arise in connection with the interpretation, enforcement or consummation of the Plan or any Plan Documents including the Liquidation Trust Agreement or any entity's obligations in connection with the Plan or any Plan Documents, or to defend any of the rights, benefits, Estate property transferred, created, or otherwise provided or confirmed by the Plan or the Confirmation Order or to recover damages or other relief for violations thereof;

(f)    To determine all controversies, suits and disputes that may arise in connection with the interpretation, enforcement or consummation of the sale and transfer of assets of the Debtors;

(g)    To consider and act on the compromise and settlement of any claim or cause of action by or against the Debtors, the Estates, or the Liquidation Trustee;

(h)    To decide or resolve any and all applications, motions, adversary proceedings, contested or litigated matters, and any other matters, or grant or deny any applications involving the Debtors, or the Estates that may be pending on the Effective Date

57

or that may be brought by the Debtors or the Liquidation Trustee, or any other related proceedings by the Liquidation Trustee, and to enter and enforce any default judgment on any of the foregoing;

(i)    To decide or resolve any and all applications for compensation with respect to Professional Fee Claims;

(j)    To issue orders in aid of execution and implementation of the Plan or any Plan Documents including the Liquidation Trust Agreement to the extent authorized by section 1142 of the Bankruptcy Code or provided by the terms of the Plan;

(k)    To decide issues concerning the federal or state tax liability of the Debtors which may arise in connection with the confirmation or Consummation of the Plan or any Plan Documents including the Liquidation Trust Agreement;

(l)    To interpret and enforce any orders entered by the Bankruptcy Court in these Chapter 11 Cases;

(m)    To address issues and disputes related to the actions by the Liquidation Trustee or to the enforcement and interpretation of the Liquidation Trust Agreement; and

(n)    To enter an order closing these Chapter 11 Cases when all matters contemplating the use of such retained jurisdiction have been resolved and satisfied.

### 16.02   Limitation on Jurisdiction

In no event shall the provisions of the Plan be deemed to confer in the Bankruptcy Court jurisdiction greater than that established by the provisions of 28 U.S.C. §§ 157 and 1334, as well as the applicable circumstances that continue jurisdiction for defense and enforcement of the Plan and Plan Documents. For the avoidance of doubt, however, such jurisdiction shall be deemed, by the entry of the Confirmation Order, to:

(a)    Permit entry of a final judgment by the Bankruptcy Court in any core proceeding referenced in 28 U.S.C. § 157(b) and to hear and resolve such proceedings in accordance with 28 U.S.C. § 157(c) and any and all related proceedings, including, without limitation, (i) all proceedings concerning disputes with, or Causes of Action or Claims against, any Person that the Debtors, the Estates, or the Liquidation Trust or any of their successors and assigns, may have, and (ii) any and all Causes of Action or other Claims against any Person for harm to or with respect to (x) any Estate Property, including conversion of Estate Property, or (y) any Estate Property liened or transferred by the Debtors to any other Person;

(b)    Include jurisdiction over the recovery of any Estate Property (or property transferred by the Debtors with Bankruptcy Court approval) from any Person wrongly asserting ownership, possession or control of the same, whether pursuant to sections 542, 543, 549, and/or 550 of the Bankruptcy Code or otherwise, as well as to punish any violation of the

58

automatic stay under section 362 of the Bankruptcy Code or any other legal rights of the Debtors or the Estates under or related to the Bankruptcy Code; and

(c)   Permit the taking of any default judgment against any Person who has submitted himself or herself to the jurisdiction of the Bankruptcy Court.

### ARTICLE XVII
### MISCELLANEOUS

### 17.01   Exemption from Taxes

The Plan and the Confirmation Order provide for (a) the issuance, transfer or exchange of notes, debt instruments and equity securities under or in connection with the Plan; and (b) the creation, execution and delivery of agreements or other documents creating or evidencing the formation of the Liquidation Trust and any right or interest in the Liquidation Trust. Pursuant to section 1146 of the Bankruptcy Code and the Plan, any such act described or contemplated herein will not be subject to any stamp tax, transfer tax, filing or recording tax, or other similar tax.

### 17.02   Compliance with Tax Requirements

Notwithstanding anything to the contrary in this Combined Disclosure Statement and Plan, the Liquidation Trust shall be entitled to deduct any federal, state or local withholding taxes from any Distributions made with respect to Allowed Claims, as appropriate. The Liquidation Trust shall be authorized to take all actions necessary to comply with applicable withholding and reporting requirements, including, without limitation, applying a portion of any Distribution of Cash to be made under the Plan to pay applicable withholding Taxes. Any amounts withheld pursuant to the immediately preceding sentence will be deemed to have been Distributed and received by the applicable recipient for all purposes of the Plan. Notwithstanding any other provision of the Plan, each Holder of an Allowed Claim that has received a Distribution under the Plan shall have sole and exclusive responsibility for the satisfaction or payment of any tax obligation imposed by any Governmental Unit, including income, withholding and other tax obligation, on account of such Distribution. The Liquidation Trustee shall have the right, but not the obligation, to not make a Distribution until the applicable recipient has made arrangements satisfactory to the Liquidation Trustee for the payment of any Tax obligations. For tax purposes, Distributions received in respect of Allowed Claims will be allocated first to the principal amount of such Claims until such principal amount is paid in full and then to any interest accrued on such Claim prior to the Petition Date, and the remaining portion of such Distributions, if any, will apply to any interest on such Claim after the Petition Date. The Liquidation Trustee shall be authorized to require each Holder of a Claim to provide it with an executed Form W-9, Form W-8, or any other tax form, documentation or certification as may be requested by the Liquidation Trustee as a condition precedent to being sent a Distribution. If a Holder of an Allowed Claim does not provide the Liquidation Trustee with an executed Form W-9, Form W-8 or other requested tax form within 90 days after the date of the Liquidation Trustee's initial request, the Liquidation Trustee may, in its sole discretion (a) make such Distribution net of applicable withholding or (b) reserve such Distribution, in which case (i) such Holder shall be deemed to have forfeited the right to receive any Distribution under the Plan, (ii) any such Distribution shall revert to the source of such Distribution (*i.e.,* the Liquidation Trust or the applicable Reserve), for Distribution on

account of other Allowed Claims and (iii) the Claim of the Holder originally entitled to such Distribution shall be irrevocably waived and forever barred without further order of the Bankruptcy Court. The Liquidation Trustee reserves the right to allocate and Distribute all Distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, Liens and similar encumbrances.

### 17.03  Retirement Plans

Notwithstanding anything in the Plan to the contrary, nothing in the Plan shall prejudice, impair, modify, amend or release any participants' vested rights in any retirement plans (with exception to the 2023 overfunding of retirement plans totaling $657,541).

### 17.04  Defenses and Setoff

Nothing contained in this Combined Disclosure Statement and Plan shall constitute a waiver or release by the Debtors, their Estates, or the Liquidation Trustee of any right rights in respect of legal and equitable objections, defenses, setoffs, or recoupment. To the extent permitted by applicable law, the Liquidation Trustee may, but shall not be required to, set off or recoup against any Claim and the payments or other Distributions to be made under the Plan in respect of such Claim, claims of any nature whatsoever that arose before the Petition Date that the Debtors, the Estates, or the Liquidation Trustee may have against the Holder of such Claim or Interest.

### 17.05  Governing Law

Except to the extent the Bankruptcy Code or the Bankruptcy Rules are applicable, the rights and obligations arising under the Plan shall be governed by and construed and enforced in accordance with the laws of the State of New Jersey, without giving effect to the principles of conflicts of law thereof.

### 17.06  Successors and Assigns

The rights, benefits and obligations of any person or entity named or referred to in the Plan, any exhibit to the Plan, or any document related to the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such entity.

### 17.07  Transfer of Claims

Prior to the Effective Date, any transfer of a Claim shall be in accordance with Bankruptcy Rule 3001(e) and the terms of this Section. Notice of any such transfer shall be forwarded to counsel for the Debtors.  Both the transferee and transferor shall execute any notice, and the signatures of the parties shall be acknowledged before a notary public. The notice must clearly describe the interest in the Claim to be transferred. No transfer of a partial interest shall be allowed. All transfers must be of one hundred percent (100%) of the transferor's interest in the Claim.

The beneficial interests owned by the Liquidation Trust Beneficiaries, which shall be reflected only on the records of the Liquidation Trust maintained by the Liquidation Trustee, shall be uncertificated, non-negotiable, and neither assignable nor transferable voluntarily.  In the case

DMS_US.366435582.22

of a deceased individual Liquidation Trust Beneficiary, its executor or administrator shall succeed to such decedent's beneficial interest upon notice to the Liquidation Trustee.

### 17.08   Post-Effective Date Service List

Pursuant to Bankruptcy Rule 2002 and any applicable Local Rule, notice of all post-confirmation matters for which notice is required to be given shall be deemed sufficient if served upon counsel for the U.S. Trustee, counsel to the Plan Proponents, counsel for the Liquidation Trustee, all persons on the Bankruptcy Rule 2002 service list, and all persons (and their counsel, if known) whose rights are affected by such post-confirmation matters. With the exception of the Plan Proponents and the U.S. Trustee, any Person desiring to remain on the Debtors' Bankruptcy Rule 2002 service list shall be required to File a request for continued service and to serve such request upon counsel to the Liquidation Trustee within thirty (30) days subsequent to the Effective Date. Persons shall be notified of such continued notice requirements in the notice of entry of the Confirmation Order. **Persons who do not File a request for continued service within thirty (30) days subsequent to the Effective Date shall be removed from the Debtors' Bankruptcy Rule 2002 service list.**

### 17.09   Notices

To be effective, any pleading, notice or other document required by the Plan or the Confirmation Order to be served on or delivered to counsel to the Plan Proponents must be sent by electronic mail, overnight delivery service, courier service, or messenger to:

**ANS Debtors' Counsel**
David L. Bruck, Esq.
GREENBAUM, ROWE, SMITH & DAVIS LLP
P.O. Box 5600
Woodbridge, New Jersey 07095
Telephone: (732) 549-5600
Facsimile: (732) 476-2441
dbruck@greenbaumlaw.com

**Hanover Hills Debtor's Counsel**
Joseph J. DiPasquale, Esq.
Michael R. Herz, Esq.
Agostino A. Zammiello, Esq.
FOX ROTHSCHILD LLP
49 Market Street
Morristown, New Jersey 07960
Telephone: (973) 992-4800
Facsimile: (973) 992-9125
jdipasquale@foxrothschild.com
mherz@foxrothschild.com
azammiello@foxrothschild.com

DMS_US.366435582.22

**Committee Counsel:**
Richard J. Bernard, Esq.
Frank F. Velocci, Esq.
FAEGRE DRINKER BIDDLE& REATH LLP
600 Campus Drive
Florham Park, New Jersey 07932
Telephone: 973-549-7000
Email: richard.bernard@faegredrinker.com
Frank.velocci@faegredrinker.com

## 17.10   Immediate Binding Effect

Notwithstanding Bankruptcy Rules 3020(e), 6004(h) and 7062 and/or any other Bankruptcy Rule, upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon the Debtors, the Liquidation Trust, any and all Holders of Claims and Interests (irrespective of whether such Claims or Interests are Allowed or Disallowed or were voted to accept or reject the Plan), all Entities that are parties to or are subject to the settlements, compromises, and releases described in the Plan, each entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts with one or more of the Debtors.

## 17.11   Severability of Plan Provisions

If, before the Effective Date of the Plan, any term or provision of the Plan is held by the Bankruptcy Court or any other court exercising jurisdiction to be invalid, void or unenforceable, the Bankruptcy Court or other court exercising jurisdiction shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted so long as such term or provision is acceptable to the Plan Proponents. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (i) valid and enforceable pursuant to its terms; (ii) integral to the Plan and may not be deleted or modified without the Plan Proponents' consent; and (iii) non-severable and mutually dependent.

## 17.12   Exhibits

All exhibits and documents attached hereto are incorporated into and are a part of the Plan as if set forth in full in the Plan, to the extent not inconsistent with the Plan. The Plan Proponents reserve the right to amend the exhibits and schedules (if any) to the Plan any time prior to the Confirmation Date.

DMS_US.366435582.22

### 17.13  Votes Solicited in Good Faith

Upon entry of the Confirmation Order, the Plan Proponents will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code and any applicable non- bankruptcy law, and pursuant to section 1125(e), the Plan Proponents and each of its affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code, including, if applicable, in the offer, issuance, sale and purchase of any Plan securities (if any) provided under the Plan, and, therefore, will have no liability for the violation of any applicable law, rule or regulation governing the solicitation of votes on the Plan.

### 17.14  Conflicts

If there is a conflict between this Combined Disclosure Statement and Plan and an Exhibit hereto, including the Liquidation Trust Agreement, the Combined Disclosure Statement and Plan shall govern and control, except for inconsistencies or clarifications in furtherance of the Liquidation Trust as a liquidating trust for federal income tax purposes, in which case the terms and/or provisions of the Liquidation Trust Agreement shall govern. If any provision of this Combined Disclosure Statement and Plan conflicts with or is in any way inconsistent with any provision of the Confirmation Order, the Confirmation Order shall govern and control.

### 17.15  U.S. Trustee Fees

The Debtors will pay pre-confirmation fees owed to the U.S. Trustee on or before the Effective Date of the Plan. After the Effective Date, the Liquidation Trustee will File with the Bankruptcy Court and serve on the U.S. Trustee quarterly financial reports in a format prescribed by the U.S. Trustee, and the Liquidation Trustee will pay post-Effective Date quarterly fees to the U.S. Trustee until a final decree is entered or the case is converted or dismissed as provided in 28 U.S.C. § 1930(a)(6).

### 17.16  Implementation

The Plan Proponents and the Liquidation Trustee shall be authorized to perform all reasonable, necessary and authorized acts to consummate the terms and conditions of the Plan and the Plan Documents, without further order from the Bankruptcy Court.

### 17.17  No Admissions

Notwithstanding anything herein to the contrary, nothing contained in the Plan shall be deemed an admission by the Debtors, the Estates, or the Committee with respect to any matter set forth herein, including, without limitation, liability on any Claim or Interest or the propriety of the classification of any Claim or Interest.

*[Signature page follows]*

DMS_US.366435582.22

__, 2024

**Debtor Atlantic Neurosurgical Specialists PA**

_____
Name: Ronald Benitez M.D.
Title: President

**Debtor ANS Newco, LLC**

_____
Name: Ronald Benitez M.D.
Title: President

**Debtor Hanover Hills Surgery Center LLC**

_____
Name: Ronald Benitez, M.D.
Title: Authorized Signatory

**Debtor Hanover Hills Surgery Center LLC**
Name: David Berman
Title: Authorized Signatory

**Official Committee of Unsecured Creditors**

_/s/_____
Name:
Title: Member

64

Submitted by:

*ANS Debtors' Counsel*

_____

David L. Bruck
Greenbaum Rowe Smith & Davis LLP
99 Wood Avenue South
Iselin, New Jersey 08830
Telephone: (732) 549-5600
dbruck@greenbaumlaw.com


*Debtor Hanover Hills' Counsel*

_____

Joseph DiPasquale
Michael R. Herz
Agostino A. Zammiello
Fox Rothschild LLP
49 Market Street
Morristown, New Jersey 07960
Telephone: (973) 992-4800
jdipasquale@foxrothschild.com
mherz@foxrothschild.com
azammiello@foxrothschild.com


*Committee's Counsel*

_____

Richard Bernard
Frank Velocci
Faegre Drinker Biddle & Reath LLP
600 Campus Dr.
Florham Park, New Jersey 07932
Telephone: (973) 549-7000
richard.bernard@faegredrinker.com
frank.velocci@faegredrinker.com

65

DMS_US.366435582.22

# Exhibit A

*Definitions*

9375995.1
DMS_US.366435582.12

DMS_US.366435582.22

As used in the Plan, the following terms have the following meanings:

1.    **"503(b)(9) Claims"** shall mean Claims arising under section 503(b)(9) of the Bankruptcy Code against one or more of the Debtors that were Filed against one or more of the Debtors on or before the General Bar Date.

2.    **"Administrative Claim"** shall mean any right to payment constituting a cost or expense of administration of these Chapter 11 Cases as it relates to one of the Debtors under section 503(b) and 507(a)(2) of the Bankruptcy Code including, any actual and necessary costs and expenses of preserving the Debtors' Estates, any actual and necessary costs and expenses of operating the Debtors' business, any indebtedness or obligations incurred by the Debtors after the Petition Date in connection with the conduct of its business, all compensation and reimbursement of expenses awarded or otherwise approved for payment by Final Order of the Bankruptcy Court under section 330, 503(b) or 1129(a)(4) of the Bankruptcy Code, any fees or charges assessed against the Debtors' Estates under section 1930 of chapter 123 of title 28 of the United States Code, all wages, salaries and health and other benefits on account of services rendered after the Petition Date, all post-Petition Date taxes, and all other claims entitled to administrative expense status pursuant to a Final Order of the Bankruptcy Court, in each case relating to the period from the Petition Date to the Effective Date but not beyond.

3.    **"Affiliated Medical Practice"** shall mean the medical practice(s) formed by the Settling Shareholder(s) through which they began practicing medicine after the Debtors ceased operations and specifically identified by each Settling Shareholder in his opt-in election.

4.    **"Allowed"** shall mean all or a portion of a Claim against one of the Debtors or an Interest in the Debtors (a) that has been listed by one of the Debtors in its Schedules as liquidated in amount and not "disputed" or "contingent," and with respect to which no contrary Claim or proof of Interest has been Filed, (b) for which a proof of claim has been Filed and as to which no Objection or request for estimation has been Filed on or before the Claims Objection Deadline or the expiration of such other applicable period fixed by the Bankruptcy Court, (c) as to which any Objection has been settled, waived, withdrawn or denied by a Final Order, or (d) that is allowed (i) by a Final Order, (ii) by an agreement between the Holder of such Claim or Interest and one or more of the Debtors prior to the Effective Date, or the Liquidation Trustee on behalf of the Debtors Estates after the Effective Date or (iii) pursuant to the terms of this Combined Disclosure Statement and Plan. For purposes of computing Distributions under this Combined Disclosure Statement and Plan, a Claim or Interest that has been deemed "Allowed" shall not include interest, costs, fees or charges on such Claim or Interest from and after the Petition Date, except as provided in section 506(b) of the Bankruptcy Code or as otherwise expressly set forth in this Combined Disclosure Statement and Plan. For the avoidance of doubt, any Claim that relates to obligations that were assumed by AOP pursuant to the Hanover APA shall not be an Allowed Claim for purposes of this Combined Disclosure Statement and Plan.

5.    **"ANS Continuum"** means ANS Continuum Holdco LLC.

6.    **"ANS Debtors"** means Atlantic Neurosurgical Specialists PA and ANS Newco LLC.

7.     **"ANS Founders"** shall mean ANS Founders PC.

8.     **"ANS Group"** shall mean Atlantic Neurosurgical Specialists, P.A., a New Jersey professional association, the Settling Shareholders, ANS Founders PC and ANS Newco, LLC.

9.     **"AOP"** shall mean AOP Holdings, LLC, the purchaser of Hanover Hills' assets under the Hanover APA and the Hanover Sale Order.

10.     **"Assets" shall** mean all tangible and intangible assets of every kind and nature of the Debtors and their Estates within the meaning of section 541 of the Bankruptcy Code.

11.     **"Avoidance Actions"** shall mean any and all claims or causes of action to avoid or recover a transfer of property, or avoid an obligation incurred by the Debtors pursuant to any applicable section of the Bankruptcy Code, including sections 510, 542, 543, 544, 545, 547, 548, 549, 550, 551, 553, and 724(a) of the Bankruptcy Code and any other applicable non-bankruptcy law, whether or not litigation has been commenced with respect to such claims or causes of action as of the Effective Date.

12.     **"Bankruptcy Code"** shall mean Title 11 of the United States Code and as such title has been, or may be, amended from time to time, to the extent that any such amendment is applicable to these Chapter 11 Cases.

13.     **"Bankruptcy Court"** shall mean the United States Bankruptcy Court for the District of New Jersey.

14.     **"Bankruptcy Rules"** shall mean, when referenced generally, (i) the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, as amended and promulgated under section 2075 of Title 28 of the United States Code, (ii) the applicable Federal Rules of Civil Procedure, as amended and promulgated under section 2072 of Title 28 of the United States Code, (iii) the applicable Local Rules of Bankruptcy Practice and Procedures for the United States Bankruptcy Court for the District of New Jersey, and (iv) any standing orders governing practice and procedure issues by the Bankruptcy Court, each as in effect on the Petition Date, together with all amendments and modifications thereto that were subsequently made applicable to these Chapter 11 Cases or proceedings therein, as the case may be; provided, however, when a specific Bankruptcy Rule is referenced (*e.g.*, Bankruptcy Rule 9019), such reference shall be to such Rule under the Federal Rules of Bankruptcy Procedure.

15.     **"Bar Date"** shall mean, with respect to any particular Claim, the specific date set by the Bankruptcy Court as the last day for Filing proofs of Claim or proofs of Interest against one or more of the Debtors in these Chapter 11 Cases for that specific Claim or Interest, as set forth in the Bar Date Order.

16. **"Bar Date Order"** shall mean the Order entered on August 27, 2024 as Document No. 154.

17. **"Borrower Group"** shall mean Continuum Institute Atlantic, LLC, a Delaware limited liability company ("Continuum Institute Atlantic"), Florham Park Investors, LLC, a Delaware limited liability company ("Florham Park"), Continuum Institute, LLC, a Delaware limited liability company ("Continuum Institute"), ANS Continuum Holdco, LLC, a Delaware limited liability company ("ANS Continuum"), Hanover Hills Surgery Center LLC, a New Jersey limited liability company, Lorient Capital Management, LLC a Delaware limited liability company("LCM"), and Lorient Continuum Investors, LLC ("LCI").

18. **"Business Day"** shall mean any day, other than a Saturday, Sunday or a legal holiday (as that term is defined in Bankruptcy Rule 9006(a)).

19. **"Cash"** or **"$"** shall mean legal tender of the United States of America or the equivalent thereof, including bank deposits, checks and cash equivalents.

20. **"Cause of Action"** or **"Causes of Action"** shall mean, individually or collectively and without limitation, any and all actions, liabilities, obligations, rights to legal or equitable remedies, suits, debts, sums of money, damages, judgments, claims and demands whatsoever, whether known or unknown, matured or unmatured, disputed or undisputed and whether asserted or assertable directly, indirectly, or derivatively in law, equity, statute, or otherwise held by the Debtors, the Committee, or the Estates as of the Effective Date, including, without limitation, Avoidance Actions, commercial tort claims as defined in Article 9 of the UCC, the D&O Claims and any and all claims and causes of action against the Debtors' current or former directors, officers, managers, members, employees, and any and all proceeds of the foregoing Causes of Action; *provided, however*, with respect to the Settling Shareholders who are Insureds, Causes of Action are limited to D&O Claims, the recovery as to which is limited to the D&O Recovery. Notwithstanding anything in the Plan to the contrary, Causes of Action include the right to obtain a refund or avoidance of the 2023 overpayments in the aggregate amount of $657,541 the Debtors made to retirement plans, regardless of whether the beneficiary thereof is a Settling Shareholder. For the avoidance of doubt, for purposes hereof, an indirect claim shall include, but not be limited to, a claim that is asserted against a person which claims contribution or indemnification under the provisions of any agreement or applicable law from any Settling Shareholder.

21. **"Chapter 11 Cases"** shall mean the Debtors' chapter 11 cases, which are jointly administered under Case No. 24-15726 (VFP) in the Bankruptcy Court.

22. **"CIA"** shall mean Continuum Institute Atlantic LLC

23. **"Claim"** or **"Claims"** shall mean a claim or claims against one or more of the Debtors, as such term is defined in section 101(5) of the Bankruptcy Code.

24. **"Claims Objection(s)"** shall mean any objection, application, motion, complaint or any other legal proceeding seeking, in whole or in part, to disallow, determine,

liquidate, classify, reclassify, or establish the priority, expunge, subordinate or estimate any Claim (including the resolution of any request for payment of any Administrative Claim).

25.     **"Claims Objection Deadline"** shall mean one hundred eighty (180) days after the Effective Date, or such later date as may be ordered by the Bankruptcy Court, provided however, that the Liquidation Trustee may File one or more motions with the Bankruptcy Court on notice and an opportunity for a hearing to extend such deadline from time to time.

26.     **"Class"** shall mean each category or group of Holders of Claims or Interests that has been designated as a class in Article IV of this Combined Disclosure Statement and Plan.

27.     **"Combined Disclosure Statement and Plan"** shall mean this entire document and all exhibits, schedules and related documents, whether annexed hereto or filed in connection herewith, including the Disclosure Statement portions and the Plan portions.

28.     **"Confirmation Date"** shall mean the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of these Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

29.     **"Confirmation Hearing"** shall mean the hearing held by the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code to consider Confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

30.     **"Confirmation Order"** shall mean the order of the Bankruptcy Court (a) approving the adequacy of the information in the Combined Disclosure Statement and Plan pursuant to section 1125 of the Bankruptcy Code, and (b) confirming the Plan pursuant to, among others, section 1129 of the Bankruptcy Code.

31.     **"Consummation"** shall mean the occurrence of the Effective Date and fulfillment of substantially all the steps necessary to implement the terms and provisions of the Plan.

32.     **"Contingent"** shall mean, with reference to a Claim, a Claim that has not accrued or is not otherwise payable and the accrual of which, or the obligation to make payment on which, is dependent upon a future event that may or may not occur.

33.     **"Continuum Institute Atlantic LLC"** means the entity which is the 40% owner of ANS Continuum Holdco LLC and is owned by Lorient Capital LLC

34.     **"Committee"** shall mean the official committee of unsecured creditors appointed by the U.S. Trustee, the composition of which has changed as a result of the resignation prior to the Effective Date of a member of the Committee.

35.    **"Creditor"** shall have the meaning ascribed to such term in section 101(10) of the Bankruptcy Code.

36.    **"CRO"** shall mean Thomas Buck as to the Debtors.

37.    **"D&O Claims"** shall mean all potential Causes of Action against the Insureds in such capacity that qualifies as an Insured.

38.    **"D&O Insurer"** shall mean Argonaut Insurance Company.

39.    **"D&O Liability Insurance Policy"** shall mean the insurance policy issued b Policy No. ML7602904-6, issued to Named Insured ANS Continuum Holdco LLC by D&O Insurer for the effective period September 21, 2023 to September 21, 2024.

40.    **"D&O Recovery"** shall mean the recovery by the plaintiff, if any against the D&O Liability Insurance Policy

41.    **"Debtors"** shall mean, collectively, Atlantic Neurosurgical Specialists PA and ANS Newco LLC and Hanover Hills Surgery Center LLC.

42.    **"Debtor ANS"** shall mean Atlantic Neurosurgical Specialists P.A.

43.    **"Debtor Hanover Hills"** shall mean Hanover Hills Surgery Center LLC

44.    **"Debtor Newco"** shall mean ANS Newco LLC.

45.    **"Disallowed"** shall mean with respect to any Claim or Interest or portion thereof, any Claim against or Interest in one or more of the Debtors which: (i) has been disallowed, in whole or part, by a Final Order; (ii) has been withdrawn by agreement of the Holder thereof and the Debtors or the Liquidation Trustee, whole or in part; (iii) has been withdrawn, in whole or in part, by the Holder thereof; (iv) is listed in the Schedules as zero or as Disputed, Contingent or unliquidated and in respect of which a proof of Claim or a proof of Interest, as applicable, has not been timely Filed or deemed timely Filed pursuant to the Plan, the Bankruptcy Code or any Final Order or other applicable law; (v) has been reclassified, expunged, subordinated or estimated to the extent that such reclassification, expungement, subordination or estimation results in a reduction in the Filed amount of any proof of Claim or proof of Interest; (vi) is evidenced by a proof of Claim or a proof of Interest which has been Filed, or which has been deemed to be Filed under applicable law or order of the Bankruptcy Court or which is required to be Filed by order of the Bankruptcy Court but as to which such proof of Claim or proof of Interest was not timely or properly Filed; (vii) is unenforceable to the extent provided in section 502(b) of the Bankruptcy Code; and (viii) where the Holder of a Claim is a Person or Entity from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, unless such Person,

Entity or transferee has paid the amount, or turned over any such Property, for which such Person, Entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of the Bankruptcy Code. In each case a Disallowed Claim or a Disallowed Interest is Disallowed only to the extent of disallowance, withdrawal, reclassification, expungement, subordination or estimation.

46.    **"Disallowed Claim"** shall mean a Claim, or any portion thereof, that is Disallowed.

47.    **"Disallowed Interest"** shall mean an Interest, or any portion thereof, that is Disallowed.

48.    **"Disbursing Agent"** shall mean the Debtor with respect to distributions on or prior to the Effective Date and the Liquidation Trustee or any third party designated by the Liquidation Trustee to act as Disbursing Agent after the Effective Date.

49.    **"Disclosure Statement"** shall mean the disclosure statement, as amended, supplemented or modified from time to time, that is embodied within this Combined Disclosure Statement and Plan and distributed in accordance with, among others, sections 1125, 1126(b) and 1145 of the Bankruptcy Code, Bankruptcy Rule 3018 and other applicable law.

50.    **"Disputed"** shall mean any Claim or Interest which has not yet been Allowed or Disallowed in accordance with the terms of this Combined Disclosure Statement and Plan.

51.    **"Disputed Claims"** shall mean any Disputed Administrative Claims, Disputed Priority Tax Claims, Disputed Priority Non-Tax Claims, Disputed Secured Claims, and Disputed General Unsecured Claims.

52.    **"Distributable Cash"** shall mean the Cash available for distribution pursuant to the Plan on the Effective Date.

53.    **"Distribution"** shall mean any distribution made pursuant to the Plan by the Disbursing Agent to the Holders of Allowed Claims.

54.    **"Distribution Date"** shall mean the date on which a Distribution is made pursuant to this Combined Disclosure Statement and Plan.

55.    **"Distribution Record Date"** shall mean the date established for determining the Holders of Allows Claims or Allowed Interests entitled to Distributions pursuant to the Plan, which shall be the Confirmation Date.

56.    **"Effective Date"** shall mean the first Business Day after the date on which (a) the Confirmation Order becomes a Final Order; and (b) all conditions in Article XI of this

Combined Disclosure Statement and Plan have been satisfied or waived in accordance with that Article.

57.    **"Entity"** shall have the meaning ascribed to such term in section 101(15) of the Bankruptcy Code.

58.    **"ERISA"** shall mean the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1001-1461 (2018 & Supp. IV 2023).

59.    **"Estate"** or **"Estates"** shall mean one or more estates of the Debtors created pursuant to section 541 of the Bankruptcy Code.

60.    **"Executory Contract"** shall mean a contract or lease to which one of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

61.    **"File," "Filed,"** or **"Filing"** shall mean, respectively, file, filed, or filing with the Bankruptcy Court or its authorized designee in these Chapter 11 Cases; provided, however, that with respect to proofs of Claim and proofs of Interest only, "Filed" shall mean delivered and received in the manner provided by the Bar Date Order or as otherwise established by order of the Bankruptcy Court.

62.    **"Final Administrative Claims Bar Date"** means the date that is 30 days after the Effective Date, which shall be the deadline for Filing requests for payment of Administrative Claims that arose after the Closing Date.

63.    **"Final Order"** shall mean an unstayed order, ruling or judgment of the Bankruptcy Court or any other court of competent jurisdiction as to which the time to appeal, petition for certiorari, or request for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending, or as to which any right to appeal, petition for certiorari, reargument, or rehearing shall have been waived in writing in form and substance satisfactory to the Debtors or the Liquidation Trustee on behalf of the Estates (on or after the Effective Date), or, in the event that an appeal, writ of certiorari, or reargument or rehearing thereof has been sought, such order of the Bankruptcy Court or other court of competent jurisdiction shall have been determined by the highest court to which such order was appealed, or petitioned for certiorari, reargued or reheard, and shall have been denied affirmed and the time to take any further appeal, petition for certiorari or move for reargument or rehearing shall have expired; provided, however, that the possibility that a motion under rule 59 or rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or applicable state court rules of civil procedure, may be Filed with respect to such order, shall not cause such order not to be a Final Order.

64. **"General Bar Date"** shall mean on or before 5:00 p.m. (Prevailing Eastern Time) for certain Claims arising before the Petition Date, including 503(b)(9) Claims, Secured Claims, General Unsecured Claims, or Priority Non-Tax Claims as established by the Bar Date Order.

65. **"General Unsecured Claim"** shall mean any unsecured Claim against the Debtors that arose or is deemed by the Bankruptcy Code or Bankruptcy Court, as the case may be, to have arisen before the Petition Date and that is not: (i) an Administrative Claim, (ii) a Priority Tax Claim, (iii) a Secured Claim, (iv) a Priority Non-Tax Claim, or (v) an Intercompany Claim.

66. **"Governmental Unit"** shall have the meaning ascribed to such term in section 101(27) of the Bankruptcy Code.

67. **"Governmental Unit Bar Date"** shall mean on or before 5:00 p.m. (Prevailing Eastern Time) as established by the Bar Date Order.

68. **"Hanover APA"** shall mean the asset purchase agreement entered into between Hanover Hills and AOP dated September 23, 2024, annexed as Exhibit A to and approved by the Hanover Sale Order.

69. **"Hanover Sale Order"** shall mean the *Order Pursuant to 11 U.S.C. §§ 105(a), 363, and 365 (I) Authorizing and Approving the Sale of Substantially All of Debtor's Assets, Free and Clear of Liens, Claims, Encumbrances and Interests, (II) Authorizing the Assumption and Assignment of Executory Contracts and Leases, and (III) Granting Related Relief* [Docket No. 260] approving the sale of Hanover Hills' assets to AOP.

70. **"Holder"** or **"Holders"** shall mean the legal or beneficial Holder of a Claim or Interest (and, when used in conjunction with a Class or type of Claim or Interest, means a Holder of a Claim or Interest in such Class or of such type).

71. **"Impaired"** shall mean, when used in reference to a Claim or Interest, a Claim or Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

72. **"Impaired Class"** shall mean a Class of Claims or Interests that is Impaired under Section 1124 of the Bankruptcy Code.

73. **"Insider"** shall have the meaning ascribed to such term in section 101(31) of the Bankruptcy Code and any Person which is or at any relevant time was an officer, director, manager, or member of the Debtors.

74. **"Insurance Policies"** shall mean all insurance policies that have been issued to, or provide coverage to, any of the Debtors and all agreements, instruments, or documents relating thereto.

75.    **"Insured"** shall mean an "Insured Person" as defined in the D&O Liability Insurance Policy. Based upon current information (including as to Dr. Saphier only, the position asserted by the D&O Insurer in its coverage letter dated October 17, 2024 regarding the Committee's claim letters dated August 15, 2024 and August 28, 2024), Drs. Baskin and Saphier are not Insureds.

76.    **"Intercompany Claim"** shall mean any account reflecting intercompany book entries by one Debtor with respect to another Debtor.

77.    **"Interests"** shall mean the legal interests, equitable interests, contractual interests, equity interests or ownership interests, or other rights of any Person in the Debtors including all capital stock, stock certificates, common stock, preferred stock, partnership interests, limited liability company or membership interests, rights, treasury stock, options, warrants, contingent warrants, convertible or exchangeable securities, investment securities, subscriptions or other agreements and contractual rights to acquire or obtain such an interest or share in the Debtor, partnership interests in the Debtors' stock appreciation rights, conversion rights, repurchase rights, redemption rights, dividend rights, preemptive rights, subscription rights and liquidation preferences, puts, calls, awards or commitments of any character whatsoever relating to any such equity, common stock, preferred stock, ownership interests or other shares of capital stock of the Debtors or obligating the Debtors to issue, transfer or sell any shares of capital stock whether or not certificated, transferable, voting or denominated "stock" or a similar security.

78.    **"IRS"** shall mean the Internal Revenue Service of the United States of America.

79.    **"KeyBank"** shall mean KeyBank National Association.

80.    **"KeyBank Claim"** shall mean, as applicable, (i) the allowed unsecured claim in the amount of $20,000,000 ( reduced by the Year End Distribution received by KeyBank in the amount of $2,500,000) against Debtor ANS, which claim includes all claims of the Lorient Parties against Debtor ANS; (ii) the allowed unsecured claim in the amount of $20,000,000 ( reduced by the Year End Distribution in the amount of $2,500,000 received by KeyBank) against Debtor Newco, which claim includes all claims of the Lorient Parties against Debtor Newco; and (iii) the allowed under secured claim in the amount of $29,000,000 against Debtor Hanover Hills, which claim includes all claims of the Lorient Parties against Debtor Hanover Hills. For the avoidance of doubt, the KeyBank Claim against Debtor ANS and Debtor Newco shall include all right, title and interest that the Lorient Parties had or may have in any collateral pledged to KeyBank and which is described in the KeyBank Complaint and the exhibits thereto referenced in Article III of this Plan.

81.    **"Liquidation Analysis"** shall mean that certain liquidation analysis, as may be amended, modified or supplemented, will be filed as a supplement to the Plan in advance of the Confirmation Hearing.

82. **"Liquidation Trust"** shall mean the trust established under the Plan and the Liquidation Trust Agreement.

83. **"Liquidation Trust Agreement"** means the trust agreement that establishes the Liquidation Trust and governs the powers, duties, and responsibilities of the Liquidation Trustee. The Liquidation Trust Agreement is attached to the Plan as **Exhibit B**.

84. **"Liquidation Trust Assets"** shall mean all Assets, including Causes of Action, of the Estates as of the Effective Date transferred to the Liquidation Trust under the Plan.

85. **"Liquidation Trust Beneficiaries"** shall mean the Holders of all Allowed General Unsecured Claims.

86. **"Liquidation Trust Expenses"** shall mean the reasonable fees, costs and expenses of the Liquidation Trust's retained professionals, as determined in the reasonable discretion of the Liquidation Trustee. For the avoidance of doubt, U.S. Trustee Fees shall be considered a Trust Expense.

87. **"Liquidation Trust Expense Reserve"** shall mean the reserve established pursuant to Section 12.02 of this Combined Disclosure Statement and Plan for payment of the actual and projected costs and expenses of the Liquidation Trust, which may be replenished or adjusted from time to time with Cash held by the Liquidation Trust, other than funds in the other Reserves.

88. **"Liquidation Trustee"** shall mean the person identified in the supplement of the Plan to be, and solely in its capacity as, Liquidation Trustee of the Liquidation Trust pursuant to the terms and conditions of this Combined Disclosure Statement and Plan and the Liquidation Trust Agreement.

89. **"Local Rules"** shall mean the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of New Jersey.

90. **"Lorient"** shall mean Lorient Capital LLC.

91. **"Lorient Parties"** shall mean (a) Lorient Capital LLC, (b) Lorient Continuum Investors LLC, (c) ANS Continuum Holdco LLC, (d) Continuum Institute Atlantic LLC, (e) Continuum Institute LLC, and (f) Florham Park Investors LLC.

92. **"Ordinary Course Liabilities"** shall mean those obligations incurred in the ordinary course of business by one or more of the Debtors following the Petition Date.

93. **"Other Secured Claim"** shall mean a Secured Claim other than KeyBank's Secured Claim.

94.     **"PBGC"** shall mean the Pension Benefit Guaranty Corporation, a wholly owned United States government corporation, and an agency of the United States, created under Title IV of ERISA to administer the federal pension insurance program.

95.     **"Pension Plan"** shall mean the Atlantic Neurosurgical Specialists, Inc. Cash Balance Plan, a defined benefit plan insured by the PBGC.

96.     **"Person"** shall have the meaning ascribed to such term in section 101(41) of the Bankruptcy Code.

97.     **"Petition Date"** shall mean June 5, 2024 for the ANS Debtors and July 12, 2024 for Debtor Hanover Hills

98.     **"Plan"** shall mean that portion of this Amended Combined Disclosure Statement and Plan that specifies the classification, treatment, and means for implantation of the distribution to certain Creditors under chapter 11 of the Bankruptcy Code, as it may be altered, amended, modified or supplemented from time to time including in accordance with any documents submitted in support hereof and the Bankruptcy Code or the Bankruptcy Rules.

99.     **"Plan Document"** shall mean any document that furthers, implements or relates to the Plan and the exhibits thereto, including without limitation the Liquidation Trust Agreement.

100.     **"Plan Proponents"** shall mean the Debtors and the Committee.

101.     **"Post-Confirmation Committee"** shall have the meaning ascribed in the Liquidation Trust Agreement.

102.     **"Priority Non-Tax Claim"** shall mean any and all Claims accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Claim.

103.     **"Priority Tax Claim"** shall mean a Claim or a portion of a Claim for which priority is asserted under section 507(a)(8) of the Bankruptcy Code.

104.     **"Priority Wage Claim"** shall mean a Priority Non-Tax Claim pursuant to section 507(a)(4) of the Bankruptcy Code.

105.     **"Pro Rata"** shall mean the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that respective Class, or the proportion that Allowed Claims in a particular Class bear to the aggregate amount of Allowed Claims in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim under the Plan, as applicable.

106. **"Professional"** shall mean any professional employed in these Chapter 11 Cases pursuant to Bankruptcy Code sections 327, 328 or 1103, or for which compensation and reimbursement has been Allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

107. **"Professional Fee Bar Date"** shall mean the deadline for Filing all applications for Professional Fee Claims, which shall be thirty (30) days after the Effective Date.

108. **"Professional Fee Claims"** shall mean a Claim of a Professional for compensation for services rendered or reimbursement of costs, expenses, or other charges incurred after the Petition Date and on or before the Effective Date.

109. **"Rejection Claim"** shall mean any Claim for amounts due as a result of the rejection by one of the Debtors of any Executory Contract under section 365 of the Bankruptcy Code.

110. **"Rejection Damages Bar Date"** shall mean the deadline by which a counterparty to an Executory Contract of the Debtor rejected by order of the Court or under this Combined Disclosure Statement and Plan must File Rejection Claim and shall be 5:00 p.m. (Eastern Time) on the date that is 30 days following service of an order approving rejection of any Executory Contract of one of the Debtors or 30 days following service of the Confirmation Order.

111. **"Related Parties"** shall mean, (i) with respect to an Entity, all of that Entity's past and current officers, directors, managers, managing members, principals, shareholders, members, partners, employees, agents, advisors, attorneys, professionals, accountants, investment bankers, consultants and other representatives; (ii) GRSD, Fox Rothschild, Epstein Becker & Green, Cole Schotz, Garfunkel Wild, McCarter and English, Riker Danzig, Chiesa Shahinian & Giantomassi PC, B Riley, and LBCM Healthcare, and each of their Representatives; and (iii) such Person's respective heirs, executors, estates, servants and nominees, in each case in their capacity as such; *provided, however*, Related Parties exclude any of the above in such capacity for a Shareholder who is not a Settling Shareholder.

112. **"Representatives"** shall mean with respect to an Entity, all of that Entity's past and current officers, directors, managers, managing members, principals, shareholders, members, partners, employees, agents, advisors, attorneys, professionals, accountants, investment bankers, consultants and other representatives and such Person's respective heirs, executors, estates, servants and nominees, in each case in their capacity as such.

113. **"Reserves"** shall mean, collectively, the Reserves established by the Liquidation Trustee pursuant to Section 12.02 of the Plan.

114. **"Schedules"** shall mean the schedules of Assets and Liabilities, schedules of Executory Contracts and Statements of Financial Affairs filed by the Debtors pursuant to

section 521 of the Bankruptcy Code and in substantial accordance with the Official Bankruptcy Forms, as the same may have been amended, modified or supplemented from time to time, which were filed on at D.I. 132.

115.    **"Secured Claim"** shall mean, pursuant to section 506 of the Bankruptcy Code, that portion of a Claim that is (a) secured by a valid, perfected and enforceable security interest, lien, mortgage, or other encumbrance, that is not subject to avoidance under applicable bankruptcy or non-bankruptcy law, in or upon any right, title or interest of one or more of the Debtors in and to property of the Estates, to the extent of the value of the Holder's interest in such property as of the Petition date, or (b) Allowed as such pursuant to the terms of this Combined Disclosure Statement and Plan (subject to the Confirmation Order becoming a Final Order). The defined term Secured Claim includes any Claim that is (i) subject to an offset right under applicable law as of the Petition Date, and (ii) a secured claim against one or more of the Debtors pursuant to sections 506(a) and 553 of the Bankruptcy Code.

116.    **"Settling Shareholder"** shall mean each Shareholder and his Affiliated Medical Practice who participates in the Shareholder Settlement, identifies his Affiliated Medical Practice, timely pays his settlement contribution, and consents to provide the third-party releases set forth in Article XIII of the Plan.

117. **"Shareholder Release"** Intentionally Omitted

118.    **"Shareholder Settlement"** shall mean the terms and provisions of Article 10.07 of the Combined Disclosure Statement and Plan.

119.    **"Shareholders"** and each a **"Shareholder"** shall mean the eight (8) holders of equity interests in ANS Founders, Drs. Ronald Benitez, Kyle Chapple, Yaron Moshel, Jonathan Baskin, Jay Chun, John Knightly, Scott Meyer and Paul Saphier.

120.    **"Solicitation Procedures Order"** shall mean the Court's *Order (I) Approving on an Interim Basis the Adequacy of Disclosures in the Combined Plan and Disclosure Statement, (II) Fixing Voting Record Date, (III) Scheduling the Confirmation Hearing and Approving Form and Manner of Related Notice and Objection procedures Deadline for Filing Objections, (IV) Approving Solicitation Packages and Procedures and Deadlines for Soliciting, Receiving, and Tabulating Votes to Accept or Reject the Combined Plan and Disclosure Statement, and (V) Approving Form of Ballot and Notice to Non-Voting Classes*, including all exhibits thereto, to be filed after the Combined Disclosure Statement and Plan.

121.    **"Tax"** or **"Taxes"** shall mean all income, gross receipts, sales, use, transfer, payroll, employment, franchise, profits, property, excise, or other similar taxes, estimated import duties, fees, stamp taxes, and duties, value added taxes, assessments, or charges of any kind whatsoever (whether payable directly or by withholding), together with any interest and any penalties, additions to tax, or additional amounts imposed by any taxing authority of a Governmental Unit with respect thereto.

122.    **"Unclaimed Distributions"** shall mean any undeliverable or unclaimed Distributions.

123    **"Unimpaired"** shall mean, when used in reference to a Claim or Interest, any Claim or Interest that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

124.    **"Unimpaired Class"** shall mean a Class of Claims that are not impaired within the meaning of section 1124 of the Bankruptcy Code.

125.    **"U.S. Trustee"** shall mean the office of the United States Trustee for the District of New Jersey.

126.    **"U.S. Trustee Fees"** shall mean all fees payable pursuant to 28 U.S.C. § 1930 and any interest thereon pursuant to 31 U.S.C. § 3717.

127.    **"Voting Agent"** shall mean Greenbaum Rowe Smith & Davis LLP counsel to the ANS Debtors.

128.    **"Voting Deadline"** shall mean [                    ], at 5:00 p.m. (Eastern Time), the date and time by which ballots to accept or reject the Plan must be received by the Voting Agent in order to be counted, as set forth by the Solicitation Procedures Order.

# Exhibit B

*Liquidation Trust Agreement*

9375995.1
DMS_US.366435582.12

DMS_US.366435582.22

# LIQUIDATION TRUST AGREEMENT

## PREAMBLE

This Liquidation Trust Agreement, dated as of __, 2024 (the "**Agreement**"), which pertains to the administration of this Liquidation Trust (the "**Liquidation Trust**"), is made effective as of the Effective Date[4] of the Combined Disclosure Statement and Plan, by and among Atlantic Neurosurgical Specialists PA, ANS Newco LLC, and Hanover Hills Surgery Center LLC, debtors and debtors in possession (collectively, the "**Debtors**") and [LIQUIDATION TRUSTEE] solely in its capacity as trustee (the "**Liquidation Trustee**" and together with the Debtors, the "**Parties**") in accordance with the *Combined Disclosure Statement and Joint Chapter 11 Plan of Liquidation* dated September ___, 2024 (including all exhibits thereto, as the same may be further amended, modified, or supplemented from time to time, the "**Plan**") jointly filed by the Debtors and the Official Committee of Unsecured Creditors (the "**Committee**"), and such Plan having been confirmed pursuant to the entry of the Confirmation Order.

## RECITALS

A.      Each of Atlantic Neurosurgical Specialists PA and ANS Newco LLC, on June 5, 2024, and Hanover Hills Surgery Center LLC, on July 12, 2024 (together, the "**Petition Date**") filed voluntary petitions for relief under chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of New Jersey (the "**Bankruptcy Court**"), thereby commencing their chapter 11 cases (collectively, the "**Chapter 11 Cases**").

B.      On ___, 2024, the Debtors and the Committee filed the Plan.

C.      Among other things, the Plan provides for the creation of a post-confirmation Liquidation Trust to hold and administer certain Liquidation Trust Assets and distribute the proceeds therefrom to the Holders of certain Allowed Claims, in accordance with the terms of this Agreement and the Plan.  This Agreement is executed to establish the Liquidation Trust and to facilitate the implementation of the Plan.

D.      The Liquidation Trust is created on behalf of, and for the benefit of, the Liquidation Trust Beneficiaries.

E.      The respective powers, authority, responsibilities, and duties of the Liquidation Trustee shall be governed by this Agreement, the Plan, the Confirmation Order, other applicable orders issued by the Bankruptcy Court and, with respect to the Liquidation Trustee only, any obligations under New Jersey law.

---

[4] A capitalized term used but not defined herein shall have the meaning ascribed to it in the Combined Disclosure Statement and Plan.

F.    This Agreement is intended to supplement, complement, and implement the Plan. If any of the terms and/or provisions of this Agreement are inconsistent with the terms and/or provisions of the Plan, then the Plan shall govern except for inconsistencies or clarifications in furtherance of the Liquidation Trust as a liquidating trust for federal income tax purposes, in which case the terms and/or provisions of this Liquidation Trust shall govern.

G.    The Liquidation Trust is intended to qualify as a "liquidating trust" under the United States Internal Revenue Code of 1986 and the Treasury Regulations promulgated thereunder, specifically Treasury Regulation section 301.7701-4(d), and as such is a "grantor trust" for federal income tax purposes with the Liquidation Trust Beneficiaries treated as the grantors and owners of the Liquidation Trust.  In particular, as specified in Revenue Procedure 94-95, 1994-2 C.B. 684 (July 11, 1994):

(a)    The Liquidation Trust is organized for the primary purpose of liquidating the Liquidation Trust Assets, with no objective to conduct a trade or business except to the extent reasonably necessary to, and consistent with, the purpose of the Liquidation Trust.  The Liquidation Trust shall not be deemed a successor of the Debtors or their Estates;

(b)    This Agreement provides that the Liquidation Trust Beneficiaries will be treated as the grantors of the Liquidation Trust and deemed owners of the Liquidation Trust Assets, and further, requires the Liquidation Trustee to file returns for the Liquidation Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a);

(c)    This Agreement provides for consistent valuations of the transferred property by the Liquidation Trustee and the Liquidation Trust Beneficiaries, and those valuations shall be used for all federal income tax purposes;

(d)    All of the Liquidation Trust's income is to be and will be treated as subject to tax on a current basis to the Liquidation Trust Beneficiaries who will be responsible for payment of any tax due;

(e)    This Liquidation Trust contains a fixed or determinable termination date in that it will terminate as soon as practicable at such time as (i) all Disputed Claims have been resolved, (ii) all of the Liquidation Trust Assets have been liquidated, (iii) all duties and obligations of the Liquidation Trustee under the Liquidation Trust Agreement have been fulfilled, (iv) all Distributions required to be made by the Liquidation Trust, the Plan and the Liquidation Trust Agreement have been made, and (v) the Chapter 11 Cases have been closed; *provided*, *however*, that, notwithstanding the foregoing, the Liquidation Trust shall be dissolved no later than five (5) years from the Effective Date unless the Bankruptcy Court, upon a motion filed prior to the fourth anniversary of the Effective Date or the end of any extension period approved by the Bankruptcy Court (the filing of which shall automatically extend the

term of the Liquidation Trust pending the entry of an order by the Bankruptcy Court granting or denying the motion), determines that a fixed period extension (not to exceed one (1) year, together with any prior extensions, without a favorable letter ruling from the IRS that any further extension would not adversely affect the status of the Liquidation Trust as a Liquidation trust for federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Liquidation Trust Assets;

(f)     The investment powers of the Liquidation Trustee, other than those reasonably necessary to maintain the value of the Liquidation Trust Assets and to further the liquidating purpose of the Liquidation Trust, are limited to powers to invest in Permissible Investments (as defined herein); and

(g)     The Liquidation Trustee is required to distribute, within thirty (30) days after the end of each calendar year, to the Liquidation Trust Beneficiaries the Liquidation Trust's net income plus all net proceeds from the sale, realization, settlement or liquidation of the Liquidation Trust Assets, except that the Liquidation Trustee may retain an amount of net proceeds or net income reasonably necessary to maintain the value of the Liquidation Trust Assets, to satisfy current and projected expenses of the Liquidation Trust, and to satisfy Claims and contingent liabilities (including Disputed Claims).

NOW, THEREFORE, in consideration of the promises and the mutual covenants and agreements contained herein and in the Plan, the Parties agree as follows:

## DEFINITIONS

"Affiliates" means parents, subsidiaries, members, managers, limited partners, and general partners as defined in section 101(2) of the Bankruptcy Code.

"Agreement" has the meaning specified in the Preamble to this Agreement.

"Bankruptcy Court" has the meaning specified in the Preamble to this Agreement.

"Causes of Action" means all Causes of Action (as defined in the Plan) that are Liquidation Trust Assets.

"Confidential Party" has the meaning specified in Article 16.4. "Debtors" has the meaning specified in the Preamble to this Agreement.

"IRS" means the Internal Revenue Service of the United States of America. "Liquidation Trust" has the meaning specified in the Preamble to this Agreement.

"Liquidation Trust Asset Proceeds" means any and all proceeds from the Liquidation Trust Assets, including, without limitation, any cash or other property received from or in connection with the Liquidation Trust Assets or the prosecution, settlement, or adjudication of any related Causes of Action that are Liquidation Trust Assets.

"Liquidation Trust Beneficiaries" means the Holders of Allowed Unsecured Claims.

"Liquidation Trustee" has the meaning specified in the Preamble to this Agreement and includes any successor Liquidation Trustee appointed pursuant to Article 10.1.

"Liquidation Trustee Non-Professionals" has the meaning specified in Article 13.1(b). "Liquidation Trustee Professionals" has the meaning specified in Article 13.1(a). "Parties" has the meaning specified in the Preamble to this Agreement.

"Person" means any individual, corporation, partnership, joint venture, association, trust, unincorporated organization, or other legal entity, or any governmental authority, entity, or political subdivision thereof.

"Petition Date" has the meaning specified in the Preamble to this Agreement. "Plan" has the meaning specified in the Preamble to this Agreement.

"Post-Confirmation Committee" means the entity formed as of the Effective Date, pursuant to Article 2.10.

"Undeliverable Distributions" has the meaning specified in Article 4.3.

# ARTICLE 1
## NAME OF TRUST AND LIQUIDATION TRUSTEE

The name of the Liquidation Trust is the "ANS Liquidation Trust."

[LIQUIDATION TRUSTEE] is hereby appointed to serve as the initial Liquidation Trustee under the Plan, and hereby accepts this appointment and agrees to serve in such capacity effective upon the Effective Date of the Plan and pursuant to the terms of the Plan and this Agreement. [NAME] shall be the employee of the Liquidation Trustee who shall be primarily responsible for administering the Liquidation Trust on behalf of the Liquidation Trustee. A successor Liquidation Trustee shall be appointed as set forth in Article 10.1 in the event the Liquidation Trustee is removed or resigns pursuant to this Agreement, or if the Liquidation Trustee otherwise vacates the position.

# ARTICLE 2
## DUTIES AND POWERS OF THE LIQUIDATION TRUSTEE

2.1    Generally

The Liquidation Trustee shall be responsible for liquidating and administering (or abandoning, as the case may be) the Liquidation Trust Assets, including the Causes of Action, and taking actions on behalf of, and representing, the Liquidation Trust. The Liquidation

Trustee shall have the authority to bind the Liquidation Trust within the limitations set forth herein but shall for all purposes hereunder be acting in the capacity of Liquidation Trustee and not individually.

2.2    Scope of Authority of Liquidation Trustee

Within the limitations set forth herein, and subject to the oversight provisions of the Post-Confirmation Committee set forth in this Agreement, the responsibilities and authority of the Liquidation Trustee shall include, without limitation: (i) holding and administering the Liquidation Trust Assets, (ii) evaluating and determining strategy with respect to the Causes of Action and litigating Causes of Action, or settling, transferring, releasing, or abandoning any and all Causes of Action on behalf of the Liquidation Trust, (iii) facilitating the prosecution or settlement of objections to, or estimations of, Claims asserted against the Liquidation Trust or the Liquidation Trust Assets, (iv) calculating and implementing distributions to the Liquidation Trust Beneficiaries in accordance with the Plan and this Agreement, (v) filing all required tax returns for the Liquidation Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a), (vi) retaining Liquidation Trustee Professionals and Liquidation Trustee Non-Professionals as provided in the Plan and this Agreement, (vii) receiving reasonable compensation for performing services as Liquidation Trustee in accordance with this Agreement and paying the reasonable fees, costs, and expenses of any Liquidation Trustee Professionals and Liquidation Trustee Non-Professionals in accordance with the applicable provisions of this Agreement, (viii) filing all required reports with the Bankruptcy Court regarding the status of the administration of the Liquidation Trust Assets and the assets, liabilities, and transfers of the Liquidation Trust, and (ix) carrying out such other responsibilities not specifically set forth herein as may be vested in the Liquidation Trustee pursuant to the Plan, this Agreement, Bankruptcy Court order, or as may be necessary and proper to carry out the provisions of the Plan or this Agreement.

2.3    Obligations to Liquidation Trust and Beneficiaries

The Liquidation Trustee's actions as Liquidation Trustee will be held to standards required under New Jersey law.

2.4    Additional Powers of Liquidation Trustee

In connection with the administration of the Liquidation Trust, subject to and except as otherwise set forth in this Agreement or the Plan, the Liquidation Trustee is hereby authorized to perform those acts necessary to accomplish the purposes of the Liquidation Trust, subject to the advice of the Post-Confirmation Committee. Without limiting, but subject to, the foregoing, the Liquidation Trustee shall, unless otherwise provided in this Agreement and subject to the limitations contained herein and in the Plan:

(a)    be expressly authorized and required to hold legal title (on behalf of the Liquidation Trust as Liquidation Trustee, but not individually) to the Liquidation Trust Assets, including, but not limited to, the Causes of Action, and be expressly authorized to vote any Claim held by the Liquidation Trust in any case or proceeding under the Bankruptcy Code or otherwise and to receive any distribution therein;

(b)    be expressly authorized and required to protect and enforce the rights to the Liquidation Trust Assets vested in the Liquidation Trust by the Plan by any method deemed appropriate in its discretion, including, without limitation, by judicial proceedings or pursuant to any applicable bankruptcy, insolvency, moratorium or similar law and general principles of equity;

(c)    be expressly authorized to invest funds (in the manner set forth in Article 2.8), make distributions, and pay any other obligations owed by the Liquidation Trust from the Liquidation Trust Assets as provided herein and in the Plan;

(d)    be expressly authorized and required to prosecute, defend, compromise, adjust, analyze, arbitrate, abandon, estimate, or otherwise deal with and settle, in accordance with the terms set forth in Article 5 hereof, Claims against the Liquidation Trust or the Liquidation Trust Assets;

(e)    be expressly authorized and required to pay expenses and make disbursements necessary to preserve and liquidate the Liquidation Trust Assets;

(f)    be expressly authorized and required to make the Distributions as contemplated in the Plan and this Agreement;

(g)    be expressly authorized and required to file appropriate tax returns with respect to the Liquidation Trust and the Debtors, and pay taxes properly payable by the Liquidation Trust, if any, in the exercise of its fiduciary obligations;

(h)    be expressly authorized and required to take such actions as are necessary and reasonable to carry out the purposes of the Liquidation Trust;

(i)    be expressly authorized to purchase insurance coverage as the Liquidation Trustee, in consultation with the Post-Confirmation Committee, deems necessary and appropriate with respect to the assets, liabilities, and obligations of the Liquidation Trust;

(j)    be expressly authorized to consult with the Post-Confirmation Committee on a regular basis and keep the Post-Confirmation Committee fully advised as to the status of the Liquidation Trust and the Liquidation Trustee's activities;

(k)    be expressly authorized to retain and pay, as applicable, the Liquidation Trustee Professionals and Liquidation Trustee Non-Professionals as provided in, and subject to the terms of, this Agreement;

(l)    be expressly authorized to incur any reasonable and necessary expenses in liquidating and converting the Liquidation Trust Assets to Cash, or otherwise administering the Liquidation Trust, as set forth in the Plan or this Agreement;

(m)    be expressly authorized to terminate the Liquidation Trust and, subject to the terms of the Plan, seek to close the Chapter 11 Cases pursuant to section 350(a) of the Bankruptcy Code; and

(n)     be expressly authorized and required to assume such other powers as may be vested in or assumed by the Liquidation Trust pursuant to the Plan or Bankruptcy Court order, or as may be necessary and proper to carry out the provisions of the Plan or this Agreement.

2.5     General Authority of the Liquidation Trustee

Unless specifically stated otherwise herein, the Liquidation Trustee shall not be required to obtain Bankruptcy Court approval with respect to any proposed action or inaction: (a) authorized in this Agreement, or (b) specifically contemplated in the Plan.

2.6     Limitation of Liquidation Trustee's Authority; No On-Going Business

(a)     The Liquidation Trustee shall have no power or authority except as set forth in this Agreement or in the Plan.

(b)     For federal income tax purposes, the Liquidation Trustee shall not be authorized to engage in any trade or business with respect to the Liquidation Trust Assets or any proceeds therefrom except to the extent reasonably necessary to, and consistent with, the liquidation purpose of the Liquidation Trust. The Liquidation Trustee shall take such actions consistent with the prompt orderly liquidation of the Liquidation Trust Assets as required by applicable law and consistent with the treatment of the Liquidation Trust as a liquidation trust under Treasury Regulation section 301.7701-4(d), to the extent such actions are permitted by this Agreement.

2.7     Other Activities

The Liquidation Trustee shall be entitled to retain Liquidation Trustee Professionals and Liquidation Trustee Non-Professionals in accordance with the terms of this Agreement and to assist with the administration of the Liquidation Trust. The Liquidation Trustee, the Liquidation Trustee Professionals, and the Liquidation Trustee Non-Professionals may be retained in matters that are unrelated to the Liquidation Trust by banks, bank groups or other institutional lenders or debt holders who are, or whose Affiliates are, Beneficiaries of the Liquidation Trust or its Affiliates, so long as such other retention does not involve holding or representing any interest adverse to the interests of the Liquidation Trust, or otherwise preclude or impair the Liquidation Trustee from performing its duties under this Agreement.

2.8     Investment and Safekeeping of Liquidation Trust Assets

All monies and other assets received by the Liquidation Trustee shall, until distributed or paid over as herein provided, be segregated from all other monies and assets of the Liquidation Trustee, and further, shall be held in trust for the benefit of the Liquidation Trust Beneficiaries, but need not be segregated from other Liquidation Trust Assets, unless and to the extent required by the Plan and this Agreement. The Liquidation Trustee shall promptly invest any such monies in the manner set forth in this Article 2.8 but shall otherwise be under no liability for interest or income on any monies received by the Liquidation Trust hereunder and held for distribution or payment to the Liquidation Trust Beneficiaries, except as such

interest shall actually be received. Investment of any monies held by the Liquidation Trust shall be administered in accordance with the general duties and obligations hereunder. The right and power of the Liquidation Trustee to invest the Liquidation Trust Assets, the proceeds thereof, or any income earned by the Liquidation Trust, shall be limited to the right and power to (i) invest such Liquidation Trust Assets (pending distributions in accordance with the Plan or this Agreement) in (a) short-term direct obligations of, or obligations guaranteed by, the United States of America or (b) short-term obligations of any agency or corporation which is or may hereafter be created by or pursuant to an act of the Congress of the United States as an agency or instrumentality thereof; or (ii) deposit such assets in demand deposits at any bank or trust company, which has, at the time of the deposit, a capital stock and surplus aggregating at least $1,000,000,000 (collectively, the "**Permissible Investments**") *provided*, *however*, that the scope of any such Permissible Investments shall be limited to include only those investments that a liquidating trust, within the meaning of Treasury Regulation section 301.7701-4(d), may be permitted to hold, pursuant to the Treasury Regulations, or any modification in the IRS guidelines, whether set forth in IRS rulings, other IRS pronouncements or otherwise.

2.9    Establishment of Reserves

On the Effective Date, the Liquidation Trustee shall establish and maintain a Reserve of Cash from the Liquidation Trust Assets as the Liquidation Trustee deems reasonably necessary to satisfy Disputed Administrative Claims, Disputed Priority Tax Claims, Disputed Priority Non-Tax Claims, Disputed Secured Claims, and for the Liquidation Trust Expense Reserve. Further, upon the Professional Fee Bar Date, the Liquidation Trustee shall establish a Reserve of Cash from the Liquidation Trust Assets in an amount that the Liquidation Trustee deems reasonably necessary to satisfy all Professional Fee Claims.

2.10    Post-Confirmation Committee

(a)    Formation. On the Effective Date, the Post-Confirmation Committee, which shall consist of one (1) to three (3) members, shall be formed to serve as an advisory board to the Liquidation Trustee. The initial members of the Post-Confirmation Committee shall be: (i) [MEMBER], (ii) [MEMBER], and (iii) [MEMBER]. The Post-Confirmation Committee shall have the rights and obligations set forth in the Plan and in this Agreement. The Committee's decisions shall be made by an affirmative vote of a majority of its members with each member having one vote. The Post-Confirmation Committee shall have the responsibility to oversee and advise the Liquidation Trustee with respect to the liquidation and distribution of the Debtor's assets in accordance with the Plan, as specified below. A member of the Post-Confirmation Committee shall recuse him/herself from considering any matter in which he/she is not disinterested; provided, however, such member shall not be considered not disinterested solely as a result of such member's affiliation with or employment by the (i) Holder of a Claim or (ii) Debtors. The proposed members of the Post-Confirmation Committee will be identified in a Plan Supplement or Confirmation Order. Vacancies on the Post-Confirmation Committee shall be filled by a Person designated by the remaining member or members of the Post-Confirmation Committee. A majority of the Post-Confirmation Committee may remove or replace members of the Post-Confirmation Committee for cause, and any party-in-interest shall have the authority to seek an order from the Bankruptcy Court removing or replacing members

of the Post-Confirmation Committee for cause. Any successor appointed pursuant to this Section shall become fully vested with all of the rights, powers, duties and obligations of his or her predecessor. For the avoidance of doubt, no member of the Post-Confirmation Committee shall be compensated for serving as a member of the Post-Confirmation Committee except as provided in the Plan or this Agreement; provided, however, that such members may be reimbursed by the Liquidation Trust, from funds in the Post-Effective Date Liquidation Trust Expense Reserve for documented reasonable out-of-pocket costs and expenses up to a cap of $2,500 per member. Beginning after the Effective Date, the Post-Confirmation Committee shall receive a quarterly report from the Liquidation Trustee showing receipts and disbursements, together with a narrative explanation regarding the activities of the Liquidation Trustee and any retained professionals.

(b)    <u>Procedures for Oversight</u>. The rights, powers and duties of the Post-Confirmation Committee shall be as follows:

(i)    To terminate by majority vote in accordance with the Liquidation Trust Agreement, the Liquidation Trustee for cause, and upon such termination (or upon the resignation, death or incapacity of the Liquidation Trustee), appoint a successor Liquidation Trustee in accordance with the terms of the Plan;

(ii)    Prior to the commencement of any litigation by the Liquidation Trustee against any of the Insiders, the Liquidation Trustee shall present to the Post-Confirmation Committee a written description of the theory of liability and quantum of damages of the claims proposed to be asserted against the Insiders. An affirmative vote of the Post-Confirmation Committee shall be required to authorize the commencement of litigation.

(iii)    To approve the settlement of any Cause of Action or dispute, for which the amount in controversy exceeds $100,000;

(iv)    To approve the allowance of any Disputed Claim if the proposed Allowed amount of such Claim exceeds $100,000;

(v)    To approve the sale of any assets by the Liquidation Trustee;

(vi)    To approve any budget in connection with the administration of the Plan and the winding down of the Debtors' affairs prepared by the Liquidation Trustee at the request of the Post-Confirmation Committee;

(vii)    To review and object to fees and expenses of professionals retained by the Liquidation Trustee on a quarterly basis and in accordance with the terms of the Plan and the Liquidation Trust Agreement; and

(viii)    To consider and, if appropriate, approve any action proposed by the Liquidation Trustee that is not specifically authorized by the Plan that

would have a material effect upon the administration of the Estates and/or the Post-Effective Date Debtors or the Liquidation Trust, provided, however, nothing contained herein shall be deemed to authorize the Liquidation Trustee to take any action that is inconsistent with the terms of the Plan or the Liquidation Trust.

## ARTICLE 3
## TERM AND COMPENSATION FOR LIQUIDATION TRUSTEE

3.1    Compensation

(a)    The Liquidation Trustee shall be entitled to receive compensation for services rendered on behalf of the Liquidation Trust in the amount of [$_____ per month], payable on the first Business Day of each month, [plus a success fee of ___% of all collections by the Liquidation Trust, payable   plus reimbursement of all reasonable, out-of-pocket expenses, until the date the Liquidation Trust is dissolved and terminated pursuant to Article 14.1, or by an order of the Bankruptcy Court.

(b)    All compensation and other amounts payable to the Liquidation Trustee shall be paid out of the Liquidation Trust Expense Reserve.

3.2    Termination

The duties, responsibilities, and powers of the Liquidation Trustee will terminate on the date the Liquidation Trust is dissolved and terminated pursuant to Article 14.1, or by an order of the Bankruptcy Court.

3.3    No Bond

The Liquidation Trustee shall serve without bond.

3.4    Removal

The Liquidation Trustee may be removed only for (i) cause by a Final Order of the Bankruptcy Court, after notice and a hearing; *provided*, *however*, that the Liquidation Trustee may not be removed until a successor Liquidation Trustee has been named or is capable of being named immediately upon such removal, or (ii) the Post-Confirmation Committee may remove the Liquidation Trustee at its discretion upon a majority vote of all members without approval of the Bankruptcy Court, *provided, however*, that the Post-Confirmation Committee shall provide the Liquidation Trustee with thirty (30) days written notice of its intent to remove the Liquidation Trustee. For purposes of removing the Liquidation Trustee, "cause" shall mean gross negligence, breach of fiduciary duty, breach of trust, and reckless or willful mishandling of the Liquidation Trust Assets. Any fees and unreimbursed expenses that have been properly incurred by the Liquidation Trustee or the Post-Confirmation Committee in accordance with the terms of this Agreement that are owing to the Liquidation Trustee as of the date of the Liquidation Trustee's removal shall be paid to the Liquidation Trustee within seven (7) calendar days of the removal date.

3.5    Resignation

The Liquidation Trustee may resign by giving not less than sixty (60) calendar days' prior written notice thereof to the Bankruptcy Court, the Liquidation Trust Beneficiaries and the Post Confirmation Committee.

## ARTICLE 4
## PROVISIONS REGARDING DISTRIBUTIONS

4.1    Priority and Method of Distributions

(a)    Generally. The Liquidation Trustee, on behalf of the Liquidation Trust, or such other Person as may be designated in accordance with this Agreement, will make distributions to the Liquidation Trust Beneficiaries in accordance with this Agreement and in accordance with the priorities set forth in, and the other provisions of, the Plan. Whenever any distribution to be made under the Plan or this Agreement is due on a day other than a Business Day, such distribution shall be made, without interest, on the immediately succeeding Business Day, but any such distribution will have been deemed to have been made on the date due.

(b)    Distribution of Liquidation Trust Assets and Proceeds Thereof. All Liquidation Trust Assets and all Liquidation Trust Asset Proceeds shall be distributed in accordance with the terms of this Agreement, the Plan, and Confirmation Order.

(c)    Timing of Distributions. Except as specifically set forth in the Plan, the Liquidation Trustee may determine, in its discretion, the appropriate timing, amount, and cadence for distributions.

(d)    Periodic Distribution Requirement. Subject to the provisions of this Article 4 and to the extent required to maintain grantor trust tax status, the Liquidation Trustee is required to distribute within thirty (30) days after the end of each calendar year following the Effective Date, or upon such other interval as the Bankruptcy Court may order, but in no event less frequently than annually, to the Liquidation Trust Beneficiaries the Liquidation Trust's net income plus all net proceeds from the sale, realization, settlement, or liquidation of the Liquidation Trust Assets, except that the Liquidation Trustee may retain an amount of net proceeds or net income reasonably necessary to maintain the value of the Liquidation Trust Assets, to satisfy current and projected expenses of the Liquidation Trust, and to satisfy Claims and contingent liabilities (including Disputed Claims).

(e)    Withholding. When making a Distribution, the Liquidation Trustee may retain an amount of Liquidation Trustee Assets reasonably necessary to satisfy current and projected expenses of the Liquidation Trust, and to satisfy Claims and contingent liabilities (including Disputed Claims). The Liquidation Trustee may also withhold from amounts distributable to any Person any and all amounts, to be determined in the Liquidation Trustee's reasonable sole discretion, required by any law, regulation, rule, ruling, directive or other government equivalent of the United States or of any political subdivision thereof. To the extent that amounts are so withheld and paid over to the appropriate governmental entity, such

amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of whom such deduction and withholding was made.

(f)    Tax Identification Numbers. The Liquidation Trustee is authorized to request and obtain from the Liquidation Trust Beneficiaries or any other Person Forms W-8 and/or W-9 or such other forms or information relating to the Liquidation Trustee's obligations to withhold as the Liquidation Trustee may reasonably request, and the Liquidation Trustee may condition any distribution to any Liquidation Trust Beneficiary or other distributee upon receipt of such forms or information.

4.2    Delivery of Distributions.

Subject to the provisions of Federal Rule of Bankruptcy Procedure 2002(g), and except as otherwise provided herein, Distributions to the Liquidation Trust Beneficiaries shall be made: (i) at the addresses set forth on the respective proofs of Claim Filed by such Holders; (ii) at the addresses set forth in any written notices of address changes delivered to the Liquidation Trustee after the date of any related proof of Claim; or (iii) at the address reflected in the Schedules if no proof of Claim is Filed and the Liquidation Trustee has not received a written notice of a change of address.

4.3    Undeliverable Distributions.

If the Distribution to a Liquidation Trust Beneficiary is returned to the Liquidation Trustee as undeliverable ("**Undeliverable Distributions**"), no further Distribution shall be made to such Liquidation Trust Beneficiary unless and until the Liquidation Trustee is notified in writing of such Liquidation Trust Beneficiary's then current address. Undeliverable Distributions shall remain in the possession of the Liquidation Trustee until the earlier of (i) such time as a Distribution becomes deliverable or (ii) such Undeliverable Distribution becomes an Unclaimed Distribution under this Agreement and the Plan.

The Liquidation Trustee shall make reasonable efforts to update or correct contact information for recipients of undeliverable Distributions, *provided*, *however*, nothing contained in the Plan or this Agreement shall require the Liquidation Trustee to locate any Liquidation Trust Beneficiary.

4.4    Unclaimed Distributions

Any entity which fails to claim any Cash within 90 days from the date upon which a distribution is first made to such entity shall forfeit all rights to any distribution under the Plan, and the Liquidation Trustee shall be authorized to cancel any distribution that is not timely claimed. Pursuant to section 347(b) of the Bankruptcy Code, upon forfeiture, such Cash (including interest thereon, if any) shall revert to the source of such distribution (*i.e.,* the Liquidation Trustee or the Distribution Reserve) free of any restrictions under the Plan, the Bankruptcy Code or the Bankruptcy Rules. Upon forfeiture, the claim of any Creditor or Interest Holder with respect to such funds shall be irrevocably waived and forever barred against all of the Debtors, the Estates, and the Liquidation Trustee, notwithstanding any federal or state

escheat laws to the contrary, and such Creditor or Interest Holder shall have no claim whatsoever against the any of the foregoing or to any Holder of a Claim to whom distributions are made.

4.5     Remainder Amounts After Final Distribution

After final Distributions have been made in accordance with the terms of the Plan, the Liquidation Trustee may donate any remaining Liquidation Trust Assets to one or more charitable organizations as determined by the Liquidation Trustee in consultation with the Post-Confirmation Committee.

4.6     De Minimis Distributions

If any interim distribution under the Plan to the Holder of an Allowed Claim would be less than $100.00, the Liquidation Trustee may withhold such distribution until a final distribution is made to such Holder. If any final distribution under the Plan to the Holder of an Allowed Claim would be less than $50.00, the Liquidation Trustee may cancel such distribution. Any potential distributions pursuant to this Section shall be treated as an Unclaimed Distribution under Section 9.02(i) of the Plan.

## ARTICLE 5
## PROCEDURES FOR RESOLUTION OF DISPUTED,
## CONTINGENT, AND UNLIQUIDATED CLAIMS OR EQUITY INTERESTS

5.1     Objections to Claims; Prosecution of Disputed Claims

Except insofar as a Claim is Allowed under the Plan on and after the Effective Date, the Liquidation Trustee will have the authority, but not the obligation, subject to Section 6.07 of the Plan, to do any of the following with respect to any Claims or Interests: (1) file, withdraw, or litigate to judgment objections to and requests for estimation of Claims; (2) settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) administer and adjust the Claims register to reflect any such settlements or compromises without any further notice to or action, order, or approval by, the Bankruptcy Court. The Liquidation Trustee shall succeed to any pending objections to Claims filed by the Debtors prior to the Effective Date and shall have and retain any and all rights and defenses the Debtors had immediately prior to the Effective Date with respect to any Disputed Claim. The Liquidation Trustee shall not be obligated to object to any Claim but may consult with the Post-Confirmation Committee in deciding whether to object to any particular Claim.

5.2     Estimation of Claims

The Liquidation Trustee may at any time request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors or the Liquidation Trustee previously have objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection.  Subject to the provisions of section 502(j) of the Bankruptcy

Code, in the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, the amount so estimated shall constitute the maximum allowed amount of such Claim. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Liquidation Trustee may pursue supplementary proceedings to object to the allowance of such Claim. All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not necessarily exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

5.3    Payments and Distributions on Disputed Claims

(a)    Notwithstanding anything herein to the contrary: (a) no distribution shall be made with respect to any Disputed Claim until such Claim becomes an Allowed Claim (as applicable), and (b) unless agreed otherwise by the Liquidation Trustee no distribution shall be made to any Person that holds both an Allowed Claim and a Disputed Claim until such Person's Disputed Claims have been resolved by settlement or Final Order.

(b)    Except as otherwise provided in a Final Order or as agreed by the relevant parties, distributions on account of Disputed Claims, if any, that become Allowed, shall be made by the Liquidation Trustee at such periodic intervals as the Liquidation Trustee determines to be reasonably prudent. No interest will be paid on Disputed Claims that later become Allowed or with respect to any distribution in satisfaction thereof to a Holder.

## ARTICLE 6
## LIABILITY AND EXCULPATION PROVISIONS

6.1    Standard of Liability

In no event shall the Liquidation Trustee or the Liquidation Trustee Professionals, Liquidation Trustee Non-Professionals, Post-Confirmation Committee, Affiliates, representatives, employees, directors, officers or principals be held personally liable for any claim, expense, liability or other obligation asserted against the Liquidation Trust. The Post-Confirmation Committee, the Liquidation Trustee, the Liquidation Trustee Professionals, the Liquidation Trustee Non-Professionals, and each of their Affiliates, representatives, employees, directors, officers or principals shall not be liable for any negligence or any error of judgment made in good faith with respect to any action taken or omitted to be taken in good faith, except to the extent that the action taken or omitted to be taken by each of the same or their respective Liquidation Trustee Professionals, Liquidation Trustee Non-Professionals, Affiliates, representatives, employees, directors, officers or principals is determined by a Final Order to be solely due to their own respective gross negligence, willful misconduct, fraud or, solely in the case of the Liquidation Trustee or Post-Confirmation Committee, breach of fiduciary duty. Any act or omission taken with the approval of the Bankruptcy Court will be conclusively deemed not to constitute gross negligence or willful misconduct.

6.2    Reliance by Liquidation Trustee Except as otherwise provided herein:

(a)    the Liquidation Trustee and Post-Confirmation Committee may rely, and shall be protected in acting upon, any resolution, certificate, statement, installment, opinion, report, notice, request, consent, order, or other paper or document reasonably believed to be genuine and to have been signed or presented by the proper party or parties;

(b)    the Liquidation Trustee and Post-Confirmation Committee shall not be liable for any action reasonably taken or not taken in accordance with the advice of a Liquidation Trustee Professional; and

(c)    persons dealing with the Liquidation Trustee or Post-Confirmation Committee shall look only to the Liquidation Trust Assets to satisfy any liability incurred by the Liquidation Trustee to such person in carrying out the terms of this Agreement, and the Liquidation Trustee shall not have any personal obligation to satisfy any such liability, except to the extent that actions taken or not taken after the Effective Date by the Liquidation Trustee are determined by a Final Order to be solely due to the Liquidation Trustee's own gross negligence, willful misconduct, fraud or breach of fiduciary duty.

6.3    Exculpation; Indemnification

(a)    Exculpation. From and after the Effective Date, the Post-Confirmation Committee, the Liquidation Trustee, the Liquidation Trustee Professionals, the Liquidation Trustee Non-Professionals, and each of their Affiliates, representatives, employees, directors, officers or principals, shall be and hereby are exculpated by all Persons and Entities, including, without limitation, Holders of Claims and other parties in interest, from any and all claims, causes of action and other assertions of liability arising out of the discharge of the powers and duties conferred upon said parties pursuant to or in furtherance of this Agreement, the Plan, or any order of the Bankruptcy Court or applicable law or otherwise, except only for actions taken or not taken, from and after the Effective Date only to the extent determined by a Final Order of the Bankruptcy Court be solely due to their own respective gross negligence, willful misconduct, fraud, or, solely in the case of the Liquidation Trustee or Post-Confirmation Committee, breach of fiduciary duty.

(b)    No Holder of a Claim or other party-in-interest will have or be permitted to pursue any claim or cause of action against the Post-Confirmation Committee, Liquidation Trustee, the Liquidation Trustee Professionals, the Liquidation Trustee Non-Professionals, or any of their representatives, employees, directors, officers or principals for making payments in accordance with the Plan or this Agreement or for implementing the provisions of the Plan or this Agreement. Any act taken or not taken, in the case of the Liquidation Trustee and Post- Confirmation Committee, with the approval of the Bankruptcy Court, will be conclusively deemed not to constitute gross negligence, willful misconduct, or a breach of fiduciary duty.

(c)    Indemnification. The Liquidation Trust shall indemnify, defend and hold harmless the Post-Confirmation Committee, Liquidation Trustee, the Liquidation Trustee Professionals and Liquidation Trustee Non-Professionals, solely from Liquidation Trust Assets, from and against any and all claims, causes of action, liabilities, obligations, losses, damages or expenses (including attorneys' fees and expenses) occurring after the Effective

Date, other than to the extent determined by a Final Order to be solely due to their own respective gross negligence, willful misconduct, or, solely in the case of the Liquidation Trustee and Post-Confirmation Committee, breach of fiduciary duty, to the fullest extent permitted by applicable law. Satisfaction of any obligation of the Liquidation Trust arising pursuant to the terms of this Article shall be payable only from the Liquidation Trust Assets, may be advanced (from insurance or Liquidation Trust Assets) prior to the conclusion of such matter, and such right to payment shall be prior and superior to any other rights to receive a distribution of the Liquidation Trust Assets.

## ARTICLE 7
## ESTABLISHMENT OF THE LIQUIDATION TRUST

7.1    Transfer of Assets to Liquidation Trust; Assumption of Liabilities

Pursuant to the Plan, the Debtors and the Liquidation Trustee hereby establish the Liquidation Trust on behalf of the Liquidation Trust Beneficiaries, to be treated as the grantors and deemed owners of the Liquidation Trust Assets and the Debtors hereby transfer, assign, and deliver to the Liquidation Trust, on behalf of the Liquidation Trust Beneficiaries, all of their right, title, and interest in the Liquidation Trust Assets, including the related claims and Causes of Action of the Debtors, other than Causes of Action released in accordance with the provisions of the Plan or assigned to AOP under the provisions of the Hanover APA or prior to the Effective Date, released by the Debtors which release was approved by the Bankruptcy Court on notice to parties-in-interest, notwithstanding any prohibition of assignability under applicable non-bankruptcy law. Such transfer includes, but is not limited to, all rights to assert, waive or otherwise exercise any attorney-client privilege, work product protection or other privilege, immunity, or confidentiality provision vested in, or controlled by, the Debtors. The Liquidation Trustee agrees to accept and hold the Liquidation Trust Assets in the Liquidation Trust for the benefit of the Liquidation Trust Beneficiaries, subject to the terms of the Plan and this Agreement.

7.2    Title to Assets

On the Effective Date, the Liquidation Trust Assets shall vest automatically in the Liquidation Trust. Notwithstanding any prohibition of assignability under applicable non-bankruptcy law and subject to the Plan, all assets and properties encompassed by the Plan shall vest in the Liquidation Trust in accordance with section 1141 of the Bankruptcy Code. Upon the transfer of the Liquidation Trust Assets to the Liquidation Trust, the Debtors shall have no interest in or with respect to such Liquidation Trust Assets or the Liquidation Trust. For all federal income tax purposes, all Parties and Liquidation Trust Beneficiaries shall treat the transfer of the Liquidation Trust Assets by the Debtors to the Liquidation Trust, as set forth in this Article 7 and in the Plan, as a transfer of such assets by the Debtors to the Liquidation Trust Beneficiaries entitled to distributions under this Agreement followed by a transfer by such Liquidation Trust Beneficiaries to the Liquidation Trust. Thus, the Liquidation Trust Beneficiaries shall be treated as the grantors and owners of a grantor trust for federal income tax purposes.

7.3    Valuation of Assets

As soon as practicable after the Effective Date, the Liquidation Trustee (to the extent that the Liquidation Trustee deems it necessary or appropriate in its discretion), shall value the Liquidation Trust Assets based on the good faith determination of the Liquidation Trustee. The valuation shall be used consistently by all Parties and the Liquidation Trust Beneficiaries for all federal income tax purposes. The Bankruptcy Court shall resolve any dispute regarding the valuation of the Liquidation Trust Assets.

## ARTICLE 8
## LIQUIDATION TRUST BENEFICIARIES

### 8.1   Identification of Liquidation Trust Beneficiaries

In order to determine the actual names and addresses of the Liquidation Trust Beneficiaries, the Liquidation Trustee shall be entitled to conclusively rely on the names and addresses set forth in the Debtors' Schedules or filed proofs of claim, unless the Liquidation Trustee receives timely notice of a Liquidation Trust Beneficiary's change of address. Each Liquidation Trust Beneficiary's right to distribution from the Liquidation Trust, which is dependent upon such Liquidation Trust Beneficiary's classification under the Plan, shall be that accorded to such Liquidation Trust Beneficiary under the Plan.

## ARTICLE 9
## ADMINISTRATION

### 9.1   Purpose of the Liquidation Trust

The Liquidation Trust shall be established for the primary purpose of liquidating its assets, in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidation purpose of the Liquidation Trust. Accordingly, the Liquidation Trustee shall, in an expeditious but orderly manner, liquidate and convert to Cash the Liquidation Trust Assets, make timely distributions to the Liquidation Trust Beneficiaries and not unduly prolong its duration, and shall take or refrain from taking such other actions as may be necessary, in the Liquidation Trustee's reasonable judgment, to preserve and maintain the status of the Liquidation Trust as a "liquidation trust" and as a "grantor trust" within the meaning of Treasury Regulation sections 301.7701-4(d) and 1.671-4(a). The Liquidation Trust shall not be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth in the Plan or this Agreement.

### 9.2   Books and Records

The Liquidation Trustee shall maintain books and records relating to the administration of the Liquidation Trust Assets and the distribution by the Liquidation Trustee of the proceeds therefrom in such detail and for such period of time as may be necessary to make full and proper accounting in respect thereof and to comply with applicable provisions of law. The Liquidation Trustee shall also maintain books and records relating to the administration of the Liquidation Trust Assets (including the Causes of Action), the income and expenses of the

Liquidation Trust, and the payment of expenses of and liabilities of, claims against or assumed by, the Liquidation Trust in such detail and for such period of time as may be necessary to make full and proper accounting in respect thereof and to comply with applicable provisions of law. Except as otherwise provided herein or in the Plan, nothing in this Agreement requires the Liquidation Trustee to file any accounting or seek approval of any court with respect to the administration of the Liquidation Trust, or as a condition for making any payment or distribution out of the Liquidation Trust Assets. Subject to Section 6.08 of the Plan, the Post-Confirmation Committee may obtain information relating to the management of the Liquidation Trust Assets upon reasonable written notice to the Liquidation Trustee, subject to applicable privileges, confidentiality requirements and applicable law.

9.3     Compliance with Laws

Any and all Distributions of Liquidation Trust Assets shall comply with all applicable laws and regulations, including, but not limited to, applicable federal and state tax and securities laws.

## ARTICLE 10
## SUCCESSOR LIQUIDATION TRUSTEE

10.1     Successor Liquidation Trustee

In the event the Liquidation Trustee is removed pursuant to this Agreement, resigns pursuant to this Agreement, or otherwise vacates its position, subject to Section 6.08 of the Plan, the Post-Confirmation Committee shall appoint a successor Liquidation Trustee by majority vote of all members. If a successor Liquidation Trustee is not so appointed, then the Bankruptcy Court shall appoint a successor in accordance with the best interests of the Liquidation Trust Beneficiaries. Any successor Liquidation Trustee appointed hereunder shall execute an instrument accepting such appointment. Thereupon, such successor Liquidation Trustee shall, without any further act, become vested with all the estates, properties, rights, powers, trusts and duties of its predecessor in the Liquidation Trust with like effect as if originally named herein; *provided*, *however*, that a removed or resigning Liquidation Trustee shall, nevertheless, when requested in writing by the successor Liquidation Trustee, execute and deliver any reasonable instrument or instruments conveying and transferring to such successor Liquidation Trustee all the estates, properties, rights, powers, and trusts of such removed or resigning Liquidation Trustee.

## ARTICLE 11
## REPORTING

11.1     Quarterly and Final Reports

As soon as practicable but in no event later than thirty (30) calendar days after the end of the first full quarter following the Effective Date and on a quarterly basis thereafter until all Cash in the Liquidation Trust has been distributed or otherwise paid out in accordance with the Plan and this Agreement, the Liquidation Trustee shall File a report with the Bankruptcy Court

setting forth the amounts, recipients, and dates of all Distributions made by the Liquidation Trustee through each applicable reporting period.

    11.2    Federal Income Tax

        (a)    Grantor Trust Status.  Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the issuance of applicable Treasury Regulations, the receipt by the Liquidation Trustee of a private letter ruling if the Liquidation Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Liquidation Trustee), the Liquidation Trustee shall file tax returns for the Liquidation Trustee as a grantor trust pursuant to Treasury Regulation section 1.671-4(a).

        (b)    Allocations of Liquidation Trust Taxable Income.  Subject to the provisions of Article 11.2(a) hereof, allocations of Liquidation Trust taxable income shall be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (without regard to any restriction on distributions described herein) if, immediately prior to such deemed distribution, the Liquidation Trust had distributed all of its other assets (valued for this purpose at their tax book value) to the Liquidation Trust Beneficiaries (treating any Holder of a Disputed Claim, for this purpose, as a current Liquidation Trust Beneficiary entitled to distributions), taking into account all prior and concurrent distributions from the Liquidation Trust (including any distributions held in reserve pending the resolution of Disputed Claims).  Similarly, taxable losses of the Liquidation Trust will be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining Liquidation Trust Assets.  The tax book value of the Liquidation Trust Assets for this purpose shall equal their fair market value on the Effective Date or, if later, the date such assets were acquired by the Liquidation Trust, adjusted in either case in accordance with tax accounting principles prescribed by the United States Internal Revenue Code, the Treasury Regulations and any other applicable administrative and judicial authorities and pronouncements.

        (c)    Tax Reporting Duties of Liquidation Trustee.  Within sixty (60) calendar days following the end of each calendar year, the Liquidation Trustee shall prepare and distribute a statement setting forth the information necessary for each Liquidation Trust Beneficiary to determine its share of items of income, gain, loss, deduction or credit for United States federal income tax purposes.

    11.3    Other

    The Liquidation Trustee shall file (or cause to be filed) any other statement, returns or disclosures relating to the Liquidation Trust or the Liquidation Trust Assets, that are required by the IRS or any other Governmental Unit.

**ARTICLE 12**
**TRANSFERABILITY OF LIQUIDATION TRUST BENEFICIARIES' INTERESTS**

    12.1    Transferability of Liquidation Trust Beneficiaries' Interests

The beneficial interests that are owned by the Liquidation Trust Beneficiaries, which shall be reflected only on the records of the Liquidation Trust maintained by the Liquidation Trustee, shall be uncertificated, are not negotiable, and shall not be assignable or transferable voluntarily. In the case of a deceased individual Liquidation Trust Beneficiary, its executor or administrator shall succeed to such decedent's beneficial interest upon notice to the Liquidation Trustee.

## ARTICLE 13
## LIQUIDATION TRUSTEE PROFESSIONALS AND NON-PROFESSIONALS

13.1     Retention of Liquidation Trustee Professionals and Non-Professionals

(a)     The Liquidation Trustee shall have the right to retain its own professionals including, without limitation, claims, disbursing and transfer agents, legal counsel, accountants, experts and other agents or advisors, as the Liquidation Trustee deems appropriate (the "**Liquidation Trustee Professionals**") and on such terms as the Liquidation Trustee deems appropriate. The Liquidation Trustee Professionals shall be compensated in accordance with Article 13.2 hereof. The Liquidation Trustee Professionals so retained need not be "disinterested" as that term is defined in the Bankruptcy Code and may include, without limitation, counsel and financial advisors of the Committee and the Debtors.

(b)     The Liquidation Trustee shall have the right to retain non-professionals including, without limitation, employees, independent contractors or other agents as the Liquidation Trustee deems appropriate (the "**Liquidation Trustee Non-Professionals**") and on such terms as the Liquidation Trustee deems appropriate. Such Liquidation Trustee Non-Professionals shall be compensated in accordance with Article 13.2 hereof. The Liquidation Trustee Non-Professionals so retained need not be "disinterested" as that term is defined in the Bankruptcy Code and may include, without limitation, employees, independent contractors or agents of the Committee or the Debtors.

13.2     Payment to Liquidation Trustee Professionals and Liquidation Trustee Non-Professionals

(a)     After the Effective Date, Liquidation Trustee Professionals shall be required to submit reasonably detailed invoices on a monthly basis to the Liquidation Trustee and the Post-Confirmation Committee, including in such invoices a description of the work performed, who performed such work, and if billing on an hourly basis, the hourly rate of each such person, plus an itemized statement of expenses. The Liquidation Trustee shall pay those invoices fourteen (14) calendar days after a copy of such invoices is provided to the Liquidation Trustee and the Post-Confirmation Committee, without Bankruptcy Court approval, unless the Liquidation Trustee or the Post-Confirmation Committee objects. If there is a dispute as to a part of an invoice, the Liquidation Trustee shall pay the undisputed portion and the Bankruptcy Court shall resolve any disputed amount.

(b)     After the Effective Date, Liquidation Trustee Non-Professionals shall be required to submit to the Liquidation Trustee periodic invoices containing information with sufficient detail to assess the reasonableness of the fees and charges. The Liquidation Trustee

shall pay those invoices fourteen (14) calendar days after a copy of such invoices is provided to the Liquidation Trustee and the Post-Confirmation Committee, without Bankruptcy Court approval, unless the Liquidation Trustee or the Post-Confirmation Committee objects. If there is a dispute as to a part of an invoice, the Liquidation Trustee shall pay the undisputed portion and the Bankruptcy Court shall resolve any disputed amount.

(c)    All payments to Liquidation Trustee Professionals and Liquidation Trustee Non-Professionals shall be paid out of the Liquidation Trust Assets.

## ARTICLE 14
## TERMINATION OF LIQUIDATION TRUST

14.1    Duration and Extension

Notwithstanding any provision of the Plan to the contrary, the Liquidation Trust shall be dissolved no later than five (5) years from the Effective Date unless the Bankruptcy Court, upon a motion filed prior to the fourth anniversary of the Effective Date or the end of any extension period approved by the Bankruptcy Court (the filing of which shall automatically extend the term of the Liquidation Trust pending the entry of an order by the Bankruptcy Court granting or denying the motion), determines that a fixed period extension (not to exceed one (1) year, together with any prior extensions, without a favorable letter ruling from the IRS that any further extension would not adversely affect the status of the Liquidation Trust as a Liquidation trust for federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Liquidation Trust Assets; *provided, however*, that adequate funding exists for such extension period as determined by the Bankruptcy Court; provided, further, that each request for an extension shall be approved by the Bankruptcy Court within six months prior to the conclusion of the extended term. After (a) the final Distribution of the balance of the assets or proceeds of the Liquidation Trust pursuant to the Plan, (b) the filing by or on behalf of the Liquidation Trust of a certification of dissolution with the Bankruptcy Court in accordance with the Plan, and (c) any other action deemed appropriate by the Liquidation Trustee, the Liquidation Trust shall be deemed dissolved for all purposes without the necessity for any other or further actions.

14.2    Diligent Administration

The Liquidation Trustee shall, as applicable, (i) not unduly prolong the duration of the Liquidation Trust; (ii) at all times endeavor to resolve, settle or otherwise dispose of all claims that constitute Liquidation Trust Assets; (iii) effect the liquidation and distribution of the Liquidation Trust Assets to the Liquidation Trust Beneficiaries in accordance with the terms hereof; (iv) consult and confer with the Post-Confirmation Committee and keep it fully advised of its activities, and; (v) endeavor to terminate the Liquidation Trust as soon as reasonably practicable.

## ARTICLE 15
## AMENDMENT AND WAIVER

### 15.1    Amendment and Waiver

Any substantive provision of this Agreement may be materially amended or waived only with the written consent of the Liquidation Trustee or by order of the Bankruptcy Court if necessary to implement the Plan; *provided, however*, that no change may be made to this Agreement that would adversely affect the federal income tax status of the Liquidation Trust as a "grantor trust." Technical or non-material amendments to or waivers of portions of this Agreement may be made as necessary, to clarify this Agreement or to enable the Liquidation Trust to effectuate the terms of this Agreement, with the consent of the Liquidation Trustee.

## ARTICLE 16
## MISCELLANEOUS PROVISIONS

### 16.1    Intention of Parties to Establish Grantor Trust

This Agreement is intended to create a grantor trust for United States federal income tax purposes and, to the extent provided by law, shall be governed and construed in all respects as a grantor trust.

### 16.2    Preservation of Privilege-   Intentionally Deleted

### 16.3    Prevailing Party

Subject to Article 6.3(c) hereof, if the Liquidation Trustee or the Liquidation Trust, as the case may be, is the prevailing party in a dispute regarding the provisions of this Agreement or the enforcement thereof, then such prevailing party shall be entitled to collect any and all costs, expenses and fees, including attorneys' fees, from the non-prevailing party incurred in connection with such dispute or enforcement action.

### 16.4    Confidentiality

The Liquidation Trustee, and each of its employees, members, agents, professionals and advisors, including the Liquidation Trustee Professionals and Liquidation Trustee Non-Professionals and the members of the Post-Confirmation Committee, (each a "**Confidential Party**" and collectively the "**Confidential Parties**") shall hold strictly confidential and not use for personal gain any material, non-public information of which they have become aware in their capacity as a Confidential Party, of or pertaining to any Entity to which any of the Liquidation Trust Assets relates; *provided, however*, that such information may be disclosed if (a) it is now or in the future becomes generally available to the public other than as a result of a disclosure by the Confidential Parties, or (b) such disclosure is required of the Confidential Parties pursuant to legal process including but not limited to subpoena or other court order or other applicable laws or regulations.  In the event that any Confidential Party is requested to divulge confidential information pursuant to this subparagraph (b), such Confidential Party

shall promptly, in advance of making such disclosure, provide reasonable notice of such required disclosure to the Liquidation Trustee to allow him sufficient time to object to or prevent such disclosure through judicial or other means and shall cooperate reasonably with the Liquidation Trustee in making any such objection, including but not limited to appearing in any judicial or administrative proceeding in support of any objection to such disclosure.

16.5    Laws as to Construction

This Agreement shall be governed by and construed in accordance with the laws of the State of New Jersey, without giving effect to rules governing the conflict of law.

16.6    Severability

Except with respect to provisions herein that are contained in the Plan, if any provision of this Agreement or the application thereof to any person or circumstance shall be finally determined by a court of competent jurisdiction to be invalid or unenforceable to any extent, the remainder of this Agreement, or the application of such provision to Persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and shall be valid and enforceable to the fullest extent permitted by law.

16.7    Notices

Any notice or other communication hereunder shall be in writing and shall be deemed to have been sufficiently given, for all purposes, if delivered by facsimile or e-mail (at the numbers or addresses set forth below) and deposited, postage prepaid, in a post office or letter box addressed to the person (or their successors or replacements) for whom such notice is intended at such address as set forth below, or such other addresses as may be filed with the Bankruptcy Court:

Liquidation Trustee:

[NAME / ADDRESS / CONTACT INFORMATION]

With a copy to:

16.8    Notices if to a Liquidation Trust Beneficiary

Any notice or other communication hereunder shall be in writing and shall be deemed to have been sufficiently given, for all purposes, if deposited, postage prepaid, in a post office or letter box addressed to the person for whom such notice is intended to the name and address set forth on such Liquidation Trust Beneficiary's proof of claim or such other notice filed with the Bankruptcy Court, or if none of the above has been filed, to the address set forth in the Debtors' Schedules or provided to the Liquidation Trustee pursuant to Article 8.1.

16.9   Survivability

Notwithstanding any provision of the Plan to the contrary, the terms and provisions of this Agreement shall remain fully binding and enforceable notwithstanding any vacancy in the position of the Liquidation Trustee.

16.10   Headings

The section headings contained in this Agreement are solely for the convenience of reference and shall not affect the meaning or interpretation of this Agreement or of any term or provision hereof.

16.11   Conflicts with Plan Provisions

Except as otherwise expressly stated herein, if any of the terms and/or provisions of this Agreement conflict with the terms and/or provisions of the Plan, then the Plan shall govern.

IN WITNESS WHEREOF, the Parties hereto have either executed and acknowledged this Agreement or caused it to be executed and acknowledged on their behalf by their duly authorized officers all as of the date first above written.

[LIQUIDATION TRUSTEE], solely as Liquidation Trustee

By:
_____
Name:
Title:


[MEMBER]

By:
_____
Name:
Title:


[MEMBER]

By:
_____
Name:
Title:


[MEMBER]

By:
_____
Name:
Title:

# **Exhibit C**

*Settling Shareholder Opt-In Form*

| UNITED STATES BANKRUPTCY COURT<br>DISTRICT OF NEW JERSEY<br>**Caption in Compliance with D.N.J. LBR 9004-1** | |
|---|---|
| In re:<br><br>**ATLANTIC NEUROSURGICAL SPECIALISTS, P.A.**<br>***et al*,[5]**<br><br>Debtors. | Chapter 11<br><br>**Case No. 24-15726(VFP)**<br><br>**Jointly Administered** |

### SETTLING SHAREHOLDER OPT-IN FORM

Reference is made to that certain Combined Disclosure Statement and Plan [Docket No. ___] in the above-referenced chapter 11 cases. Capitalized terms not defined herein have the meanings ascribed to them in the Combined Disclosure Statement and Plan.

Undersigned Settling Shareholder agrees, subject to and in accordance with the terms and conditions set forth in the Combined Disclosure Statement and Plan, to pay the settlement amount of $500,000 as and upon the terms and conditions set forth in the Combined Disclosure Statement and Plan, including, without limitations, the receipt, on the "Effective Date" of the releases that run in favor of the undersigned Settling Shareholder and their respective Affiliated Medical Practices and Related Parties and otherwise consents to the releases set forth in Article XIII of the Combined Disclosure Statement and Plan. The undersigned Settling Shareholder's Affiliated Medical Practice(s) (as defined in the Combined Disclosure Statement and Plan) is/are

_____.

The undersigned Settling Shareholder's execution and delivery of this Settling Shareholder's Opt-In Form shall, as of the "Effective Date" be deemed to be their joinder in the releases forth in Article XIII of the Combined Disclosure Statement and Plan, having the same legal force and effect as if as the undersigned had been a direct signatory to the Combined Disclosure Statement and Plan as the same relate to the provisions of the Article XIII and each counter party to such Article XIII releases shall have the right to rely on joinder herein provided for. If (i) any of the Lorient Parties or KeyBank do not timely deliver their Opt-In Forms, (ii) any modifications are made to the Plan or the Liquidation Trust Agreement, (iii) the conditions precedent to the Effective Date do not occur or (iv) the Confirmation Date does not occur, then the Shareholder Settlement shall be revoked, be deemed null and void and all of the funds delivered by the Settling Shareholders to the escrow account of the ANS Debtors counsel shall be forthwith returned to the respective parties who made those payments.

---

[5] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are: Atlantic Neurosurgical Specialists, P.A., d/b/a Altair Health (0733); ANS Newco, LLC, d/b/a Altair Health (7893); and Hanover Hills Surgery Center LLC, d/b/a Altair Health Surgical Center (8645).

Dated: _____, 2025


_____

[Name]

# Exhibit D

*Lorient Parties Opt-In Form*

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
Caption in Compliance with D.N.J. LBR 9004-1

In re:                                                          Chapter 11

**ATLANTIC NEUROSURGICAL SPECIALISTS, P.A.**                    **Case No. 24-15726(VFP)**
**et al,**[6]
                                                                **Jointly Administered**
                    Debtors.

## LORIENT PARTIES OPT-IN FORM

Reference is made to that certain Combined Disclosure Statement and Plan [Docket No. ____] in the above-referenced chapter 11 cases. Capitalized terms not defined herein shall have the meanings ascribed to them in the Combined Disclosure Statement and Plan.

The Lorient Parties represent that (i) they have assigned and transferred to KeyBank free and clear of any and all liens, claims and encumbrances their right, title and interest to all Claims against the Debtors to Key Bank, (ii) they have not reserved any rights relating to such Claims, and (iii) all Claims of the Lorient Parties include. all right, title and interest that the Lorient Parties had or may have in any collateral pledged to KeyBank and which is described in the KeyBank Complaint and the exhibits thereto referenced in Article III of this Plan.

For valuable consideration received, the undersigned consent to the consensual third party releases set forth in Article XIII of the Combined Disclosure Statement and Plan.

Dated: _____, 2025


ANS CONTINUUM HOLDCO LLC              CONTINUUM INSTITUTE ATLANTIC
                                      LLC

_____     _____
Name:                                 Name:
Title:                                Title:


---

[6] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are: Atlantic Neurosurgical Specialists, P.A., d/b/a Atlantic Neurosurgical and Altair Health (0733); ANS Newco, LLC, d/b/a Altair Health (7893); and Hanover Hills Surgery Center LLC, d/b/a Altair Health Surgical Center (8645).

CONTINUUM INSTITUTE LLC

Name:
Title:

FLORHAM PARK INVESTORS LLC

Name:
Title:

LORIENT CAPITAL MANAGEMENT  LLC

Name:
Title:

LORIENT CONTINUUM INVESTORS LLC

Name:
Title:

# Exhibit E

*KeyBank Opt-In Form*

| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>DISTRICT OF NEW JERSEY<br>**Caption in Compliance with D.N.J. LBR 9004-1** | |
| In re:<br><br>**ATLANTIC NEUROSURGICAL SPECIALISTS, P.A.<br>et al,[7]**<br><br>                    Debtors. | Chapter 11<br><br>**Case No. 24-15726(VFP)**<br><br>**Jointly Administered** |

## KEYBANK OPT-IN FORM

Reference is made to that certain Combined Disclosure Statement and Plan [Docket No. ___] in the above-referenced chapter 11 cases. Capitalized terms not defined herein shall have the meanings ascribed to them in the Combined Disclosure Statement and Plan.

KeyBank represents that it (i) has received for value from the Lorient Parties any and all Claims as against the Debtors and that it holds such Claims free and clear from any and all liens, claims and encumbrances, (ii) is the sole and exclusive holder of the KeyBank Claims and holds such Claims free and clear from any and all liens, claims and encumbrances, including all Claims of the Lorient Parties that the Lorient Parties had or may have in any Collateral pledged to KeyBank and which is described in the KeyBank Complaint and the exhibits thereto referenced in Article II of this Plan and (iii) has not transferred, assigned or encumbered any of the KeyBank Claims.

For valuable consideration received, the undersigned consents to the consensual third party releases set forth in Article XIII of the Combined Disclosure Statement and Plan.

Dated: _____, 2025

KEYBANK NATIONAL ASSOCIATION

_____
Name:
Title:

---

[7] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are: Atlantic Neurosurgical Specialists, P.A., d/b/a Atlantic Neurosurgical and Altair Health (0733); ANS Newco, LLC, d/b/a Altair Health (7893); and Hanover Hills Surgery Center LLC, d/b/a Altair Health Surgical Center (8645).

# EXHIBIT B

**ANS** ⚕ **Altair Health**

**Atlantic Neurosurgical Specialists**

Cash Flows & Liquidity Analysis
December 19, 2024

**B | RILEY**
*Advisory Services*

The accompanying financial analysis dated, December '24 was assembled for Atlantic Neurosurgical Specialists and subsidiaries. ("ANS" or the "Company"). The analysis was developed by B. Riley Advisors ("B. Riley") from, and supported by information, documentation and data furnished by the Company. We were not engaged to, and did not conduct either an audit, review, compilation or valuation, the objective of which would be an expression of an opinion. In addition, we did not review this analysis in accordance with standards promulgated by the American Institute of Certified Public Accountants. As of the date of the analysis, B. Riley has not independently verified the viability of the underlying assumptions. The information contained in it were prepared solely for the use of the Company, its officers, directors, and legal and financial advisors. This limited report does not provide investment, accounting, tax or legal advice. The information contained herein is confidential and may not be given to any other party without the prior consent of B. Riley.

Atlantic Neurosurgical Specialists
Cash Flows & Liquidity Forecast

| Week Ending >> | 27 12/27/2024 | 28 12/14/2024 | 29 1/03/2024 | 30 1/09/2024 | 31 1/4/2025 | 32 1/10/2025 | 33 1/18/2025 | 34 1/24/2025 | 35 2/1/2025 | 36 2/8/2025 | 37 2/15/2025 | Total - 12/6/24 to 2/15/25 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Actuals | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected |

**ANS PA Operating (x2525) - DEBTOR**

Receipts
- Insurance receipts
- Patient receipts
- Other medical receipts
- Others
- Transfer from ANS PA Savings - x0795

Total Receipts

Disbursements
- OpEx reimbursements - MSO
- SG&A - Employee benefits
- SG&A - Office expenses
- SG&A - IT
- SG&A - Facility
- Vendor - Credit card processor
- Professionals - Others
- Insurance
- Taxes
- Bank Fees

Operating Disbursements
- Transfer to Hanover Hills Surgery Center

Net Cash Flow

Professionals - Restructuring

Total Disbursements

Net Cash Flow
Beginning Cash Balance
Ending Bank Balance - ANS PA Operating (x2525)

**ANS Continuum MSO Operating (x0948) - NON DEBTOR**

Receipts
- OpEx reimbursements - MSO
- Others

Total Receipts

Disbursements
- SG&A - Payroll
- SG&A - Employee benefits
- SG&A - IT
- SG&A - Rent
- SG&A - Office expenses
- Vendor - Medical instruments
- Vendor - Medical other
- Insurance
- Professionals - Others
- Bank Fees
- Other

Operating Disbursements

Net Transfers

Total Disbursements

Net Cash Flow
Beginning Cash Balance
Ending Bank Balance - ANS Continuum MSO Operating (x0948)

**ANS PA Savings (x0795) - DEBTOR**

Receipts
- Interest
- Others
- Transfer from ANS PA Checking - x2525

Total Receipts

Disbursements
Operating Disbursements
- Transfer to ANS PA Checking - x2525

Net Transfers

Total Disbursements

Net Cash Flow
Beginning Cash Balance
Ending Bank Balance - ANS PA Savings (x0795)

**ANS Newco Operating (x5348) - DEBTOR**

Receipts
- Interest
- Others
- Transfer from ANS PA Checking - x2525

Total Receipts

Disbursements
- Professionals - Restructuring

Total Disbursements

Net Cash Flow
Beginning Cash Balance
Ending Bank Balance - ANS Newco Operating (x5348)

Atlantic Neurosurgical Specialists
Cash Flows & Liquidity Forecast

| Week Ending >> | 27 12/7/2024 Actuals | 28 12/14/2024 Projected | 29 12/21/2024 Projected | 30 12/28/2024 Projected | 31 1/4/2025 Projected | 32 1/11/2025 Projected | 33 1/18/2025 Projected | 34 1/25/2025 Projected | 35 2/1/2025 Projected | 36 2/8/2025 Projected | 37 2/15/2025 Projected | Total - 12/8/24 to 2/15/25 Projected |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **HHSC KeyBank (x2646) - DEBTOR** | | | | | | | | | | | | |
| **Receipts** | | | | | | | | | | | | |
| Insurance receipts | - | - | - | - | - | - | - | - | - | - | - | - |
| Other medical receipts | - | - | - | - | - | - | - | - | - | - | - | - |
| Transfer from HHSC Wells Fargo - x7246 | - | 10,289 | - | 6,000 | - | 1,333 | - | - | 8,333 | - | 2,500 | 28,455 |
| Loan proceeds from ANS PA | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Receipts** | - | 10,289 | - | 6,000 | - | 1,333 | - | - | 8,333 | - | 2,500 | 28,446 |
| **Disbursements** | | | | | | | | | | | | |
| SG&A - IT | - | - | - | - | - | - | - | - | - | - | - | - |
| SG&A - Office expenses | - | (3,442) | - | (3,000) | - | - | - | - | (3,000) | - | - | (5,442) |
| SG&A - Regulatory | - | (4,000) | - | - | - | - | - | - | - | - | - | (4,000) |
| SG&A - Others | - | (2,122) | - | (3,000) | - | - | - | - | (4,000) | - | (2,500) | (11,623) |
| Vendor - Billing & Collections | - | - | - | - | - | - | - | - | - | - | - | - |
| Vendor - Medical records | - | (1,333) | - | - | - | (1,333) | - | - | (1,333) | - | - | (4,000) |
| Insurance/bank equipment | - | - | - | - | - | - | - | - | - | - | - | - |
| Others | - | - | - | - | - | - | - | - | - | - | - | - |
| **Operating Disbursements** | - | (10,898) | - | (6,000) | - | (1,333) | - | - | (8,333) | - | (2,500) | (25,065) |
| **Total Loan Payments to ANS PA** | - | - | - | - | - | - | - | - | - | - | - | - |
| **Professionals - Restructuring** | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Disbursements** | - | (10,898) | - | (6,000) | - | (1,333) | - | - | (8,333) | - | (2,500) | (25,064) |
| **Net Cash Flow** | (609) | - | - | - | - | - | - | - | - | - | - | (609) |
| **Beginning Cash Balance** | 609 | 609 | - | - | - | - | - | - | - | - | - | 609 |
| **Ending Bank Balance - HHSC KeyBank (x2646)** | - | - | - | - | - | - | - | - | - | - | - | - |
| **HHSC Wells Fargo (x7246) - DEBTOR** | | | | | | | | | | | | |
| **Receipts** | | | | | | | | | | | | |
| Insurance receipts | 57,904 | 6,583 | - | 6,302 | 375 | 1,333 | - | - | 9,008 | - | 2,938 | 26,537 |
| Others | 60,064 | 6,583 | - | 6,306 | 375 | 1,333 | - | - | 9,008 | - | 2,938 | 26,537 |
| **Total Receipts** | 60,064 | 6,583 | - | 6,306 | 375 | 1,333 | - | - | 9,008 | - | 2,938 | 26,537 |
| **Disbursements** | | | | | | | | | | | | |
| Vendor - Credit card processor | (225) | (275) | - | (300) | (375) | - | - | - | (300) | - | (250) | (850) |
| Bank Fees | (50,904) | - | - | - | - | - | - | - | (375) | - | (188) | (1,313) |
| SG&A - Rent | - | - | - | - | - | - | - | - | - | - | - | - |
| SG&A - Office Expenses | 629 | - | - | - | - | - | - | - | - | - | - | - |
| Others | 4,081 | - | - | - | - | - | - | - | - | - | - | - |
| **Operating Disbursements** | (51,126) | (275) | - | (300) | (375) | - | - | - | (675) | - | (438) | (2,163) |
| **Total Loan Payments to ANS** | - | - | - | - | - | - | - | - | - | - | - | - |
| Transfer to HHSC KeyBank - x2666 | - | (10,289) | - | (6,000) | - | (1,333) | - | - | (8,333) | - | (2,500) | (28,455) |
| **Net Transfers** | - | (10,289) | - | (6,000) | - | (1,333) | - | - | (8,333) | - | (2,500) | (28,455) |
| **Professionals - Restructuring** | (7,000) | - | - | - | - | - | - | - | - | - | - | (36,618) |
| **Total Disbursements** | (58,126) | (10,564) | - | (6,300) | (375) | (1,333) | - | - | (9,008) | - | (2,938) | (30,618) |
| **Net Cash Flow** | 1,926 | (4,081) | - | - | - | - | - | - | - | - | - | (4,081) |
| **Beginning Cash Balance** | 2,154 | 4,081 | - | - | - | - | - | - | - | - | - | 4,081 |
| **Ending Bank Balance - HHSC Wells Fargo (x7246)** | 4,081 | - | - | - | - | - | - | - | - | - | - | - |
| **Morristown IOM Wells Fargo (x8821) - NON DEBTOR** | | | | | | | | | | | | |
| **Ending Bank Balance - Morristown IOM Wells Fargo (x8821)** | 34,115 | 34,115 | 34,115 | 34,115 | 34,115 | 34,115 | 34,115 | 34,115 | 34,115 | 34,115 | 34,115 | 34,115 |
| **NJPC Peapack Gladstone (x8822) - NON DEBTOR** | | | | | | | | | | | | |
| **Ending Bank Balance - NJPC Peapack Gladstone (x8822)** | - | - | - | - | - | - | - | - | - | - | - | - |
| **Ending Bank Balance - All Accounts** | 3,913,266 | 3,874,213 | 3,299,623 | 3,244,174 | 3,699,921 | 3,675,743 | 3,652,023 | 3,646,674 | 2,999,976 | 2,982,661 | 3,071,380 | 3,071,380 |
| **Cash Summary** | | | | | | | | | | | | |
| Ending Bank Balance (ANS PA Operating) - DEBTOR | 1,271,023 | 1,040,316 | 756,526 | 710,277 | 556,024 | 541,866 | 518,126 | 666,877 | 466,078 | 449,704 | 537,482 | 537,482 |
| Ending Bank Balance (ANS PA Savings) - DEBTOR | 2,421,820 | 2,421,820 | 2,421,820 | 2,421,820 | 2,421,820 | 2,421,820 | 2,421,820 | 2,421,820 | 2,421,820 | 2,421,820 | 2,421,820 | 2,421,820 |
| Ending Bank Balance (ANS Newco Operating x5346) - DEBTOR | 58,157 | 58,157 | 58,157 | 58,157 | 58,157 | 58,157 | 58,157 | 58,157 | 58,157 | 58,157 | 58,157 | 58,157 |
| Ending Bank Balance (ANS Continuum MSO Operating - NON DEBTOR | 3,464 | 5,600 | 5,600 | 5,600 | 5,600 | 5,600 | 5,600 | 5,600 | 5,600 | 5,600 | 5,600 | 5,600 |
| Ending Bank Balance (ANS Founders Operating x5316) - NON DEBTOR | 5,934 | 87 | 87 | 87 | 87 | 87 | 87 | 87 | 87 | 87 | 87 | 87 |
| Ending Bank Balance (ANS Surgery - KeyBank) - DEBTOR | 609 | - | - | - | - | - | - | - | - | - | - | - |
| Ending Bank Balance (Hanover Hills Surgery - Wells Fargo) - DEBTOR | 4,081 | - | - | - | - | - | - | - | - | - | - | - |
| Ending Bank Balance (Morristown IOM - Wells Fargo) - NON DEBTOR | 14,749 | 14,749 | 14,749 | 14,749 | 14,749 | 14,749 | 14,749 | 14,749 | 14,749 | 14,749 | 14,749 | 14,749 |
| Ending Bank Balance (Morristown IOM - Wells Fargo) - NON DEBTOR | 34,115 | 34,115 | 34,115 | 34,115 | 34,115 | 34,115 | 34,115 | 34,115 | 34,115 | 34,115 | 34,115 | 34,115 |
| Ending Bank Balance (NJPC Peapack Gladstone) - NON DEBTOR | - | - | - | - | - | - | - | - | - | - | - | - |
| **Ending Bank Balance - All Accounts** | 3,913,266 | 3,874,213 | 3,299,623 | 3,244,174 | 3,699,921 | 3,675,743 | 3,652,023 | 3,646,674 | 2,999,976 | 2,982,661 | 3,071,380 | 3,071,380 |
| **Loan Summary - ANS PA to Hanover Hills Surgery Center** | | | | | | | | | | | | |
| Beginning Loan Balance - ANS to HHSC | 231,675 | 289,579 | 296,163 | 296,163 | 302,463 | 302,838 | 304,171 | 304,171 | 304,171 | 313,179 | 313,179 | 289,579 |
| Advances (+) | 57,904 | 6,583 | - | 6,300 | 375 | 1,333 | - | - | 9,008 | - | 2,938 | 26,537 |
| Payments (-) | - | - | - | - | - | - | - | - | - | - | - | - |
| **Ending Loan Balance - ANS to HHSC** | 289,579 | 296,163 | 296,163 | 302,463 | 302,838 | 304,171 | 304,171 | 304,171 | 313,179 | 313,179 | 316,117 | 316,117 |

**Atlantic Neurosurgical Specialists**
*Cash Flows & Liquidity Forecast*

**Notes:**

- "ANS Debtors" - Atlantic Neurosurgical Specialists P.A. & ANS Newco, LLC

- "HHSC Debtor" - Hanover Hills Surgery Center

- As referenced in the cash management motion, ANS Continuum Holdco LLC (Non Debtor)  the Management Services Organization acts as a pass through entity for the vast majority of ANS Debtor payments and is reflected as such in the liquidity projections

- US Trustee fees as projected in the attached liquidity projections are based on current budgeted disbursements and does not reflect any UST fees that may arise from shareholder settlements

- HHSC Debtor is estimated to borrow approximately $316k (HHSC DIP Loan) from the ANS Debtors to fund its operating and professional costs through February 15, 2025

- HHSC DIP Loan amounts reflected in liquidity projections show only Principal portion of the loan. Any accrued interest is not reflected in liquidity projections

- The liquidity projections for HHSC Debtor show transfers to HHSC Debtor's KeyBank account from HHSC Debtor's Wells Fargo account solely for projections purposes. The payments are intended to continue in ordinary course, as approved under cash management order, from bank accounts consistent with pre-petition operations

- Professional (Others) include non-restructuring consulting fees, legal expenses (OCPs) for ANS Debtors and consulting fees for investment banking advisor, individual contractors for HHSC Debtor

- Post-petition restructuring fees to counsel of HHSC Debtor are expected to be paid from sale proceeds of Hanover Hills Surgical Center and the respective amounts are not projected in the liquidity projections

- HHSC Debtor counsel is holding retainer balance of approximately $30k and amounts are not included in ending cash of the estate

- Professional Fees roll forward projects funding of a professional fees escrow for all ANS professionals, with disbursements to professionals subject to retention orders and case management procedures

- Lease payments for 60 Columbia Road location is not anticipated to be paid during the Chapter 11 process. Lease payments for Hanover Hills Surgery Center are projected to be paid through December 2024 and are not contemplated to be paid after December 2024

- HHSC Debtor is expected to pay ambulatory assessments to State of NJ for Q3, Q4 2024 and amounts are NOT reflected in liquidity projections. Assessments are projected to be paid from sale proceeds of Surgical Center

- HHSC Debtor is not expected to collect any A/R and as such, amounts are not projected in the liquidity projections

- The majority of projected receipts are related to state and federal Independent Dispute Resolution (IDR) processes. The timing of such are uncertain and will likely exhibit more fluctuations than projected on a week to week basis during the pendency of the case

- Week ending 2/15/25 - Others receipts includes partial professional fees retainer refunds at the end of the projection period

- Week of 6/8/2024 - ANS PA Operating Account (x2526) does not reflect certain voided and/or reversed transactions that netted to $0 within the same week

- Debtors and Non-debtors are in process of putting stop payments on the outstanding checks

Atlantic Neurosurgical Specialists
Professional Fees Roll Forward

| Week Ending >> | 6/8/2024 (1) Actuals | 6/15/2024 (2) Actuals | 6/22/2024 (3) Actuals | 6/29/2024 (4) Actuals | 7/6/2024 (5) Actuals | 7/13/2024 (6) Actuals | 7/20/2024 (7) Actuals | 7/27/2024 (8) Actuals | 8/3/2024 (9) Actuals | 8/10/2024 (10) Actuals | 8/17/2024 (11) Actuals | 8/24/2024 (12) Actuals | 8/31/2024 (13) Actuals | 9/7/2024 (14) Actuals | 9/14/2024 (15) Actuals | 9/21/2024 (16) Actuals | 9/28/2024 (17) Actuals | 10/5/2024 (18) Actuals | 10/12/2024 (19) Actuals | 10/19/2024 (20) Actuals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Incurred Fees** | | | | | | | | | | | | | | | | | | | | |
| Debtor Counsel | | | | | | | | | 77,415 | | | | 58,031 | | | | 80,947 | | | |
| Debtor CRO/FA | | | | | | | | | 104,575 | | | | 104,911 | | | | 75,221 | | | |
| Debtor Special Counsel | | | | | | | | | 6,566 | | | | 6,373 | | | | 19,960 | | | |
| Claims/Noticing Agent | | | | | | | | | 50,593 | | | | 43,547 | | | | 19,631 | | | |
| Committee - Professionals | | | | | | | | | 74,503 | 45,467 | 10,000 | 10,000 | 10,000 | 23,233 | 10,000 | 10,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| Counsel - Surgical Center | | | | | | | | | | | | | | | | | | | | |
| US Trustee | | | | | | | | | | | | | | | | | | | | 43,547 |
| **Total Incurred Fees** | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 312,654 | $ 45,467 | $ 10,000 | $ 10,000 | $ 263,762 | $ 23,233 | $ 10,000 | $ 10,000 | $ 200,889 | $ 5,000 | $ 5,000 | $ 5,000 |
| | | | | | | | | | | | | | | | | | | | | |
| **Paid Fees (excluding retainer)** | | | | | | | | | | | | | | | | | | | | |
| Debtor Counsel | | | | | | | | | | | | | | | | | | | | |
| Debtor CRO/FA | | | | | | | | | | | | | | | | | | | | |
| Debtor Special Counsel | | | | | | | | | | | | | | 100,773 | | | | | | 43,547 |
| Claims/Noticing Agent | | | | | | 41,748 | | | | | | | | | | | | | | |
| Committee - Professionals | | | | | | | | | | | | | | | | | | | | |
| Counsel - Surgical Center | | | | | | | | | | | | | | | | | | | | |
| US Trustee | | | | | | | | | 500 | | | | | | | | | | | |
| **Total Paid Fees** | $ - | $ - | $ - | $ - | $ - | $ 41,748 | $ - | $ - | $ 500 | $ - | $ - | $ - | $ - | $ 100,773 | $ - | $ - | $ - | $ - | $ - | $ 43,547 |
| | | | | | | | | | | | | | | | | | | | | |
| **Incurred, Unpaid Fees** | | | | | | | | | | | | | | | | | | | | |
| Debtor Counsel | | | | 57,222 | 57,222 | 57,222 | 57,222 | 57,222 | 134,637 | 134,637 | 134,637 | 134,637 | 233,568 | 233,568 | 233,568 | 233,568 | 314,515 | 314,515 | 314,515 | 314,515 |
| Debtor CRO/FA | | | | 106,876 | 106,876 | 106,876 | 106,876 | 106,876 | 211,451 | 211,451 | 211,451 | 211,451 | 316,362 | 316,362 | 316,362 | 316,362 | 393,583 | 393,583 | 393,583 | 393,583 |
| Debtor Special Counsel | | | | 17,718 | 17,718 | 17,718 | 17,718 | 17,718 | 22,286 | 22,286 | 22,286 | 22,286 | 29,659 | 29,659 | 29,659 | 29,659 | 49,549 | 49,549 | 49,549 | 49,549 |
| Claims/Noticing Agent | | | | 50,180 | 50,180 | 50,180 | 50,180 | 50,180 | 100,773 | 100,773 | 100,773 | 100,773 | 144,319 | 144,319 | 43,546 | 43,546 | 63,378 | 63,378 | 63,378 | 63,378 |
| Committee - Professionals | | | | | | | | | 74,503 | 120,000 | 130,000 | 140,000 | 150,000 | 150,000 | 183,233 | 183,233 | 203,233 | 203,233 | 208,233 | 213,233 |
| Counsel - Surgical Center | | | | | | | | | | | | | | | | | | | | |
| US Trustee | | | | | 500 | 500 | | | | | | | | | | | | | | |
| **Total Incurred, Unpaid Fees** | $ - | $ - | $ - | $ 233,996 | $ 234,496 | $ 234,496 | $ 234,496 | $ 234,496 | $ 548,649 | $ 593,146 | $ 602,146 | $ 612,146 | $ 875,908 | $ 895,140 | $ 808,367 | $ 818,367 | $ 1,019,257 | $ 1,024,257 | $ 1,029,257 | $ 990,710 |

Atlantic Neurosurgical Specialists
Case # 24-15726, 24-15727, 24-16995
Cash Flows & Liquidity Forecast

**Atlantic Neurosurgical Specialists**
*Professional Fees Roll Forward*

| Week Ending >> | 21 10/29/2024 Actuals | 22 11/12/2024 Actuals | 23 11/19/2024 Estimated | 24 11/16/2024 Estimated | 25 11/23/2024 Estimated | 26 11/30/2024 Estimated | 27 12/7/2024 Estimated | 28 12/14/2024 Projected | 29 12/21/2024 Projected | 30 12/28/2024 Projected | 31 1/4/2025 Projected | 32 1/11/2025 Projected | 33 1/18/2025 Projected | 34 1/25/2025 Projected | 35 2/1/2025 Projected | 36 2/8/2025 Projected | 37 2/15/2025 Projected | Total 6/10/2024 to 2/15/2025 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Incurred Fees** | | | | | | | | | | | | | | | | | | |
| Debtor Counsel | | 57,379 | 10,000 | 10,000 | 10,000 | 10,000 | 5,000 | 3,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 5,000 | 5,000 | 487,893 |
| Debtor CRO/FA | | 52,577 | 15,000 | 15,000 | 10,000 | 15,000 | 15,000 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 10,000 | 10,000 | 10,000 | 12,500 | 12,500 | 641,160 |
| Debtor Special Counsel | | 10,825 | 1,000 | 1,000 | 1,000 | 1,000 | 500 | 500 | 500 | 500 | 875 | 250 | 250 | 250 | 250 | 250 | 250 | 68,549 |
| Claims/Noticing Agent | 5,000 | 29,404 | 7,500 | 7,500 | 7,500 | 7,500 | 6,000 | 21,000 | 6,000 | 6,000 | 6,000 | 5,000 | 20,000 | 5,000 | 5,000 | | | 318,955 |
| Committee - Professionals | | 5,000 | 5,000 | 5,000 | 6,768 | 5,000 | 5,000 | 10,000 | 15,000 | 15,000 | 100,000 | | | | | | | 300,000 |
| Counsel - Surgical Center | | | | | | | | 200,000 | | | | | | | | | | 41,748 |
| US Trustee | 8,849 | | | | | | | | | | | | | | | | | 50,165 |
| **Total Incurred Fees** | 13,849 | 194,584 | 38,500 | 38,500 | 40,268 | 38,500 | 31,500 | 47,500 | 36,500 | 39,000 | 12,963 | 20,250 | 32,750 | 17,750 | 17,750 | 28,250 | 27,963 | 1,908,469 |
| | | | | | | | | | | | | | | | | | | |
| **Paid Fees (excluding retainer)** | | | | | | | | | | | | | | | | | | |
| Debtor Counsel | | | 421,883 | 431,883 | 441,883 | 138,674 | 143,674 | 146,974 | | | | | | | | | | 487,893 |
| Debtor CRO/FA | | | 401,160 | 367,284 | 382,284 | 112,577 | 127,577 | 140,077 | | | | | | | | | | 641,160 |
| Debtor Special Counsel | | | 61,174 | 62,174 | 63,174 | 64,174 | 64,674 | 65,174 | | | | | | | | | | 68,549 |
| Claims/Noticing Agent | | | 56,725 | 64,225 | 71,736 | 79,226 | 85,831 | 78,831 | | | | | | | | | | 318,555 |
| Committee - Professionals | | | 228,233 | 233,233 | 240,000 | 245,000 | 250,000 | 200,000 | | | | | | | | | | 300,000 |
| Counsel - Surgical Center | | | | 108,876 | | | | | | | | | | | | | | 41,748 |
| US Trustee | 8,849 | | | | | | | | | | | | | | | | | 50,165 |
| **Total Paid Fees** | 8,849 | | | 108,876 | | 588,126 | 29,404 | 629,056 | 31,500 | 26,000 | 134,738 | 20,250 | 32,750 | 17,750 | 17,750 | 25,250 | 53,263 | 1,908,070 |
| | | | | | | | | | | | | | | | | | | |
| **Incurred, Unpaid Fees** | | | | | | | | | | | | | | | | | | |
| Debtor Counsel | 314,515 | 411,893 | 421,883 | 431,883 | 441,883 | 138,674 | 143,674 | 146,974 | | | | | | | 5,000 | 5,000 | 5,000 | |
| Debtor CRO/FA | 393,583 | 446,160 | 401,160 | 367,284 | 382,284 | 112,577 | 127,577 | 140,077 | 12,500 | 15,000 | 12,500 | 12,500 | 10,000 | 10,000 | 10,000 | 12,500 | 12,500 | |
| Debtor Special Counsel | 48,549 | 60,174 | 61,174 | 62,174 | 63,174 | 64,174 | 64,674 | 65,174 | 500 | 500 | 875 | 250 | 250 | 250 | 250 | 250 | 250 | |
| Claims/Noticing Agent | 19,831 | 49,225 | 56,725 | 64,225 | 71,736 | 79,226 | 85,831 | 78,831 | 6,000 | 6,000 | 6,000 | 5,000 | 20,000 | 5,000 | 5,000 | | | |
| Committee - Professionals | 218,233 | 223,233 | 228,233 | 233,233 | 240,000 | 245,000 | 250,000 | 200,000 | 75,000 | 90,000 | 100,000 | | | | | | | |
| Counsel - Surgical Center | | | | | | | | 60,000 | | | | | | | | | | |
| US Trustee | | | | | | | | | | | | | | | | | | |
| **Total Incurred, Unpaid Fees** | 995,710 | 1,190,894 | 1,226,194 | 1,156,818 | 1,195,088 | 639,466 | 641,556 | 66,000 | 75,000 | 90,000 | 90,000 | | | | | | | |